## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

United States of America ex rel.                    )
                                                    )
LATHIERIAL BOYD #B10106                             )
(Full name and prison number)                       )
(Include name under which convicted)                )        08CV4257
                                                    )        JUDGE GETTLEMAN
PETITIONER                                          )        MAG. JUDGE KEYS
                                                    )
                                                    )
JOSEPH V. MATHY, WARDEN                             )        RECEIVED
                                                    )
(Warden, Superintendent, or authorized             )        JUL 25 2008
person having custody of petitioner)                )        MICHAEL W. DOBBINS
                                                    )        CLERK, U.S. DISTRICT COURT
RESPONDENT, and                                     )
                                                    )
**(Fill in the following blank only if judgment     )
attacked imposes a sentence to commence            )
in the future)**                                    )
                                                    )
ATTORNEY GENERAL OF THE STATE OF                    )        Case Number of State Court Conviction:
                                                    )
COOK COUNTY                                         )        90 CR 8602
(State where judgment entered)                      )

### PETITION FOR WRIT OF HABEAS CORPUS – PERSON IN STATE CUSTODY

1.  Name and location of court where conviction entered: COOK COUNTY CIRCUIT COURT 2650 S. CALIFORNIA AVE. CHICAGO, IL 60608

2.  Date of judgment of conviction: 12-10-90

3.  Offense(s) of which petitioner was convicted (list all counts with indictment numbers, if known)
    MURDER # 90CR086201  2 COUNTS  ATT MURDER 4 COUNTS, AGG BATTERY 13 COUNTS

4.  Sentence(s) imposed: 82 YEARS

5.  What was your plea? (Check one)    (A)  Not guilty    (✓)
                                        (B)  Guilty        (  )
                                        (C)  Nolo contendere (  )

If you pleaded guilty to one count or indictment and not guilty to another count or indictment, give details:

_____

Revised: 7/20/05

**PART I – TRIAL AND DIRECT REVIEW**

1. Kind of trial: (Check one):  Jury ( )  Judge only (✓)

2. Did you testify at trial?  YES ( )  NO  (✓)

3. Did you appeal from the conviction or the sentence imposed? YES (✓) NO ( )

   (A)  If you appealed, give the

   (1)  Name of court:  SHELVIN SINGER

   (2)  Result:  DENIED

   (3)  Date of ruling:  3-24-93

   (4)  Issues raised:  IDENTIFICATION, PERJURED TESTIMONY, COERCED
   VICTIM TO ID ME, DISREGARD/IGNORED ALIBI WITNESS
   OF 14YR COOK COUNTY SHERIFF, VICTIM SAID HE DID NOT KNOW WHO SHOT

   (B)  If you did not appeal, explain briefly why not:  NOT PROVEN GUILTY BEYOND  HIM.
   A REASONABLE DOUBT.

4. Did you appeal, or seek leave to appeal, to the highest state court?  YES ( )    NO (✓)

   (A)  If yes, give the

   (1)  Result:

   (2)  Date of ruling:

   (3)  Issues raised:

   (B)  If no, why not:  TRIAL ATTORNEYS ADVICE.

5. Did you petition the United States Supreme Court for a writ of *certiorari*?  Yes ( )  No (✓)

   If yes, give (A) date of petition: _____  (B) date *certiorari* was denied:  _____

Revised: 7/20/05

## PART II – COLLATERAL PROCEEDINGS

1. With respect to this conviction or sentence, have you filed a post-conviction petition in state court?

   YES (✓)   NO ( )

   With respect to *each* post-conviction petition give the following information (use additional sheets if necessary):

   A. Name of court: SHELVIN SINGER , JAMES EGAN

   B. Date of filing: 8-3-93 , _____ 3-6-02

   C. Issues raised: INEFFECTIVE ASSISTANCE , BRADY VIOLATION

   _____

   _____

   D. Did you receive an evidentiary hearing on your petition?    YES (✓)   NO ( )

   E. What was the court's ruling? DENIED , DENIED

   F. Date of court's ruling: 10-12-94 , 9-15-04

   G. Did you appeal from the ruling on your petition?    YES (✓)   NO ( )

   H. (a)   If yes, (1) what was the result? DENIED , DENIED

              (2) date of decision: 1-31-96 , 5-12-06

       (b)   If no, explain briefly why not: _____

   I. Did you appeal, or seek leave to appeal this decision to the highest state court?

   YES (✓)   NO ( )

       (a)   If yes, (1) what was the result? DENIED , DENIED

              (2) date of decision: 6-5-96 , 9-27-06

       (b)   If no, explain briefly why not: _____

Revised: 7/20/05

2. With respect to this conviction or sentence, have you filed a petition in a **state court** using any other form of post-conviction procedure, such as *coram nobis* or habeas corpus?     YES (  )        NO (✓)

    A. If yes, give the following information with respect to each proceeding (use separate sheets if necessary):

        1.    Nature of proceeding    _____

        2.    Date petition filed    _____

        3.    Ruling on the petition    _____

        4.    Date of ruling    _____

        5.    If you appealed, what was
            the ruling on appeal?    _____

        6.    Date of ruling on appeal    _____

        7.    If there was a further appeal,
            what was the ruling ?    _____

        8.    Date of ruling on appeal    _____

3. With respect to this conviction or sentence, have you filed a previous petition for habeas corpus in **federal court**?   YES (  )   NO (✓)

    A. If yes, give name of court, case title and case number: _____

_____

    B. Did the court rule on your petition?  If so, state

        (1) Ruling:    _____

        (2)    Date:    _____

4. With respect to this conviction or sentence, are there legal proceedings pending in any court, other than this petition?     YES (  )        NO (✓)

    If yes, explain: _____

_____

Revised: 7/20/05

## PART III – PETITIONER'S CLAIMS

1.    State briefly every ground on which you claim that you are being held unlawfully.  Summarize briefly the facts supporting each ground.  You may attach additional pages stating additional grounds and supporting facts.  If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds later.

**BEFORE PROCEEDING IN THE FEDERAL COURT, YOU MUST ORDINARILY FIRST EXHAUST YOUR STATE COURT REMEDIES WITH RESPECT TO EACH GROUND FOR RELIEF ASSERTED.**

(A)   Ground one BRADY VIOLATION, TRIAL COURT APPLIED WRONG MATERIALITY STANDARD
Supporting facts (tell your story briefly without citing cases or law):

EYEWITNESS GAVE DETAILED DESCRIPTION OF SHOOTER AND TOLD POLICE AFTER VIEWING LINE-UP I WAS ABSOLUTLEY NOT THE MAN SHE SAW COMMIT SHOOTING - POLICE NEVER PUT THIS IN THEIR REPORT.  9 EYEWITNESSES EXCLUDED ME AS THE SHOOTER FROM LINE-UP. 3 WEEKS AFTER CRIME VICTIM TOLD DET. HE NEVER SAW SHOOTER; DET. AND R.N. CONFIRMED HIS STATEMENT AT TRIAL. MY ALIBI WITNESS WAS 11 YR COOK COUNTY SHERIFF. VICTIM TOLD HIS BROTHER HE LIED SAYING I SHOT HIM. 14th AMEND VIOLATION.

(B)   Ground two MISCARRIAGE OF JUSTICE AND ACTUAL INNOCENCE/FUNDAMENTAL FAIRNESS
Supporting facts:

DET. ZULEY COERCED VICTIM INTO SAYING I SHOT HIM. DET. ZULEY LIED SAYING MY ATTY WAS PRESENT FOR LINE-UP. COMPOSITE DESCRIPTION OF 9 3FT AWAY EYEWITNESSES DOES NOT FIT ME. ON SCENE DET. KOWLASKI SAID MS. BONANNO WAS SOBER AT TIME OF SHOOTING AS DID WITNESS WARD. DET. ZULEY LIED SAYING BONANNO SAID PRIOR TO VIEWING LINE-UP SHE WAS DRUNK. ATTY ALLEN CONFIRMS ZULEY IS CORRUPT VIA ILLEGAL SEARCHES, AND THE(A) GROUNDS.

Revised: 7/20/05

(C) Ground three **DISREGARD OF KEY EVIDENCE, RECORDS AND TESTIMONY BY**
Supporting facts:

CIRCUIT COURT JUDGE EGAN, IL APPELLET Ct. AND IL SUPREME COURT JUDGES. ALL IGNORED KEY EVIDENCE, RECORDS, AFFIDAVITS, TESTIMONY AND REFUSED TO MAKE CREDIBILITY DETERMINATIONS AND/OR MADE CREDIBILITY DETERMINATIONS 100% CONTRARY TO THE RECORDS, FACTS, EVIDENCE AND THE STATES OWN WITNESSES WHO PROVED I'M INNOCENT. BULLET WOUND SHOWS VICTIM WAS SHOT FROM BEHIND, FOUND FACE DOWN UNCONSCIOUS BY CFD#6, ABUSE OF POWER.

(D) Ground four **TRIAL ATTY WAS INEFFECTIVE AND 1998 PC ATTY BRENT STRATTON**
Supporting facts:

BOTH HAD THE POLICE REPORTS WITH COMPOSITE DESCRIPTION WITNESSES GAVE OF SHOOTER AND THEIR STATEMENTS YET DID NOT PRESENT ABOVE TO COURTS NOR CALLED WITNESSES TO TESTIFY. FAILED TO ELICIT FULL ALIBI. FAILED TO PRESENT POLICE REPORTS OF TRUE MOTIVE OF VICTIMS SELLING FAKE COCAINE ON JAMAICANS DRUG AND GANG TURF. EVIDENCE YURI "CHEESY" SMITH WAS THE SHOOTER. SEE ATTACHED EXHIBITS WHICH CLEARLY PROVE MY COMPLETE INNOCENCE, 5TH, 6TH AMEND. AND 14TH AMEND VIOLATIONS, MICARRIAGE OF JUSTICE AND ACTUAL INNOCENCE.

2. Have all grounds raised in this petition been presented to the highest court having jurisdiction?

   YES (✓)  NO ( )

3. If you answered "NO" to question (2), state briefly what grounds were not so presented and why not:

_____

_____

(D) CONT. : PETITIONER'S 2002 SUCCESSOR PETITION FOR BRADY VIOLATIONS ADVISED PETITIONER IN NOVEMBER 2006 AFTER HIS PLA TO IL SUP Ct. WAS DENIED THAT HIS 1990 AND 1994 ATTORNEYS WERE INEFFECTIVE FOR NOT PRESENTING TO EITHER COURT THE POLICE COMPOSITE DESCRIPTION, STATEMENTS OF THE EYEWITNESSES EXORNERATING PETITIONER NOR INTERVIEWING THEM WHICH MAKE THEM INEFFECTIVE - VIOLATION OF MY RIGHTS. YET PETITIONERS 2002-2008 6 ATTORNEYS ADVISED HIM IT WOULD BE A VALID CLAIM ON FEDERAL HABE BUT NOT TO PERSUE IT, INSTEAD FILE A CLEMENCY. THUS PETITIONER TOOK THEIR EXPERT ADVICE. BUT NOW REALIZES THEIR ADVICE WAS INEFFECTIVE AND BEGS THIS COURT TO REVERSE CONVICTION ON EVIDENCE

Revised: 7/20/05

## PART IV – REPRESENTATION

Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(A) At preliminary hearing ROBERT SCHROEDER, OAK PARK, IL

(B) At arraignment and plea

(C) At trial ROBERT SCHROEDER, EMORY TATE  708.848.2904

(D) At sentencing SAME

(E) On appeal SAME

(F) In any post-conviction proceeding PAT BRONTE, JENNER+BLOCK 330 N. WABASH

(G) Other (state): CHICAGO, IL 60611 312.222.9350 PROF. LARRY
MARSHALL NW UNIV. LAW SCHOOL 357 E. CHICAGO AVE., CHICAGO, IL 60611

## PART V – FUTURE SENTENCE

Do you have any future sentence to serve following the sentence imposed by this conviction?

YES ( )   NO ( ✓ )

Name and location of the court which imposed the sentence: SHELVIN SINGER, COOK COUNTY 26th + CALIF CH. IL 60608

Date and length of sentence to be served in the future  23 YEARS, 82 YEARS 50% 18 SERVED

WHEREFORE, petitioner prays that the court grant petitioner all relief to which he may be entitled in this proceeding.

Signed on: 7-14 - 2008
　　　　　　(Date)

_____
Signature of attorney (if any)

**I declare under penalty of perjury that the foregoing is true and correct.**

Xathirial Boyd
(Signature of petitioner)

B10106
(I.D. Number)

Box 99  PONTIAC, IL 61764
(Address)

Revised: 7/20/05

● PETITIONER, LATHIERIAL BOYD, REQUEST WITH HIS MOST POWERFUL EVIDENCE ACTUAL INNOCENCE AND MISCARRIAGE OF JUSTICE, ASK THIS COURT TO CONSIDER THE ABOVE AND NEWLY DISCOVERED EVIDENCE OF POLICE REPORTS OF MITIGATING FACTORS THAT 9 EYEWITNESSES INCLUDING JENNIFER BONANNO SEE EXH. #2, EXH.9 COMPOSITE DESCRIPTION AND STATEMENTS OF THE SHOOTER WHICH EXCLUDE AND EXONORATE PETITIONER. WERE NOT DISCLOSED TO PETITIONER TIL YEARS AFTER TRIAL AND PC. BONANNO WAS DISCOVERED IN 04.

ALSO SEE EXH. 5 LINE-UP EXCLUDING PETITIONER. JUDGE SINGER RULED THE VICTIM SAID HE DID NOT KNOW WHO SHOT HIM AS WELL AS DET. SODOLEWSKI SEE EXH. 18. SINGER FURTHER STATES NO ONE ID'd PETITIONER AS THE OFFENDER NOR SAW A GUN IN PETITIONERS HAND. SEE EXH. 8.

PETITIONER, REQUEST, BECAUSE HE'S INNOCENT WITH NO EXTENUATING OR MITIGATING FACTORS TO JUSTIFY 55 YRS FOR MURDER AND 27 FOR ATTEMPT TO RUN CONSECUTIVE TO THE 55, THAT HE BE GIVEN 20 YEARS FOR THE MURDER AND 6 YEARS FOR THE ATTEMPT TO RUN CURRENT/REDUCED TO TIME SERVED AND ORDERED RELEASED IMMEDIATELY. PETITIONER HAS ALREADY SERVED 18 YRS 4 MO. INNOCENT OF ALL CHARGES. SEE EXH. #4    ALIBI OF 11 YR COOK COUNTY SHERIFF. SEE EXH. 17 LETTERS OF SUPPORT OF RELEASE. SEE EXH. #3 JAMES FLEMING. ~~———————————~~ ~~———~~. PETITIONER'S CRIMINAL HISTORY RECORD CONSIST OF MISDEMEANOURS AS A TEENAGER - SEE EXH. 1B.

(E) GROUND FIVE, FUNDAMENTAL FAIRNESS, ACTUAL INNOCENCE AND A MISCARRIAGE OF JUSTICE ALLOWS CITING CASES AND LAW

SUPPORTING FACTS:

SCHLUP v. DELO, 513 U.S. 298(1995) AND HOUSE V. BELL, 126 S.ct 2064 (U.S. 2006) ALLOW HABEAS CLAIMS HEARD ON ITS MERITS WHEN OTHERWISE BARRED PROCEDURALLY PETITIONER IS ASSERTING ACTUAL INNOCENCE AS A GATEWAY TO DEFAULTED CLAIMS TO "ESTABLISH THAT, IN LIGHT OF NEW EVIDENCE, NO REASONABLE JUROR WOULD HAVE FOUND PETITIONER GUILTY BEYOND A REASONABLE DOUBT." THE NEW RELIABLE TRUSTWORTHY EYEWITNESS EXCULPATORY EYEWITNESS ACCOUNTS/EVIDENCE OF JENNIFER BONANNO, 8 OTHER EYEWITNESSES STATEMENTS, COMPOSITE DESCRIPTION OF THE SHOOTER AND TELLING POLICE AFTER VIEWING LINE-UP PETITIONER WAS NOT THE SHOOTER WAS NEVER PRESENTED AT TRIAL BY TRIAL ATTORNEY OR POST-CONVICTION ATTORNEY CONSTITUTE NEWLY DISCOVERED EVIDENCE BECAUSE THE STATE WITHHELD THIS EVIDENCE OF MS. BONANNO AND TRIAL AND PC ATTORNEYS WERE INEFFECTIVE BECAUSE THEY FAILED TO GO OUT AND LOCATE AND INTERVIEW THESE WITNESSES WHO HAD EXCULPATORY EVIDENCE, EVEN THOUGH THESE WITNESSES NAMES WERE AVAILABLE IN THE POLICE REPORTS AND DISCOVERY REQUEST. SEE SULLIVAN V. FAIRMAN, 819 F.2d 1382 (7th Cir.1987).

PEOPLE V. BURROWS, 172 Ill. 2d 169, 181(1996).

REGARDING JENNIFER BONANNO, SEE BRADY V. MARYLAND. PEOPLE V. JOHNSON, 272 Ill. App. 3d 479(1995) IDENTICAL ISSUES TO PETITIONERS BEFORE JUDGE EGAN; WAS REVERSED AND NEW TRIAL ORDERED BY IL APPELLATE CT. NO.1-00-3795 5-8-02. See PEOPLE V. ORTIZ, 196 Ill. 2d 236, 259, 267(2001) ADVERSE CREDIBILITY DETERMI-NATIONS MUST BE VACATED WHEN CONTRARY TO WEIGH OF EVIDENCE See PEOPLE V. GUNBULLUS, 72 Ill. App. 3d 440, 442 2d part (1979)

THE STATE COURT MADE CREDIBILITY DETERMINATIONS, INFRENCES, FACTUAL FINDINGS THAT WERE MANIFESTLY ERRONEOUS, IGNORED KEY EVIDENCE, RECORDS, AFFIDAVIT OF ATTORNE ROBERT SCHRODER, JAMES FLEMING, HAROLD CASEY (ALIBI WITNESS/COOK COUNTY SHERIFF). THE TESTIMONY OF DET. KOWALSKI, TASHYRA WARD. SEE PEOPLE V. ROOS, 181 Ill. APP. 3d 682 (5th DIST. 1989), PEOPLE V. MOLSTAD, 101 Ill. 2d 128 (1984).

FLOYD V. FLORIDA, NO. SC 03-865, 2005 WL 673639 (Fla. Mar. 24, 2005 GRAVES V. DRETKE, 442 F. 3d 334 (5th Cir. 2006) A WRIT OF HABEAS SHALL BE GRANTED BECAUSE THE ADJUDICATION OF THE CLAIM (1) RESULTED IN A DECISION THAT WAS CONTRARY TO AND INVOLVED AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW, AS DETERMINED BY THE SUPREME Ct. OF THE U.S. (2) RESULTED IN A DECISION THAT WAS BASED ON UNREASONABLE DETERMINATIONS OF THE FACTS IN LIGHT OF THE CLEAR AND CONVINCING EVIDENCE PRESENTED IN THE STATE COURT PROCEEDING(S). SEE PEOPLE V. ORTIZ, 196 Ill. 2d 236, 259, 267 (2001). REVIEWING COURT MUST DECIDE CASES ON PROOF IN THE RECORD PEOPLE V. DAVIS, 278 Ill. APP. 3d 532, 544 (1st DIST. 1996).

ALL EVIDENCE PROVED MS. BONANNO WAS NOT DRUNK. DET. ZULEY SAID SHE SAID SHE WAS. DET. ZULEY SAID MY ATTORNEY WAS PRESENT FOR THE LINE-UP, DET. ZULEY COERCED RICKY WARNER INTO SAYING I SHOT HIM A DAY AFTER WARNER TOLD DET. SOBOLEWSKI HE NEVER SAW THE SHOOTER, DET. ZULEY CONDUCTED WARRANTLESS SEARCHES ON MY RELETIVES HOMES. SEE AFFIDAVITS OF ATTORNEYS ALLEN AND SCHROEDER, LINE-UP, JAMES FLEMING'S PEOPLE V. HOBLEY, 182 Ill. 2d 404, 433 (1998), KYLES V. WHITLEY, 514 U.S. 419, 434 (1995) CLEAN-CUT PATTERN OF PERJURY AND CORRUPTION-SEE NAPUE V. PEOPLE, 79 S.Ct. 1330 (1959).

EXH. 1

WGN NEWS TV BROADCASTS IN THEIR EFFORTS TO PROVE IM INNOCENT AND FREE ME.



## "Reasonable Doubt"
### Broadcast Wednesday, 6 February 2002

Reporter: Muriel Clair  •  Producer: Jason Jedlinski  •  Editor: Theodore Parra

Back in 1985, Lathierial Boyd was a hot young model gracing the pages of the Tribune's Style section. His future looked promising -- until the day he was arrested and accused of murder.

Today, Boyd is relegated to life as a model prisoner -- having been convicted of a double-murder in 1990.

Lathierial Boyd has spent every day of the last twelve years behind bars proclaiming his innocence. He's written thousands of letters, trying to get somebody to help him prove he's not a killer.

Our exhaustive review of police reports and court files raised *"Reasonable Doubt."* The more digging we did, the more questions we had, about the evidence -- or lack of evidence -- that landed Boyd behind bars.

During the course of our investigation, we turned up an eyewitness who never testified in court. An eyewitness who says she told detectives -- twelve years ago -- they had the wrong man.

It was February 24th, 1990. Two in the morning, and the bars along North Clark Street were letting out. Hundreds crowded the sidewalks near Wrigley Field. Suddenly, gunshots. In an instant, 19-year-old Michael Fleming was dead. His cousin, 22-year-old Ricky Warner: paralyzed from the neck down. Three bystanders were hit.

Police arrived within two minutes, and rounded up a dozen eyewitnesses. They were college students, sailors, and teenagers... including Jennifer Bonnano; one of several people who saw the shooter. "Being 19, you're still kind of innocent and not used to seeing that kind of violence," she says. "For the first time, somebody is evil. You don't forget what they look like very easily."

We asked Bonnano what she remembers about the shooter. She said, "He was only 5'9", 5'10" maybe. He was not a very big man in any way, shape or form. Very, very dark complected. I believe he had a small mustache."

But the man detectives arrested was 6'2", light skinned, and clean-shaven. Prosecutors described Lathierial Boyd as an "Uzi-wielding attacker," who was out to settle a drug debt. After a bench trial, Judge Shelvin Singer found Boyd guilty of first-degree murder, sentencing him to more than eighty years in prison.

"Have you ever killed anybody?"
"No, no, no," Boyd replied.
"And yet you sit in here accused of killing somebody."
"I know in my heart that it's only by the grace of God that I've made it thus far. It's a living nightmare being in here when you know you don't belong in here."

Before prison, Lathierial Boyd had a promising career as a fashion model. He was 24 years old when he was arrested. Today, he is 36. His daughters, Camille and Olivia have grown up without him. For the last decade, Boyd has spent all but twelve hours a week locked in his cell at Stateville prison.

"There was no physical evidence linking you to the crime? There was no gun with your handprints?"
"No, absolutely nothing," Boyd says.
"And you were many miles from the scene?"
"I believe 22 miles to be exact."

The night of the shooting, Boyd says he was in Ford City, eating pizza and watching basketball with his sister and her boyfriend - a corrections officer at the Cook County Jail. The boyfriend signed an affidavit, swearing he used the bathroom in the middle of the night, and saw Boyd asleep in the guest bedroom.

When Boyd learned detectives were looking to question him about a murder, he came to what's now Area Three police headquarters, at Belmont and Western. Not with an attorney, but with his parents and siblings.

"I asked them to place me in a lineup, so they'd see they had the wrong person," Boyd says.
"Why were you convinced that they would see they had the wrong person by putting you in a lineup?"
"Because when you know you haven't done anything, you know you weren't there, there's no way. How can anybody pick you out of a lineup as the offender, the shooter, the killer?"

Police put Boyd in a lineup. Nine eyewitnesses looked him in the eye, and not one picked him out as the shooter.

Jennifer Bonnano was one of the witnesses. She says, "I was pretty clear with the officer, 'I cannot pick anyone out of this lineup.' "

We asked Bonnano, "Is this the man that you saw pull a gun out of his coat and shoot??"
Her reply? "No ma'am."

"They knew I didn't commit this crime," Boyd says. "I believe they knew. And I believe they just wanted to close the case. Just to get it over with."

Jennifer Bonnano agrees. She says police knew Boyd was not the killer. Why? Because Bonnano says she specifically told police they had the wrong man.

"I remember very vividly looking at him in the lineup that day and going 'nuh-uh.' And I told the police that," Bonnano says. "I asked the officer, I asked him who they had thought had done it, and who they were looking for us to pick. And I remember the gentlemen that he picked, he was standing on the end of the line, a lot taller than the guy that I saw with the gun. Very much so lighter complected, no ifs, ands, or doubts about it. They just didn't even look alike at all."

But what Bonnano says she told detectives, that Boyd looked nothing like the killer, never made it into the official police reports. And Bonnano was never called to testify.

We asked Boyd, "Why you? Why were you so convenient to them?"
"My name came about from past involvement in drugs, unfortunately," he says.

Boyd had a minor police record, but had never been to prison. He acknowledges, with remorse, he was once a small-time drug dealer. One of his customers was one of the victims, Ricky Warner. It was Warner's father who pointed detectives to Lathierial Boyd. Herbert Warner told police: Boyd threatened his family over Ricky's drug debt.

"He had come to my house, threatened to take me, to take me and my wife and kids and Ricky's life. He had threatened to do that," Warner told us.

Even after hearing from the victim's father, court transcripts show that Judge Shelvin Singer was leaning toward an acquittal -- telling prosecutors: "There is really very little to connect the defendant to the shooting."

So with no eyewitnesses placing Boyd at the scene, no murder weapon, and no physical evidence linking him to the crime -- how could Boyd be found guilty? When we come back, we'll tell you about the dramatic testimony that changed the course of Boyd's trial, changed Judge Singer's mind about the evidence, and erased *"Reasonable Doubt."*

(Commercial Break)

Again, without any physical evidence, even the judge commented that the case against Lathierial Boyd was weak. Boyd still had faith that the system would work and he would be acquitted... until the day the judge moved the proceedings to the bedside of victim Ricky Warner.

"The only evidence that has me sitting here is Ricky's identification of me as the shooter," Boyd says.

In an emotionally-charged setting, with a tube down his throat, Ricky Warner testified from his hospital bed, that Boyd shot him. "I was speechless. I was dumbfounded. I couldn't believe he was saying I shot him. I just couldn't believe it was happening," Boyd says. "It seemed like at that moment I realized what was going on. That, that I could actually end up in prison."

Ricky Warner was shot in the back of the neck and paralyzed. According to police records we examined, when detectives first interviewed him at Northwestern Memorial Hospital, he told them he never saw the man who shot him. But then, three days later, his story changed... and the new story contradicted what eyewitnesses told police.

"Ricky was the only person who said he saw me get out of a white car, walk up on him, shoot him, walk back to the white car, and drive away," Boyd says.

The night of the shooting, at least four eyewitnesses told police: they saw the gunman drive up in a brown Riviera and run away through an alley. It may be too late to resolve the contradiction, since Ricky Warner died in 1993. But according to an affidavit, his own brother says before he died, Ricky told him he didn't know who shot him... "He said he never saw the shooters face."

We interviewed dozens of people connected to the case--from Florida to Hawaii. We tracked down seven of the original nine eyewitnesses who viewed the lineup, and we showed each one a series of mugshots. Still, not one of them identified Lathierial Boyd as the killer.

So if Lathierial Boyd didn't do it, who shot Michael Fleming and Ricky Warner?

Interviews with several people, led us to Yuri Smith, known on the street as "Cheesy," a violent gun-toting member of a Jamaican street gang.

We asked Jennifer Bonnano to look at a photograph of Cheesy. "Does that ring a bell?"

"Yep," she said. "He was wearing a black leather jacket the night that I saw him, and his hair was shorter the night that I saw him. Again, that big, square, protruding jaw. And his face was very clenched when he was doing what he was doing."

Jennifer Bonnano believes Cheesy is the man she saw shooting at Fleming and Warner.

"Oh, I saw the man pull a gun out of his jacket!"

But detectives never questioned Cheesy about the murders -- and they never will. Yuri "Cheesy" Smith was shot and killed on a Chicago street corner eight years ago. For Lathierial Boyd, Cheesy's demise makes it even more difficult to prove his innocence.

"What if I'm forced to continue to sit here for something I didn't do?" Boyd asks. "I have two daughters who have grown up -- been forced to grow up without me. Just so many things that most people take for granted - I dream about."

While Boyd dreams of freedom; Jennifer Bonnano has nightmares about what she calls a miscarriage of justice. "He is innocent -- and I know it, because I was there," she says. "That's just sick and wrong. I'm sorry, it is."

Lathierial Boyd could spend the rest of his life in prison. He's not eligible for parole, for another 30 years.

Neither prosecutors nor police detectives would comment on-camera for this story. But they say they stand behind Boyd's conviction, pointing out: his appeals have all been turned down.

Boyd's attorneys will soon file a new appeal, based on our interview with eyewitness Jennifer Bonnano. They plan to ask for a new trial.

The judge who convicted Boyd told us he wanted to watch this story, before commenting on the new developments.



# Follow-Up: "Reasonable Doubt"
## Broadcast Wednesday, 13 February 2002

Reporter: Muriel Clair • Producer: Jason Jedlinski • Editor: Theodore Parra

The judge who put Lathierial Boyd behind bars now says: the new evidence we uncovered has convinced him, Boyd deserves a new hearing.

Lathierial Boyd was an aspiring model with a promising future, when he was convicted of a double-murder and sentenced to eighty years in prison. After watching our story, "Reasonable Doubt," retired criminal court judge Shelvin Singer says: the case should be re-opened... based on evidence we uncovered, and an eyewitness we tracked down.

"When I look at the evidence, I'm only looking at the evidence that's before me. I cannot go out and conduct my own investigation," Singer explains.

He still has the notes he took during Lathierial Boyd's trial, 12 years ago. Singer acknowledges: we've turned up critical evidence, which never came out in court.

"You can't explain what's not there. You can't evaluate what's not there," Singer says.

"What if I'm forced to continue to sit here for something I didn't do?" Boyd asks.

Lathierial Boyd was accused of shooting 19-year-old Michael Fleming and 22-year-old Ricky Warner. When Boyd learned he was a suspect, he asked police to put him in a lineup.

"When you know you haven't done anything," Boyd says, "When you know you weren't there, there's no way anyone could pick you out."

In fact, none of the nine eyewitnesses who viewed the lineup picked out Boyd as the killer.

"I was pretty clear with the officer, 'I cannot pick anyone out of this lineup.' "

When we tracked down eyewitness Jennifer Bonnano, she was shocked to learn from us that Boyd had been convicted -- because she says she specifically told detectives, 12 years ago: they had the wrong man. Bonnano has never met, nor spoken to Boyd.

"I remember very vividly looking at him in the lineup that day and going 'nuh-uh.' And I told the police that," Bonnano says. "I asked the police officer, when it was all said and done; I asked him who they had thought had done it, and who they were looking for us to pick. And I remember the gentlemen that he picked, he was standing on the end of the line, a lot taller than the guy that I saw with the gun. Very much so lighter complected. No ifs, ands, or doubts about it. They just didn't even look alike at all."

What Bonnano says she told detectives, that Boyd looked nothing like the killer, never made it into the official police reports.

"There's no question in my mind that the information should have been made available," Judge Singer says. "It should have been provided to the defense. That was the law in 1990, at the time of trial. It's the law today."

Boyd's attorneys are preparing an appeal based on Bonnano's story, and Judge Singer says her testimony should be heard. "You've got to evaluate her testimony, in my opinion, when she testifies under oath, in court, and is subject to cross examination. If I were a judge now, and I had that case, I certainly would want to hear that testimony," Singer says.

"Now, whether or not that's enough to, uh, get a new trial, I'm not going to say at this point," Singer explains. "By golly, I felt there was enough to convict. I'm not saying he didn't [do it, or that] he should be acquitted at this point."

"You're saying it should be revisited?" we asked.
"It should be. It certainly should be," Singer replied.

A Chicago Police spokesman had no comment on the allegation that homicide detectives withheld evidence from the defense in this case. Police and prosecutors tell us: they stand behind Boyd's murder conviction. That new appeal, should be filed later this month.

EXH. 2

AFFIDAVIT OF JENNIFER
BONANNO WHICH FLAT OUT
PROVES A BRADY VIOLATION
AND THAT POLICE KNEW FROM
DAY ONE I WAS INNOCENT.
AND THAT DET. ZULEY LIED
IN HIS 1990 PR AND IN 2004
SAYING MS. BONANNO SAID SHE
WAS DRUNK. DET. KOWALSKI, MS.
WARD ALL CORROBORATE SHE WAS
NOT DRUNK IN ANY WAY,

COUNTY OF COOK

STATE OF ILLINOIS

### AFFIDAVIT OF JENNIFER BONANNO

I, Jennifer Bonanno, having first been duly sworn under oath, hereby states as follows:

1.    I am a 31-year-old woman who works as a computer programmer. I have never been in any trouble with the law at any time in my life.

2.    On February 23, 1990, I was celebrating my birthday a few days early (2/27). My friend Tishyra Ward and I went to the Exedus bar on Clark Street between 9:00 p.m. and 10:00 p.m. that evening. I was at the bar dancing until the bar closed at 2:00 a.m. on February 24. During the course of the evening, I had three or four drinks, but was not drunk in any way.

3.    When Tishyra and I walked out of the bar after it closed, we were approached by two Black men who asked whether we wanted to buy any marijuana. We said no. These two men then turned away from us and were facing away from Clark Street.

4.    At this point, a car traveling South on Clark Street screeched to a stop and I looked over to see what happened. I saw a man get out of the front passenger seat of the car and walk toward the two men who had just tried to sell us marijuana. The man who got out of the car came within 8-10 feet of where I was standing.

5.    The man who got out of the car was a very dark Black man. I would call his complexion "midnight black." He was 5'8" or 5'9" tall and had a relatively small build. His face was very distinctive. He had a very prominent square chin that was very large. His haircut was unusual. It appeared to be shaved on the sides with a flat-top. He had a full mouth and high cheekbones.

6.    I saw the man open his coat and take out a black gun. The gun had a prominent square part. I then heard a round of shots, and I dropped to the ground. The two men who were shot were facing away from the shooter when the shots were fired.

7.    When the police arrived, they gathered all the witnesses up and took us to the police station. We stayed there for many hours. I was interviewed by a detective there and gave him my description of the shooter, including all of the details I have set forth above in paragraph 5. The police showed me pictures of suspects but I did not see the shooter in any of the pictures.

8.    Several weeks later, two detectives found me and took me to a lineup at the Belmont police station. While I was waiting to view the lineup, I was in a room with other witnesses in the case. One of these people (a heavyset Black man who said he was a cousin of one of the victims) told me that the police had a suspect and that the father of one of the victims had heard his son argue with this man over a $500 debt for some drugs.

-1-

9. One of the detectives then came and took me over to a window where I viewed the lineup. Besides the detective and myself, no one else was there with us during my viewing of the lineup. The detective was in his 40s or 50s, was tall, heavyset, had a mustache and had bushy hair. I never told this detective or any other police officer that because I had been drinking on the night of the shooting, I might not be able to make an identification.

10. When the detective lifted up the shade for me to view the lineup, I looked at the six men who were there. Five of them appeared pretty scruffy while one of them was clean cut and dressed in a "preppy" manner. Exhibit A to this affidavit is a photograph of the lineup that I saw.

11. The detective asked me whether I recognized anyone. I looked carefully at the men and told the detective that the shooter was definitely not in the lineup. The detective then told me, "come on, you were standing right there. I know you saw him." I told the detective that the person I saw was definitely not in the lineup. I said that the only person that even resembled the shooter a little was one of the dark men in the middle, but that man was definitely not the shooter. I then asked the detective which of the men in the lineup the police had suspected. The detective pointed to the last man in the row (the one standing in on the left side of Exhibit A)—the one who I thought looked "preppy." (This is the same man depicted in Exhibit B). I said to the detective, "you mean the preppy guy?" The detective said, "yeah." I told the detective that there was no way in the world that this was the shooter. I explained that this man looked nothing like the shooter.

12. After the lineup in 1990, I never heard anything about the case until 2001. I was in Chicago for a few months after the lineup, but I then moved around for several years, going to school and/or living in the suburbs of Chicago, Wisconsin, New Mexico and Quebec, Canada. I did not generally have a telephone listed under my name during the period. At no time did I ever live in Eastpointe, Michigan.

13. I moved back to Chicago in the Summer of 2001. Soon after that, I was contacted by Jason Jedlinski, a producer from WGN-TV. The producer told me that he was contacting the witnesses from the shooting and showed me a picture of the lineup that I had viewed back in 1990. I told him that I had told the police that the shooter was definitely not in the lineup. When I realized that the man at the end of the row (who I now have learned is named Lathierial Boyd) was convicted, I felt awful. I am 100% certain that this man was not the shooter and looks nothing like the man who fired the shots.

14. Had I known that this man was being charged with the crime, I would have done everything in my power to testify on his behalf so that the jury would know that he was not the man who shot the gun that night.

15. I later met with Lawrence C. Marshall and Brianna Smith, who interviewed me and prepared this affidavit for me to sign. I have read it carefully, made various edits to an earlier draft, and all of it is true.

-2-

16.  I have been given nothing by anyone in return for my willingness to help.  I was raised to believe that it is a crime to sit by while injustice occurs.  That is why I am doing whatever I can to make sure that everyone understands that the man who was convicted is not the man who committed the crime.

Further affiant sayeth not.

Jennifer Bonanno

Signed and sworn before me on this
28th day of February, 2002

Notary Public

OFFICIAL SEAL
LOUISE C ORTIZ
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES.01/?

-3-





EXH. 3

AFFIDAVIT OF JAMES
FLEMING FURTHER PROVING
VICTIM COMMITTED PERJURY,
WAS COERCED AND THE REAL
MOTIVE CORROBORATED BY
CHARISSE PARKE AND PETITIONER'S
COMPLETE INNOCENCE. JUDGE EGIAN
2004 COMPLETELY IGNORED FLEMINGS
AFFIDAVIT — AS DID THE "HIGHER COURTS."

State of Illinois    )
                        )    SS                Page 1 of 2

County of Cook    )

### AFFIDAVIT OF JAMES FLEMING

James Fleming, having been duly sworn under oath, hereby states as follows, under penalty of perjury:

1. My brother, Ricky Warner, was shot on February 24, 1990.

2. I went to see my brother in Oak Forest Hospital around August 1990.

3. I asked my brother who shot him. He said that he did not see the shooter and did not know who shot him. Ricky said he was running away when he was shot, so he never saw the shooter.

4. Ricky told me that he had told the police that Latherial Boyd was the shooter because Boyd had threatened him before, but he did not really know that Boyd was the shooter.

5. Ricky was alert when I spoke with him and did not seem confused in any way.

6. About a week before my brother was shot, he and I talked about trouble he was having on the north side of Chicago with some guys who were mad he was selling fake drugs. Ricky told me that our cousin, Michael Fleming, had a fight with these guys over the fact that Ricky and Michael were selling the fake drugs. I told Ricky to stay away from there because he was going to get hurt. It was after this that Ricky and Michael were shot on Clark Street.

7. 

8.    I have received no benefits or promises for signing this affidavit. No threats have been made. I am not under the influence of drugs or alcohol.

**Further Affiant Sayeth Not.**

Subscribed and affirmed to before me on this 16th day of April 2001.

Notary Public

James Fleming

April 16, 2001

Date

"OFFICIAL SEAL"
IVORY R. AVERY
NOTARY PUBLIC STATE OF ILLINOIS
My Commission Expires 08/02/2004

EXH. 4

AFFIDAVIT OF HAROLD CASEY
PROVING PETITIONERS ALIBI AND
TRIAL ATTORNEY WAS INEFFECTIVE
BY NOT ELICITING PETITIONERS
COMPLETE ALIBI OF A COOK COUNTY
SHERIFF AT TRIAL. EGAN IGNORED
IT IN 2004. AS DID THE "HIGHER
COURTS."

STATE OF ILLINOIS)
                 ) SS
COUNTY OF C O O K)

## AFFIDAVIT

I, Harold T. Casey, being first duly sworn upon oath, depose and state as follows:

1. My name is Harold T. Casey. I live at 4559 South Lawler, Chicago, Illinois, and have lived at that address since approximately 1980.

2. I am currently employed as a Cook County Correctional Officer with the Cook County Sheriff's Department, and I have been employed in that position since approximately 1980. I also work part-time for the Chicago Park District at La Clair Park, 5140 W. 44th St., Chicago, Illinois.

3. I am a good friend of the defendant Lathierial Boyd, and have been, since approximately 1976. At the time of Mr. Boyd's arrest in 1990, I was dating Lathierial Boyd's sister Angela. I am no longer dating Angela Boyd, but I am still a friend of Angela's.

4. On February 23, 1990, I met Lathierial Boyd at LeClair Park. Mr. Boyd was driving a gray Subaru hatchback, which was owned by his cousin. Mr. Boyd and I drove to Water Tower Place on North Michigan Avenue in Chicago, Illinois in my car, which is a Jeep Wrangler. Mr. Boyd left his car at 4428 S. Leamington, his parent's address. We stayed at Water Tower Place until

approximately 7:15 p.m.  At that time, we called Lathierial
Boyd's sister Angela, and we agreed that we would drive to her
condominium to eat dinner and watch the Chicago Bulls on
television.  I asked Angela to order a pizza from Giordano's
Restaurant, located at 63rd & Kedzie.  After talking to Angela on
the telephone, we drove to Angela's condominium, which is located
at 4280 W. Ford City Drive, #108, Chicago, Illinois.  We arrived
at Angela's apartment between 8:00 and 8:15 p.m.  The three of us
ate the pizza and watched the Chicago Bulls play the Portland
Trailblazers on television.  We were watching the game in
Angela's bedroom.

5.  I fell asleep before the conclusion of the game.  When I
woke up, it was approximately 1:30 a.m. on February 24, 1990.
When I woke up, Angela was asleep in her bed, and Lathierial was
no longer in Angela's bedroom.  I got up to go to the bathroom,
which was down the hall from Angela's bedroom.  As I was going
down the hall to the bathroom, I could see into the second
bedroom in the apartment.  The door was open, and I could see
Lathierial asleep in the other bedroom.  After going to the
bathroom, I went back to Angela's bedroom, and fell asleep in
that bedroom.  When I awoke at 8:30 or 9:00 that morning, Angela
and Lathierial were both in the apartment.  Lathierial and
I left Angela's apartment together sometime between 9:00 and
10:00 a.m., again driving my Jeep Wrangler.

2

6.  Because I saw Lathierial at approximately 1:30 a.m. on February 24, 1990, I know for a fact that he could not have been in the vicinity of Wrigley Field at about 2:00 a.m. on February 24.

7.  Even if I had not personally seen him in Angela's apartment at 1:30 a.m., there is no way that Lathierial could have left Angela's apartment earlier in the evening and returned before 9:00 a.m. the next morning.  I know this because Angela's building has an outside door with a security lock, and neither Lathierial nor I had a key to that lock.  And, the apartment door to Angela's apartment required a separate key, and neither Lathierial nor I had a key to that door.  In addition, we drove to Angela's apartment that night in my automobile, and Lathierial did not have a key to my automobile.  The keys to the automobile were in my pants pocket, and I was asleep wearing my pants until 1:30 a.m.

8.  On approximatley March 10 or March 11, 1990, I learned that Lathierial Boyd was wanted for questioning on a murder charge.  The information that Lathierial and his family has received was that the murder had occurred in the early morning hours of February 25, 1990.  I learned from Lathierial or his family that Lathierial had an alibi for February 25 at approximately 2:00 a.m. because he was with a friend named John Pritchard.  I knew that I had not been with Lathierial in the

3

early morning hours of February 25.  Believing that Lathierial had no involvement in this murder, I advised him to go to the station to answer questions.

9.  I learned sometime during the week of March 12, 1990, after Lathierial had been arrested and charged with the murder, that the murder occurred at approximately 2:00 a.m. on February 24, 1990.  I of course knew that I had been with Lathierial and his sister Angela between approximately 8:00 p.m. on February 23 and 9:00 a.m. on February 24.  After Lathierial and his family hired Emory Tate to represent him, I went to talk to Mr. Tate sometime around the middle of March 1990.  During my interview with Mr. Tate, I told him about the events of February 23 and February 24, including those that I have related above.  I specifically remember telling Mr. Tate that I had awakened at about 1:30 a.m., gone to the bathroom, and seen Lathierial Boyd asleep in the second bedroom of Angela's apartment.  I did not go to the police to tell them that I was with Lathierial at the time of the murder because Lathierial already had been arrested and charged with the murder.  Because he had hired an attorney, I told his attorney that I had been with Lathierial at the time of the murder.

10.  I testified at Lathierial's trial in October of 1990. In answer to Mr. Tate's questions, I testified to the events of February 23 and February 24 as described above.  However, Mr.

Tate did not ask me about seeing Lathierial at about 1:30 a.m. as I walked to the bathroom in Angela's apartment. In addition, Mr. Tate did not ask me to explain why I did not give the police my alibi for Lathierial for the early morning hours of February 24, which was that the family had originally been given the wrong date for the murder. I was asked on cross-examination about waking up at 1:30 a.m. and I answered that I did in fact wake up at 1:30 a.m. However, neither the State's Attorney nor Mr. Tate asked me whether I saw Mr. Boyd in the apartment at that time.

11.  As I described earlier, Lathierial was driving a grey Subaru hatchback owned by his cousin on February 23, 1990. To the best of my knowledge, Lathierial did not own a white Jaguar, black Corvette, black BMW, or beige Nova. In all of the years I have known Lathierial, he never had a license plate with the letters RAT.

Further, Affiant Sayeth Naught.

Harold T. Casey

SUBSCRIBED AND SWORN to before me this 26 day of ~~June~~, 1993.
JULY

NOTARY PUBLIC

OFFICIAL SEAL
FRANCES K. MALLONEY
NOTARY PUBLIC STATE OF ILLINOIS
MY COMMISSION EXP. JUNE 3, 1994.

5

EXH. 5

THE POLICE LINE UP
WHERE DET. ZULEY LIED STATING
ATTORNEY SCHROEDER WAS PRESENT
FOR/DURING PETITIONER'S VOLUNTARY
LINE-UP IN WHICH NOT ONE OF
THE 3-6ft. AWAY 9 EYEWITNESSES
ID'd HIM AS THE MAN THEY SAW
COMMIT THIS CRIME. THEY ALL
DESCRIBED AND SAW THE SHOOTER

SUPPLEMENTARY REPORT

CHICAGO POLICE - FOR USE BY B.I.S PERSONNEL ONLY

24 Feb 90    0200

HOMICIDE/MURDER 1ST DEGREE    0110    3505 N. Clark    2331

FLEMING, Michael    5631

Street    304    S    Unknown

DNA    DNA    DNA    662

THIS IS AN AREA 6 VIOLENT CRIMES LINE UP REPORT.

DATE, TIME, LOCATION OF LINE-UP:    12 Mar 90; 2200hrs.; Area 6 Line-Up Room

PERSONS CONDUCTING LINE-UP:    Det. R. Zuley#15185 ..... (OUTSIDE)

Det. S. Schorsch#8955 ..... (OUTSIDE)

Det. W. Johnson#4266 ... (INSIDE)

PERMANENT RETENTION FILE

Normal    13 Mar 90    1500    EW ADORIAN 727

Det. S. Schorsch    8955    Det. R. Zuley    15185

14 MARCH 90    1535

28

DETECTIVE DIVIS
AREA SIX VIOLENT CRIMES
HOMICIDE/MURDER 1ST DEGREE
FLEMING,Michael

(2)

.3 Mar 90
N- 088 648

PERSONS PRESENT DURING LINE-UP:

Att. Robert Schroeder representing
Mr. Lathierias Boyd.

PERSONS VIEWING LINE-UP:

#1: LOFTON,David P.
#2: KUTCHEK,Richard R.
#3: KABUROV,Boris P.
#4: WARD,TISHYRA M.
#5: BONANNO,Jennifer J.
#6: HEATH,David S.
#7: CLOHECY,William J.
#8: OSBORNE,Jeff M.
#9: DIAMOND,Glenn B.
#10: WARNER,Herbert.

# PERMANENT RETENTION FILE

PERSONS PARTICIPATING IN LINE-UP:

( FROM LEFT TO RIGHT )

#1: BOYD,Lathierias J.:M/B;24yrs old;
    6'1;215lbs; (CB# 8500 734 )

#2: SANDERS,Sean A.: M/B: 21yrs. old;
    5'11;155lbs; (CB# 8500 404 )

#3: SIMMONS,Theodore: M/B: 25yrs. old;
    5'11;150lbs; (CB# 8499 963 )

#4: DICKSON,Billie: M/B: 33yrs. old;
    6';190lbs; (CB# 8499 954 )

#5: KELLY,Kerry: M/B: 30yrs. old;
    6';220lbs; (CB#8500 697 )

#6: WASHINGTON,Johnny L.: M/B: 18yrs. old;
    6'; 155lbs; (CB# 8500 027 )

PERSONS IDENTIFIED IN LINE-UP:

See Narrative

( CONTINUED ON NEXT PAGE.........)

DETECTIVE DIVISION                              (3)                        13Mar90
AREA SIX VIOLENT CRIMES                                                    N- 088 658
HOMICIDE/MURDER 1ST DEGREE
FLEMING,Michael

HISTORY & INVESTIGATION :                    In furtherance of this investigation a
                                             line-up was held at the area six violent
                                             crimes line-up room on 12 Mar 90 at 2200hrs.
As a result of the line-up the suspect Lathierias Boyd was not identified by any of the
on the scene at the time of the incident witnesses. Mr. Boyd was however positively
identified by the victim Ricky WARNERS' father one Herbert WARNER as the person who had
come to his house and threatened to kill his son or members of his family if the victim
Ricky WARNER did not pay him back money which was owed to the suspect by the victim.

                                             A polaroid photo of those paarticipating in
                                             the line-up was then taken by Det. Zuley
                                             and inventoried under Inv# 733 974
                                             at Area Six Violent Crimes

## PERMANENT RETENTION FILE

                                             THIS INVESTIGATION REMAINS IN PROGRESS.

                                             REPORT OF: Dets. S. Schorsch#8955
                                                             R. Zuley#15185
                                                             W. Johnson#4266

                                             AREA SIX VIOLENT CRIMES



EXH. 6

AFFIDAVIT OF ATTORNEY
ROBERT SCHROEDER WHICH PROVES
DET. ZULEY COMMITTED PERJURY IN
HIS 1990 REPORT AND WHEN HE
TESTIFIED AT 2004 HEARING SCHROEDER
WAS PRESENT FOR LINE-UP.

JUDGE EGAN 2004 COMPLETELY
IGNORED THIS AFFIDAVIT AS DID
THE "HIGHER COURTS."

FEB-22-2002  14:58        JENNER AND BLOCK, LLC          312 527 8484    P.02/02

COUNTY OF COOK

STATE OF ILLINOIS

### AFFIDAVIT OF ROBERT L. SCHROEDER

I, Robert L. Schroeder, having first been duly sworn under oath, hereby state as follows:

1.      I am an attorney in Oak Park, Illinois.  I was admitted to practice in Illinois in 1979.

2.      I was an associate of Mr. Emory Tate when he represented Lathierial Boyd from 1990 until 1993 in connection with his trial and direct appeal stemming from a shooting on February 24, 1990, on North Clark Street in Chicago.  Throughout that time, I had numerous discussions with Mr. Tate regarding Boyd's case.

3.      Until 2002, I did not know that an eyewitness to the shooting named Jennifer Bonanno had viewed a lineup that included Boyd and had then told police that Boyd was definitely not the man she saw commit the crime.

4.      I was not present at any lineup involving Boyd.

5.      I have read this affidavit carefully and all of it is true.

6.      I have been given nothing by anyone in return for this affidavit.

Further affiant sayeth not.

_Robert L. Schroeder_

Robert L. Schroeder

Signed and sworn before me on this
22nd day of _February_, 2002.

_Susan Cihlar_
Notary Public

```
"OFFICIAL SEAL"
SUSAN CIHLAR
Notary Public. State of Illinois
My Commission Expires Sept. 30. 2002
```

(CHICAGO) 719663  2  1/25/02 11:17 AM                                1

EXH. 7

POLICE STATEMENT OF
CHARISSE PARKER DCA VICTIM'S
GIRLFRIEND AND ADDITIONAL
REPORTS OF TRUE MOTIVE AND
JAMAICANS COMMITTING THIS
CRIME.

**GENERAL PROGRESS REPORT**
DETECTIVE DIVISION/CHICAGO POLICE

| | DATE OF ORIG. CASE REPORT | DATE OF THIS REPORT |
|---|---|---|
| | 24   Feb   90 | 24   Feb   90   2 |

OFFENSE CLASSIFICATION—LAST PREVIOUS REPORT   VICTIM'S NAME AS SHOWN ON CASE REPORT
Homicide/Murder 1st Degree      FLEMING, Michael

BEAT UNIT ASSIGNED
5631

This form is designed for recording handwritten notes and memoranda which are made during the conduct of investigations including: inter-watch memoranda (handwritten or typewritten), witness and suspect interview notes, on-scene canvas notes, and any handwritten personal notes made by detectives during the field investigation of violent crimes which are used to prepare official Department case reports.

**#1.** Area 4 V.C. Det. Abru notified Michael FLEMING'S sister Ada FLEMING of Michael's death

FLEMING, Ada F/B, 3Jul70, 3251 W. Fulton, phone 533-8653

**#2.** Per Lt. Jenkins of the Maywood, P.D., the father of Ricky WARNER has been notified

that his son is at the Ill. Masonic Hosp. in critical condition.

**#3.** The owner of the truck with the bullet in it is Daniel Malloy. He said he will be

coming into the Area 6 office after 1800 Hrs. on 24 Feb 90, so we can recover the

bullet from the tailgate.( No one at the garage to assist removable, but tools are available.)

**#4.** Identify and locate the older female black who was working in the ticket booth

of the parking lot at approx. 3507 N. Clark St. She was in the booth at the time of

the shooting. Try and locate her between the hours of 1700-0200

**#5.** Per Det. Sikorski the wife of Luther THOMAS called about the well being of her husba

Mrs. THOMAS related that her husband is the owner of the Boogaloo Tavern ,Cornelia &

Clark St. and he did not return home last night. He alledgedly was chased by a group

of Jamaicans at the time of the incident. The address and phone number of Luther

THOMAS are unknown but he had returned home and is suppose to come into area 6

for an interview.

**#6.** Identify and locate "Breezo" the name on the piece of paper in Ricky WARNER's

pocket. The number 329-4789 is a beeper #, (Roger's Radio 55 E. Washington

is a paging company, no answer )

| REPORTING OFFICER'S SIGNATURE—STAR NO. | RECEIVED BY | SUPERVISOR'S SIGNATURE—STAR NO. | DAY-MO-YR | TIME |
|---|---|---|---|---|
| T. Johnson , S. Schorsch | | 727 | 25-2-90 | 142 |

CPD-23.122 (Rev. 2/83)

LB 00485

**GENERAL PROGRESS REPORT**
**DETECTIVE DIVISION/CHICAGO POLICE**

| | DATE OF ORIG. CASE REPORT | DATE OF THIS REPORT |
|---|---|---|
| | DAY · MONTH · YEAR · WATCH | DAY · MO · YEAR · WATCH |
| | 24   Feb   90 | 24  Feb  90   1st |

| OFFENSE CLASSIFICATION—LAST PREVIOUS REPORT, VICTIM'S NAME AS SHOWN ON CASE REPORT | BEAT·UNIT ASSIGNED |
|---|---|
| Homicide/Murder    |   John Doe  KNA   Michael FLEMMING | 5618 |

This form is designed for recording handwritten notes and memoranda which are made during the conduct of investigations, including: inter-watch memoranda (handwritten or typewritten), witness and suspect interview notes, on-scene canvas notes, and any handwritten personal notes made by detectives during the field investigation of violent crimes which are used to prepare official Department case reports.

THINGS TO DO:::

#1.  Notify the family of Michael Flemming of his untimely passing.  Copy of rap
sheet attached.  A/4 NOTIFIED  1325  Cwa  *SISTER ADA FLEMMING* *of 32521L FUEREN CALLED*
*24 Feb 46 - 1415*

#2.  Notify family of Ricky Warner that he is in Illinois Masonic in critical condition.
A copy of his rap sheet is attached.  MAYWOOD PD. NOTIFIED @ 1320  Cwa

#3.  The owner of the truck with the bullet in it is Daniel Malloy.  He is to come
into the office so we can recover the bullet from the tail gate.  Our mobile
crime lab was unable to recover it on the street.  It was suggested that the
truck be brought into the Area garage in order to take the tail gate apart.
The bullet should be trapped between the panels of the tail gate.

#4.  Identify and locate the older female black who was working in the ticket booth
of the parking lot at approx 3507 N. Clark St.  She was in the booth at the time
of the shooting.

#5.  Interview Luther Thomas (Owner of the Boogaloo Tavern on Clark St.)  He alledgedly
was chased by a group of Jamaicans at time of incident.

#6.  Identify and locate "BREEZO" the name on the scrap of paper that Ricky Warner
had in his pocket.  Phone # 329-4789.  This is a beeper #.

| REPORTING OFFICER'S SIGNATURE—STAR NO. | RECEIVED BY: SUPERVISOR'S SIGNATURE—STAR NO. | DAY - MO - YR. | TIME |
|---|---|---|---|
| Kowalski/Sikorski   16755/13499 | | 721 | 25 FEB 90 | 1400 |
| CPD-23.122 (Rev. 2/83) | | | |

SUPPLEMENTARY REPORT

CHICAGO POLICE – FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

4 DATE OF ORIG. OCCURRENCE - TIME

| 10 DAY | MO | YR |
| 24 | Feb | 90 | 0200 |

| OFFENSE CLASSIFICATION LAST PREVIOUS REPORT | IUCR OFF. CODE | 3 ADDRESS OF ORIG INCIDENT/OFFENSE ☒☒ VERIFIED ☐ 2 CORRECTED | 2 BEAT OF OCCUR |
| HOMICIDE/ Murder 1st.Degree | 0110 | 3505 N.Clark | 2331 |

| 5 VICTIM'S NAME AS SHOWN ON CASE REPORT | CORRECT ☒☒ YES ☐ 2 NO | IF NO, CORRECT ALL VICTIM INFORMATION IN BOXES 20 THROUGH 27. | 6 FIRE RELATED ☐ 1 YES ☒☒ NO | 7 BEAT ASSIGNED |
| FLEMING, Michael | | | | 5624 |

| 8 TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | LOCATION CODE | 9 NO. OF VICTIMS | 10 NO. OF OFFENDERS |
| STREET | 304 | 5 | Unk. |

| 11 INTERVIEWED 12. OBJECT/WEAPON | 13. FIREARM FEATURES | 14. POINT/ENTRY | 15. POINT/EXIT | 16. BURGLAR ALARM | 17. SAFE BURGLARY METHOD | 18 IF RESIDENCE WHERE INCID OCCUR |

DESCRIBE PROPERTY IN NARRATIVE.
T = TAKEN    R = RECOVERED

FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE ORIGINAL CASE REPORT OR THE LAST PREVIOUS SUPPLEMENTARY REPORT.

| 1 MONEY | 2 JEWELRY | 3 FURS | 4 CLOTHING | 7 OFFICE EQUIPMENT | 8 TV, RADIO, STEREO |
| 5 HOUSEHOLD GOODS | 6 CONSUM. GOODS | 11 FIREARMS | 9 NARC. DANGEROUS DRUGS | 5 OTHER | 6 NONE |

| 20 NAME (LAST—FIRST—M.I.) | 21. IUCR OFFENSE CODE | 22. HOME ADDRESS (NO., DIR., STREET, APT. NO.) | 23. SEX-RACE-AGE | 24. HOME PHONE | 25. BUSINESS PHONE | 27 VICTIM REL. CODE |
| 1. | | | | | | |
| 2. | | | | | | |
| 3. | | | | | | |

**PERMANENT RETENTION FILE**

| 28 OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 29. HOME ADDRESS | 30. SEX-RACE-AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
| 1. | | | | | | | |
| 2. | | | | | | | |

| 31 C.B. NO. | I.R. NO., Y.D. NO. OR J.O.A NO. | OFFENDER REL. CODE | C.B. NO. | I.R. NO., Y.D. NO. OR J.O.A NO. | OFFENDER REL. CODE | 32 NO. ARRESTED ARRESTED/UNIT NO. |
| OFF. 1 | | OFF. 2 | | | | |

| 33. OFF'S VEHICLE YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | STATE LICENSE NO. | STATE |
| ☐ USED ☐ STOLEN | | | | | | |

| 34 SERIAL NOS. OR IDENTIFICATION NOS. ☒☒ DNA ☐ 2 VERIFIED ☐ 3 CORRECTED | LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED IN NARRATIVE |

| 50. OFFENSE/CLASS. THIS DATE (IF SAME ENTER DNA) | REV. CODE | 51. METHOD CODE | 52. METHOD ASSIGNED | UNIT NO. | 53. STATUS |
| DNA | | DNA | ☒☒ FIELD ☐ SUMMARY | 662 | ☒☒ PROGRESS ☐ 1 SUSPENDED ☐ 2 UNFOUNDED |

STATUS CONT'D
| ☐ 3 CLRD. CLOSED | ☐ 4 CLRD. OPEN | ☐ 5 EXC. CLRD. CLOSED | ☐ 6 EXC. CLRD. OPEN | ☐ 7 CLSD. NON-CRM. | 54. IF CASE CLEARED, HOW CLEARED | ☐ ADULT ☐ JUV |
| | | | | | ☐ 1 ARREST & PROSEC. | ☐ 2 DIRECTED TO JUV. CRT. | ☐ 3 COMPL. REFUSED TO PROSECUTE | ☐ 4 COMMUNITY ADJUSTMENT | ☐ 5 OTHER EXCEPT | |

55. ☐ FOR SUMMARY CASES ONLY – THE ORIGINAL CASE REPORT IS SUBSTANTIALLY CORRECT, AND CONTACT WITH THE VICTIM HAS DISCLOSED NO ADDITIONAL PERTINENT INFORMATION.

80. NARRATIVE

THIS IS AN AREA SIX VIOLENT CRIMES UNIT HOMICIDE/MURDER PROGRESS REPORT.

INTERVIEWED:       ZONE, Marie  F/B  62yrs.  DOB 10Jun27

3504 N.Sheffield  H/P 472-9405  employed as

parking attendant at Secure Parking

3507 N.Clark.  Bus#935-5084.

LB 00526

(Continued page#2)

| 90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 91. DATE THIS REPORT SUBMITTED | TIME | 92. SUPERVISOR APPROVING (PRINT NAME) | STAR NO. |
| Normal | DAY 24 | MO Feb | YR 90 | 2300 | SGT. TOEDINGS | 1459 |

| 92 REPORTING OFFICER (PRINT NAME) | STAR NO. | 93 REPORTING OFFICER (PRINT NAME) | STAR NO. | SIGNATURE |
| Det. A.Sobolewski | 16498 | Det. L.Thezan | 9419 | |

| SIGNATURE | SIGNATURE | 95. DATE APPROVED (DAY—MO.—YR.) | TIME |
| | | 24 FEB 90 | 2345 |

CPD 11.411-A (Rev. 1/81)       *MUST BE COMPLETED IN ALL CASES

11

HOMICIDE/ Murder
FLEMING, Michael
R.D.#N-0b€548

(Page#2)

24 February 1990

# PERMANENT RETENTION FILE

INTERVIEWED(CONT.):

LESTER, Timothy  M/W 32yrs.  DOB 27Feb57
640 W.Barry  H/P 549-9263  employed as a
bartender at the BoogaLou Tavern,
3434 N.Clark  Bus#549-9692.


FLEMING, Francis  F/B 35yrs.  DOB 30Jul54
3251 W.Fulton 2nd.flr.  H/P none, can be reached
at sisters'#384-4940(Betty Jackson); mother of
victim Michael FLEMING.


PARKER, Charisse  F/B 19yrs.  DOB 07Oct70
5337 W.Van Buren (house)  H/P 287-8548  unemployed,
girlfriend of victim(FLEMING, Michael).


INVESTIGATION:

R/Ds were assigned to continue the investigation
of the HOMICIDE/ Murder of Michael FLEMING by
Sgt.J.Toenings#1459 of Area Six Violent Crimes Unit. In furtherance of this investigation,
R/Ds proceeded to the Secure Parking Lot located at 3507 N.Clark to interview the attendant
who was on duty at or about the time of the incident and who had not been interviewed.

R/Ds did in fact interview Marie ZONE, the atten-
dant who was on duty when the incident occurred.
The following is a summary of that interview, in essence but not verbatim;

ZONE, Marie:

had in fact been working when the shooting occurred.
She had been getting ready to close up and leave,
when she heard what she thought was firecrackers going off. When she looked in the direction
of the noises, just south of the attendants' booth, she observed the two(2) victims on the
ground. She recalled hearing two(2) or three(3) shots, and saw people scattering/running.
She did not see who had shot the victims, and could add nothing further.

R/Ds then went to the BoogaLous' Tavern and spoke
to the bartender Timothy LESTER. He related that
he had not observed what had happened on the street. That when he closed the tavern, shortly
after 2:00 AM, he had been told that there had been a shooting across the street. He was also
requested to have Luther THOMAS, owner of the tavern, contact R/Ds if he had any pertinent
information concerning this matter.

R/Ds, in attempting to gather information regarding
this incident, proceeded to 3251 W.Fulton and were
able to interview victim's mother, Francis FLEMING. She related that Michael(FLEMING) and
his cousin, Ricky(WARNER) spent a lot of time together. That she did not know what they did,
that Michael came and went as he wanted to. She could add nothing additional which would be
of any evidentuary value to this investigation.

While at the home of victims' mother, R/Ds also
spoke to Charisse PARKER, the victim's girlfriend.
She related,in summary, the following;

PARKER, Charisse:

she had been with Michael and Ricky at 3251 W.

R.D.#N-088 648

(Continued page#3)

**LB 00527**

HOMICIDE/ Murder                          (Page#3)                        24 February 1990
FLEMING, Michael
R.D.#N-088648

<u>PARKER, Cahrisse</u>(CONT.):              Fulton. That they had been watching television and
                                          had been aware of a large crowd at Wrigley Field.
That they had been selling narcotics in the area, particularly near the Wild Hare Tavern, on
weekends for some time. That they would go to this area, approach people around the taverns,
and sell some marijuana and cocaine. That they were small dealers just trying to make a
little money. That after seeing the crownd by Wrigley Field, Ricky had said that there was
money to be made, and she had observed both Ricky and Michael take some marijuana in a plastic
bag, and also when they both were crushing some white pills into a powder, which resembled
cocaine. That they both then left the apartment at 3251 W.Fulton at about 10:00 PM. She also
related that they did not have a car, and that they went up north by taking the elevated.
She continued that she had been in the area with Michael on several locations, and that she
recalled that the manager of the White Hare tavern had told Michael not to hang around. She
surmised that he knew what Michael and Ricky were doing. She recalled Michael telling her
that he had a problem with three(3) black guys to whom he had sold some fake cocaine, and
that he had some altercation with some white guys for the same reason, but she could not
furnish R/Ds with any additional information at this time. When R/Ds inquired if she knew
anyone by the nickname of "Breezo" she related that she remembered someone by the name of
"Breeze", but she did not know his real name. That she would attempt to find out through her
friends. She thought that this person might be someone to whom Michael and Ricky had sold
narcotics to, and had given them his pager number for future transactions. She also related
that she would recontact R/Ds if she had any new information.

                                          R/Ds returned to Area Six Violent Crimes Unit and
                                          contacted Daniel MALLOY for the removal of a pellet
from his truck's tailgate. He did in fact appear at Area Six; however, R/Ds, along with the
Crime Lab personnel were unable to remove said pellet since there were no apropriate tools
for the removal of a panel which needed to be opened for access to this pellet. Daniel
MALLOY agreed to return to Area Six on Monday, 26Feb90, at 0900hrs. to accomplish said removal.

                                          This is a continuing investigation...

**PERMANENT RETENTION FILE**

LB 00528

**GENERAL PROGRESS REPORT**
DETECTIVE DIVISION/CHICAGO POLICE

| DATE OF ORIG. CASE REPORT | DATE OF THIS REPORT |
| DAY   MONTH   YEAR   WATCH | DAY   MONTH   YEAR   WATCH |
| 24   Aug   50 | 24 Aug 50   3 |

| OFFENSE CLASSIFICATION—LAST PREVIOUS REPORT | VICTIM'S NAME AS SHOWN ON CASE REPORT | BEAT UNIT ASSIGNED |
| Homicide | Flores | 5224/25 |

This form is designed for recording handwritten notes and memoranda which are made during the conduct of investigations, including: inter-watch memoranda (handwritten or typewritten), witness and suspect interview notes, on-scene canvas notes, and any handwritten personal notes made by detectives during the field investigation of violent crimes which are used to prepare official Department case reports.

Boogalous Tavern         347 N. Clark
                         Bus. # 549-9692

Timothy Lester  M/W  32 yrs.  DOB 27 Feb 57
640 W. Barry    H/P 549-9263

closed up bar - when he went
outside heard that there had
been some problem - saw many
police cars.

**LB 00567**

REPORTING OFFICER'S SIGNATURE—STAR NO.     RECEIVED BY SUPERVISOR'S SIGNATURE—STAR NO. | DAY-MO.-YR. | TIME
CPD-23.127 (Rev. 2/83)

EXH. 8

- JUDGE SINGERS DECISION PLACING THE GUN IN PETITIONER'S HAND DESPITE THE EVIDENCE AND TESTIMONY IN HIS OWN WORDS; 100% CONTRARY TO EYEWITNESS DECRIPTION OF THE SHOOTER, TESTIMONY AND VICTIM'S TESTIMONY HE NEVER SAW THE SHOOTER. LINES 14-23.

1    not know who shot him.  In this kind of case, that

2    would be normally most compelling evidence.

3          However, I cannot ignore the condition of

4    Ricky Warner when he testified or the condition he

5    must have been at the time he gave, he was first

6    interviewed by Detective Sobolewski.  It is readily

7    observable that Ricky Warner is almost totally

8    disabled.  Totally, almost totally incapacitated, very

9    little movement, cannot breathe without assistance,

10    can barely speak, can speak with the aid of a

11    microphone.  He must — and the interview of Detective

12    Sobolewski of Ricky Warner was approximately two weeks

13    after that shooting.

14          I also observed Ricky Warner and his

15    testimony.  I don't regard it as significant in this

16    context that Ricky Warner did not describe the

17    defendant as having a gun, as using a gun.  There were

18    other witnesses which if you take their testimony put

19    it together, they put a gun in the hands of the person

20    who would be the defendant, albeit they do not

21    describe that person as the defendant or identify him

22    as the defendant.  Because, of course, they did not

23    see his face.

24          Moreover, even from my untrained eye, it

9

EXH. 9

COMPOSITE DESCRIPTION OF
SHOOTER AND EYEWITNESSES
STATEMENTS ALL WHICH EXONERATE
PETITIONER

# SUPPLEMENTARY REPORT
CHICAGO POLICE - FOR USE BY B.I.S PERSONNEL ONLY

24 FEB 90    0200

| HOMICIDE/Murder 1st Degree | 0110 | 3505 N. Clark | 2331 |

| DOE, John | | | 5618 |

| street | 304 | 5 | unk |

**PERMANENT RETENTION FILE**

AREA SIX VIOLENT CRIMES PROGRESS REPORT, HOMICIDE/MURDER 1st Degree    M.E.#438    FEB 90

DATE & TIME OF ASSIGNMENT:    24 FEB 90, 0203

VICTIMS:    #1 DOE, John   M/B/approx 20-25/5-11/160/brn/blk

wore: 2 yellow metal neck chains, having 3 charms

1-heart charm, 1-Jesus Christ's head, 1-square

charm with JUANA, also $1.43 in his pocket,

no IDs.

(cont'd.)

| NORMAL | 24 FEB 90 | 1300 | EW ADORJAN 721 |
| DET. R. SIKORSKI | 13499 | DET. D. KOWALSKI | 16755 | 27 FEB 90 | 1140 |

HOMICIDE/MURDER
DOE, John T.

page two

VICTIMS:(cont'd.)

#1 continued----Clothing:blk cloth belted waistlength
   jacket, grey jogging suit jacket. MCM logo on
   white sweatshirt, grey w red stripe jogging
   suit pants, white thermal long underwear,
   red/wh/blk Everlast gym shoes
   (baseball cap recovered from scene-see evidence)

#2 DOE, John   M/B/approx. 20-25/5-11/175/brn/blk/
   tatoo on inside of left calf- 4CW and a 5-pointed
   star, possible symbol of the 4-Corner Hustlers,
   old burns on left hand and wrist,
   Clothing: grey plaid scarf, blk leather or crushed
   vinyl and cloth jacket, grey/blue ADIDAS jogging
   shirt, black LEVIS, white underwear, white sweat sock
   w/blue stripe, NIKE AIR wh/red gym shoes,
   $15.00USC, 5-singles, 1-ten,
   1-white piece of paper with BREEZO & tel#329-4789
     and unreadable printing on the obverse side,
     INV#733941 in 662

#3 LOFTON, David P   M/W/20YOA   17 JUN 69
   141 Gage Rd., Riverside, IL    708-447-9521
   WK 708-279-1200=forklift operator
   full-time student at Triton
   single, SS#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

#4 KUTCHEK, Richard R   M/W/21YOA   18JAN69
   3605 McCormack, Brookfield, IL   708-485-9021
   works at TCBY in Hinsdale tel# unk,
   SS#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

#5 KABUROV, Boris P   M/W/21YOA   23 NOV 68
   3441 Vernon, Brookfield, IL   708-387-7674
   full-time student at TRITON,
   works-SUPERIOR BANK in Countryside, IL
   tel# unk    SS#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

WANTED:

#1 M/B/mid to late 20s/ 5-10--6-0/170-190/well built
   unk/blk hair/flat nose w/moustache/ med dk./ wore:
   either a blk leather baseball cap, or ski cap,
   waistlength dark brn. or blk leather jacket,
   bl. jeans, gym shoes   NFD
   (above from interviews of all known witnesses)

#2+ Additional offender(s) in vehicle described
    subsequently.

PERMANENT RETENTION FILE

HOMICIDE MURDER
DOE, John

N 288 4-8
24 FEB 90

page three

**INJURIES:**

#1-DOE, John---1-GSW-apparent entrance to the
left side of the neck, approx. 1" below the
jawline, and 2" back from the chin,
1-GSW, apparent exit on the rt. side of the
neck, low near the shoulder, 1-apparent graze
GSW to the rt. shoulder,
DECEASED-pronounced by Dr. FANTUS at 0220hrs

#2 DOE, John----1 GSW to the rt. side of the neck,
1-GSW, possible exit to the left side of the
upper back, below the shoulder, graze
wound to the rt. side of the chest,
paralyzed at this time from neck down,
per DR. FANTUS, to surgery

#3 LOFTON, David P----1- apparent GSW to the right
side of the head, possible richochet,
Per DR. FANTUS, fragments of foreign material
are lodged,
admitted

#4 KUTCHEK, Richard R----1-bruise to the upper rt.
thigh possibly from a ricochet,
treated and released at Ill. Masonic

#5 KABUROV, Boris P----1-bruise and laceration to
the rt. ear, possible ricochet,
Refused hospitalization

**TAKEN TO:**

#1 DOE, John-deceased by CFD#31
#2 DOE, John-by CFD #6
#3 LOFTON,-by BT2324
#4 KUTCHEK,-by BT2324
All to ILL. MASONIC HOSPITAL

**WEAPON:**

BS-dark metal-autoloading handgun, possibly a TEC-9
(see narrative)

**LOCATION:**

3505 N. Clark, in front of the SECURE PARKING LOT
on the sidewalk, just to the West of the fence
line, the deceased was found with his head to
the East and feet to the West, the #2 victim
was just to the South and next to him in much
the same position,

**DATE & TIME OF OCCURRENCE:**

24 FEB 90, 0200





HOMICIDE: Murder                                                N 098 4-8
DOE, John                                                       1- FEB 9)

                              page four

WEATHER & LIGHTING:          32 Degrees, snowing.

MANNER/MOTIVE:               offender walked up to victims #1 & #2 who
                             were trying to sell cannabis to #3-5 victims
                             and open fire.  motive unknown, possibly
                             drug or gang related

VEHICLE USED:                possible--------brown, maroon, or copper colored
                             late model, possibly a Grand Am or Riviera

EVIDENCE:                    1-expended 9mm PMC Luger headstamp-found on
                                the sidewalk to the South of the deceased
                             1-expended 9mm PMC Luger headstamp-found on
                                the blacktop a few feet East of the parking
                                lot fence
                             1-expended 9mm PMC Luger headstamp-found embedded
                                in the snow approx. 1 foot West of the fence.

                             The above 3 casings were observed by the R/Ds
                             and recovered by BT9602 and inventoried at
                             the Crime Lab # 734 396

                             1-black w/orange lettering Portland Trail Blazers
                                baseball type cap
                             1-Blue w/orange lettering Chicago Bears cloth
                                baseball type cap

                             The above found where the #1 & #2 offenders
                             fell and both are attributed to the victims
                             Observed by the R/Ds and inventoried by
                             BT9602 at the Crime Lab # 734 397

                             Photos and prints of the deceased at Ill Masonic

                             Photos of the scene

                             Photos of a Ford F-150 Pickup truck that had
                             an apparent bullet lodged within the tail. the
                             Vehicle is registered to:
                             1989 Ford F-150 black pickup truck
                             77SDU IL Jun '90 "B" license
                             VIN#1FTDF15YKLA58290
                             owned by:  Edward J MOLLOY of 2200 E. De..
                                         DesPlaines, IL
                             operated by: Daniel MOLLOY  M/W/23YOA  - "" 66
                                         6948 N. Leoti    775-7144
                                         self-employed as a landscaper
                                         SS#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
                             Bullet has to be removed by 2nd watch Crime Lab.
                             9602 was unable to do so on the 1st watch.
                             3-round plastic wrapped packages of crushed green
                                plant in a plastic bag,from victim#2 at Hospital

(5)

(26)

HOMICIDE/Murder
DOE, John

N 088 648
24 FEB 90

page five

NOTIFICATIONS:

THOMPSON of the M.E.'s office at 0300hrs

PERSONNEL ASSIGNED:

BT 2331 P.O. O'REILLY #14158 & KERNAN #3046
        Original R.O.s and hospital
BT 2312 P.O. JURKIEWICZ #7105
        Protected and preserved scene.
BT 2310 SGT. THIEL #1145
        First car on the scene.
BT 2372 P.O. NIEVES #17366 & E'Akels #4130
        Transported witnesses.
BT 2324 P.O. ANDRUZZI #4083
        Transported victims #3 & #4 to hospital.
BT 2390 LT. NOLAN #548
        Field Lt. 023
BT 9602 TECHS. BUTLER #10448 & P.MORAN #7718  *1st Watc
        Processed scene
BT 5618 DETS. R. SIKORSKI #13499 & KOWALSKI #16755

CFD #31 transported victim #1
CFD # 6 transported victim #2
BT 9601 TECHS. STELLA #14488 & O'CONNOR #8342
BT 1906 P.O. SIM #5050 & BENEVEDES #14085
        saw victims #1 & 2 before homicide

WITNESSES:

#1  WARD, Tishyra M  F/B/16YOA     6 JUN 73
    6441 S. Evans 1st flr 241-5111  WK. 643 2134
    single, student at Truman College and works
    at Pier #1  53rd & Blackstone  SS#348 78 3107

#2  VALLACCI, Victor C  M/W/21YOA  30 APR 68
    1131 Darron hse, Evanston, IL
    708-328-3528    Work Fun in a Bun, 800 Dodge, Evanston
    WK 708 491 0941    SS#359 54 7515

#3  BONANNO, Jennifer J  F/W/18YOA  27 FEB 71
    1451 W. Catalpa 2nd  275-9202
    WK 334-3100 clerk at Blockbuster Video
    SS#387 78 6589

#4  HEATH, David S  M/W/18 YOA     26 APR 71
    1724 W. Wood    Shamokin, PA   717-648-5348
    Navy Hospital Apprentice at Great Lakes Core Side 129H
    SS#209 64 3869 until 20 APR 90

#5  CLOHECY, William J   M/W/21YOA   25 OCT 68
    193 Gage, Riverside, IL        708-447-2566
    single, student at Triton College
    SS#347 74 6863

#6  OSBORNE, Jeff M M/W/20YOA   2 JUN 69
    600 S. Dearborn #1308   427 1903
    wk 973 9384 _ phone clerk at Prudential-Bache
    847 74 6223

PERMANENT RETENTION FILE

CLERK OF UNITED COURT
FILED

HOMICIDE/Murder                                      N 088 648
DOE, John                                            24 FEB 90

                              page six

WITNESSES: (cont'd.)          #7 DIAMOND, Glenn B   M/W/17YOA   30 OCT 72
                                 525 W. Hawthorne  #3105   404 1239
                                 Corpman trainee at Great Lakes Naval Training
                                 SS# unk

# PERMANENT RETENTION FILE

TO BE INTERVIEWED:            Older F/B attendant at the SECURE PARKING LOT
                             at 3505 N. Clark

INTERVIEWED:                 MOLLOY, Daniel   M/W/23YOA   4 MAY 66
                             6948 N. Leoti hse 775-7144
                             self employed as a landscaper
                             SS#325 60 3050


INVESTIGATION:               The R/Ds monitored a call of "shots fired, man
                             shot" at 3500 N. Clark.  The R/Ds immediately
responded from a short distance away and upon arrival found the two victims
side by side with their heads to the East and feet to the West on the East
sidewalk of Clark street at approx. 3505 N. Clark.  Their heads were abutting
a chain link fence of the Secure Parking lot and near the service booth at that
location.  Several witnesses were immediately located by the R/Ds and after
a flash message was sent by DET. KOWALSKI they were transported via 2372 to
A/6 for further investigation.  At this time the wounds were noted on victims
#3,4,5, and they refused hospitalization at this time.  At the scene the R/Ds
spoke to Sgt. THIEL, who was the first unit on the scene.  He related in summary
that he was at Addison and Clark and heard the reports and proceeded to the
location depicted above.  Upon his arrival he found the scene to be as described
by the R/Ds.  He called for Fire Ambulances and the Mobile Unit.

                             The R/Ds examined the crime scene and found
                             3 spent cartridge casings all 9mm with the
headstamp 9mm PMC Luger.   One was found on the sidewalk to the South of the
deceased, 1 was found on the blacktop in the lot on the other side of the
fence a few feet to the East, and one was found embedded in the snow approx.
1 foot West of the fence and approx. 3 feet South of the deceased.  Two
baseball caps as described in the heading were found with the bodies.
These were attributed to the deceased and victim #2.  The R/Ds also found
an apparent bullet hole in the tailgate of a Ford F-150 black pickup truck
in the parking lot at that location.  This vehicle was parked facing North
approx. 40' North of the scene and East of the fence.  There was blood
on the snow that corresponded to the head wounds.  CFD#31 transported victim
#1 to Ill. Masonic and CFD #6 transported the #1 victim who appeared to be
lifeless.  Addtional witnesses were located.   BT1906 P.O. SIM #5050 & BENEVEDES #14085
also at the scene related that they observed the two victims, #1 & 2 at approx.
3200 N. Sheffield at approx. 0030 on the street walking the neighborhood.
The scene was preserved and BT2312 was assigned by 2310 to protect same
pending the arrival of 9602.

MOLLOY, Daniel               Related that the truck with the bullet hole
                             in the tailgate was his father's and he was
operating same.  He did not witness anything and was willing to leave the
truck there until morning and was going to stay in the neighborhood with a
friend.  He furnished a tel# for his friend.  The R/Ds advised that the
vehicle would be photographed and efforts would be made to recover the bullet.

PERMANENT RETENTION FILE

HOMICIDE/Murder
DOE, John

N 088 648
24 FEB 90

page seven

The R/Ds then went to Ill. Masonic Hospital where the R/Ds learned that the victim listed as #1, John DOE in this report was pronounced at 0220hrs by DR. FANTUS. The R/Ds made the observations as to his clothing and wounds as listed in the heading of this report. There was a GSW approx. 2"back from the chin and apprex. 1" below the jawline. There was an apparent exit wound on the rt. side of the neck near the juncture of the base of the neck to the torso. Also there was a graze wound to the rt. shoulder. The victim had $1.43 in his pocket. no ID, and two gold chains with charms as described in the heading around his neck.

The other victim listed as #2 suffered a GSW to the rt. side of the neck with an apparent exit wound to the left side of the upper back. Also there was a graze wound to the rt. side of the chest. Per DR. FANTUS he was being taken to surgery and was paralyzed from the neck down. He had $15.00 dollars in his pocket. No ID was found. He had a note with the name BREEZO and the tel#329-4789 on it. There was some illegible printing on the back of this note. The note was taken by the R/D as part of the evidence in this investigation.

BT9602 met the R/Ds at Ill. Masonic after processing the scene. They recovered the two previously mentioned baseball caps which were soaked with blood and the 3 cartridge casings. They also photographed the scene and the tailgate of the truck. They related that they did not have any tools to unbolt the inner panel of the tailgate and related that the R/Ds should have the second watch from the crimelab do so. The operator of the truck was so notified. All victims and their wounds were photographed by the Crime Lab. The mobile unit personnel related that they did not have their polaroid or film with them and the R/Ds had a camera brought from the 662 office to the hospital to photograph the victims. The BT9602 printed and photographed the #1 victim, however the #2 victim was already taken to surgery and was not available. The R/Ds will have the second watch of the Crime Lab do so, for identification purposes.

The telephone # 329-4789 which was on the slip of the paper with the name BREEZO and in the possession of the #2 victim was checked and found to be listed to a paging company known as Rogers Radio at 55 E. Washington, Chicago, IL.

WARD, Tashyra M
Was interviewed by DET. KOWALSKI in 662 and related in summary that she left the EXODUS LOUNGE at 3477 N. Clark tel# 348-3998 and observed the victims NKA #1 & #2 on the street in front of the parking lot with approx. 5 M/Ws. She observed the offender standing in front of the victims and saw him fire 3 or 4 shots. He then ran SB on Clark to WB on Cornelia. She observed him tuck the gun in his pants. She furnished a description of the offender and noted only that he gun was dark in color.

VALLACCI, Victor C
Was interviewd in 662 and in summary related that he came out of the EXODUS LOUNGE and heard at least 2 gunshots and turned to his right (NORTH) and observed the second victim hit the ground. He also observed a late model 89-90 maroon Grand Am or Riviera speed off NB on Clark. He did not get a good look at the shooter or the people in the car.

PERMANENT RETENTION FILE

HOMICIDE/Murder
DOE, John

N 088 648
24 FEB 90

page eight

**BONANNO, Jennifer J**     Was interviewed and in summary was also leaving
the EXODUS LOUNGE and walked out about 0150hrs
and heard shots and see the M/W victim/witnesses running and falling and the
two M/B victims falling to the ground. She observes the M/B with the gun about
3 feet from her. She observes him run SB on Clark to WB on Cornelia and SB in
the first alley West of Clark. She provided a description of the shooter and
described the car as copper or brown in color. She heard 5 or 6 shots fired.

**HEATH, David S**     Was interviewed and in summary was also leaving
the EXODUS and walked out to the street to get
a taxi and hears guns hots and looks to the North and see a M/B running across
Clark St. at Cornelia. He hears that someone is shot and runs over to the victims.
He yells for someone to get an ambulance. He also furnished a description of
the offender.

**KUTCHEK, Richard R**     Was originally brought to A/6 when he refused
hospitalization at the scene later agreed
to be taken to Ill. Masonic Hospital for treatment. He had a red bruise to
the upper part of the thigh, approx. ½" in diameter. There was no hole in
his pants and it appeared that this injury was from a richochet. He was
treated and released. He was with Boris KABUROV, William CLOHECY, Jeff OSBOURNE,
and David LOFTON and had just left the EXODUS at approx. 0155 and they were
NB on Clark. The M/B victims approached them and the M/B now identified as
the deceased walked up to them and asked if they wanted to buy any "buds".
He took this to mean "dope" and he said no and kept walking. He hears a
car skid to a stop and looks up and sees a M/B on the street shooting at the
victims. He puts his head down and runs. He describes the offender and describes
the weapon as a TEC-9 type from a page of photos of like weapons.

**CLOHECY, William J**     He is with the aforementioned group of friends
as described by KUTCHEK and leaves the EXODUS
at closing and is NB on Clark when the M/B victims approach and ask if they want
to buy "buds". He and his friends keep walking and he hears 2 shots, then 1
that sounded louder and then 2-3 more and sees the M/Bs go down.

**KABUROV, Boris P**     He was with the same group of friends as the
two witnesses listed above and was with them
when the M/Bs ask them to buy some "buds" and they refused and then he hears
two shots and feels a stinging to his ear. He dives down and yells to friends
to get down and sees the MB victims go down. He grabs one of his friends and
sees the offender with the gun at his side. He sees the car pull up and hears
four more shots. He did not see which way the shooter went. He describes
the car as maroon and an older model. He sufferred a bruised and laceration
to his right ear and refused any hospitalization.

**OSBOURNE, Jeff M**     He was with the group of people named by KUTCHEK
and heard the shots and went down to the ground.
He didn't see the offender or his flight.

**LOFTON, David P**     Also was part of the above listed group of
friends and was approached by the M/Bs
selling "dope" and heard shots and a loud noise by his right ear. He
fell to the ground and stayed down. He originally refused hospitalization
and was later taken from 662 with KUTCHEK by BT2324 to Ill. Masonic where after
being X-Rayed fragments were found in the approx. 1" laceration type wound on
the rt. side of his head approx. 2" above and in front of his ear. He was admitted.

# PERMANENT RETENTION FILE

HOMICIDE/Murder
DOE, John

N 088 648
24 FEB 90

page nine

DIAMOND, Glenn B                    He was with Jason BROWNSTEIN another sailor
and also exited the EXODUS at which time he
heard 3 shots and saw a M/B running across Clark towards Cornelia. He furnished
a description of the offender. He ran back into the EXODUS and told them to call police

BROWNSTEIN, Jason E                 Resides at 2253 Lowell in Louisville, Ky. and
is a M/W/19YOA   19 AUG 70 Home tel# 502-454-
4366, SS# 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.   He is also a sailor in training to be a corpsman at
Great Lakes.   He cannot recall anything.

The R/D contacted the Crime Lab at 0830 and
notified TECH RICHARDS  #7490 and requested
that another Mobile Unit be assigned to fingerprint the hospitalized victim
known as John Doe #2 and photo same for identification.  He was in Intensive
Care Unit #24 as of this writing.  Also it was requested that they try to
remove the bullet from the pickup truck operated by MALLOY.  9601 STELLA &
O'CONNOR were assigned.

The R/D recontacted MALLOY who related that
he would bring his truck into 662 to have the
tailgate inner panel unbolted and the bullet removed at the A/6 garage and
upon his promised arrival this afternoon the crime lab will be recontacted.

As this report was being prepared the identities
of the two victims were provided by McGRATH
#13968 of Ident. from fingerprints.  This info will be the topic of a subsequent
report.

Notifications to family of the victims, recovery
of the bullet in the truck, and interview
of the older F/B who was working the booth of the parking lot was left for the
second & third watch as "Things to Do".  The F/B from the Secure Parking Lot
left the scene before she could be interviewed.  Investigation to continue........
..............

DET. R. SIKORSKI #13499
DET. D. KOWALSKI #16755

# EXH. 10

AFFIDAVIT OF ATTORNEY
CHARLES ALLEN. PROVES A
PATTEREN OF ZULEY'S CORRUPTION.

STATE OF ILLINOIS     )
                            ) SS
COUNTY OF COOK     )


## AFFIDAVIT


I, **Charles D. Allen**, Attorney, being first duly sworn upon oath, depose and state that the following information, to best of my knowledge and recollection, is true and correct in both substance and in fact or based on information and belief.


1.    On March 11, 1990, I was at the home of the Kelly Family at 410 S. 17th, Maywood, IL. Detective Zuley was on the premises and was attempting to search the home without a search warrant. I informed Det. Zuley that I was a licensed attorney and presented my ARDC card at his request.

2.    Joey Kelly was present that day. He stated that Det. Zuley had first searched his apartment for approximately one hour without a search warrant two (2) days prior on March 9, 1990. Joey had been bought from his apartment at 41 S. 16th, Maywood, IL March 11, 1990 and brought him to his mother's house at 410 S. 17th, Maywood, IL for the purpose of searching her house.


I, **Charles D. Allen**, Attorney, certify that the above information is true and correct or is based on information and recollection.


Charles D. Allen
Affiant


SUBSCRIBED AND SWORN TO BEFORE ME

THIS, **24th** DAY of **JULY**, 20_00_

NOTARY PUBLIC

"OFFICIAL SEAL"
Paul P. Harris
Notary Public, State of Illinois
My Commission Exp. 06/24/2001

EXH. 11

AFFIDAVIT OF ROBERT GAGIE

COUNTY OF COOK

STATE OF ILLINOIS

### AFFIDAVIT OF ROBERT GAGE

I, Robert Gage, having first been duly sworn under oath, hereby state as follows:

1.      I am 31 years old. I work as a CARPENTER .

2.      In the early morning of February 28, 1990, I left the Exedus [sic] nightclub on North Clark Street around 2:00 a.m. I was walking some women to their car, which was parked across Clark Street from the club. As we got to the car, I heard gunfire behind me, toward the club. It sounded like semi-automatic gunfire, quick "pops." I ducked down.

3.      When the gunfire stopped, I stood up. The women had driven away in their car. I walked toward my car, which was parked on Eddy Street.

4.      As I walked to my car, I saw a man running from Clark Street toward Cornelia Street. I saw him pull something off his head with his left hand as he ran. I thought it was a cap or a mask. I also saw him stuff a pistol in his jacket with his right hand. I saw him run toward the alley near Clark and Cornelia.

5.      The man I saw was between 5'8" and 5'10" tall. His complexion was brown. He seemed to have short braids or short dreadlocks. I looked at him for a few seconds because I froze at seeing a man running toward me with a gun.

6.      I left the area before the police came.

7.      A few days after the shooting, I went to a nightclub called Club Dread. One of the security guards, named Lemuel "Big Hank" Chambers, said to me, "I heard Cheesy shot up the North Side the other day." I told him I did not know who Cheesy was. Later that night, my friend came and I asked him who Cheesy was. He pointed out a man in the club. I recognized that man as the same man I had seen running across Clark Street the night of the shooting.

8.      In 1995 , I happened to read an article in the Chicago Defender newspaper about the shooting. The article asked anyone with information about the shooting to call a telephone number. I called the number and talked with a woman named ANGELA BOYD , who is Lathierial Boyd's sister.

9.      I met Ms. BOYD shortly after calling her, and she showed me a picture of her brother Lathierial. I can say with absolute certainty that the man in the

picture Ms. ___BOYD___ showed me is not the man I saw running across Clark Street that night.

9.      I later met Lathierial Boyd in Stateville Prison. I can say with absolute certainty that Lathierial Boyd is not the man I saw running across Clark Street that night. Lathierial Boyd is taller than the man I saw, and he is lighter-skinned than the man I saw.

10.     I have read this affidavit carefully and all of it is true.

11.     I have been given nothing by anyone in return for my willingness to help.

Further affiant sayeth not.


Robert Gage

*I declare under the penalty of perjury the above is true.*

Signed and sworn before me on this
___3___ day of December, 2001.


_____
Notary Public

EXH. 12

JUDGE EGANS ORDER

9-20-2004  11:05AM     FROM                                                    P. 2

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CRIMINAL DIVISION

**FILED**

SEP 15 2004

DOROTHY BROWN
CLERK OF CIRCUIT COURT

PEOPLE OF THE STATE OF ILLINOIS,          )
                                          )
          Respondent,                     )
                                          )
               vs.                        )          90-CR-8602
                                          )
LATHERIAL BOYD,                           )
                                          )
          Petitioner,                     )
                                          )

## MEMORANDUM OF OPINION AND ORDER

This court convened an evidentiary hearing to address the claims advanced in the instant proceeding for post-conviction relief. At the hearing, which commenced on January 12, 2004 and concluded July 21, 2004, petitioner presented the testimony of Jennifer Bonanno, a civilian witness. In turn, respondent offered the testimony of Wayne Johnson, former area 6 detective, Jasper Johnson, inmate informant, Sgt. Ralph Sikorski, former area 6 detective, Daniel Kowalski, former area 6 detective, Tashyra Ward, a civilian witness, Richard Zuley, former area 6 detective, Steven Schorsch, former area 6 detective, Joseph Murauskis, Cook County State's Attorney investigator, John Griffin Jr., Cook County State's Attorney investigator, and William Saylor, a civilian witness. The testimony was supplemented by exhibits, depositions as well as the record of the trial proceedings. Following arguments presented by counsel, the matter was taken under advisement. The court's ruling now follows.

## BACKGROUND AND PROCEDURAL HISTORY

See attached Appendix 1 which is a copy of the Appellate Court's recitation of the facts and procedural history up to the point of that opinion. In that opinion, *People v. Boyd*, No. 1-98-2135 (1ˢᵗ Dist.2000), the Appellate Court affirmed the trial court's ruling dismissing the petition for post-conviction relief. The Illinois Supreme Court denied petition for leave to appeal on November 29, 2000. *People v. Boyd*, 192 Ill.2d 694, 742 N.E.2d 330 (2000).

The instant proceedings for post-conviction relief were commenced with the filing of a successor petition for post-conviction relief filed on March 6, 2002. The petition included attachments A thru X and a videotape of WGN-TV broadcasts concerning this

case.  A hearing was held in which WGN-TV was ordered to produce the outtakes of their broadcasts.  WGN-TV complied with this court's order.

## ANALYSIS

The Illinois Post-Conviction Hearing Act, 725ILCS 5/122-1 *et. req.*, "provides a mechanism by which criminal defendants can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both." *People v. Haynes*, 192 Ill.2d 437, 464, 737 N.E.2d 169, 184 (2000).  In assessing the merits of petitioner's grievances, in accordance with the provisions of section 6 of the Act, 725 ILCS 5/122-6, the court has considered the petition and memorandums of law, affidavits, exhibits, depositions, the trial record, as well as the testimony and arguments of counsel received at the evidentiary hearing.

The petitioner alleges that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963) when it failed to disclose to the defense that Jennifer Bonnano's description of the shooter excluded Boyd and that Ms. Bonnano excluded Boyd as the shooter after viewing the lineup.  "In order to succeed in a Brady claim, the defendant must show that: (1) the evidence is favorable to the defendant because it is either exculpatory or impeaching; (2) the evidence was either willfully or inadvertently suppressed by the State; and (3) prejudice ensued to the defendant." *People v. Burt*, 205 Ill.2d 28, 47, 792 N.E. 2d 1250, 1263 (2001).  The State argues that no exculpatory information was suppressed because none existed.

Ms. Bonnano testified that she had gotten a good look at the shooter.  She told police at the scene of this attack that she was within 3 feet of the shooter.  On March 12, 1990 at the police station, she testified that she asked the police who they suspected in the lineup was the shooter after she was unable to make an identification.  She further stated that when the officer indicated whom they suspected, she stated that she never saw that man on the night of the shooting.  In her affidavit, Ms. Bonnano gives a more detailed description of the shooter.  The police report, dated 3-13-90, given the defense in discovery, stated that the two female witnesses, Ward and Bonnano, "stated they had been drinking and didn't know if they could make any identification.  If the women stated they didn't say this earlier because they were underage and were afraid of getting into trouble."  It is this alleged suppression of Ms. Bonnano's negative identification of the petitioner that the petitioner believes is a *Brady* violation for which he deserves a new trial.

Detectives Zuley and Schorsch were working as the detectives that brought the witnesses viewing the lineup to the 2 way mirror viewing area.  They further testified that Ms. Bonnano was reluctant as they approached the window.  They further stated that Ms. Bonnano stated that she could not recognize or identify anyone because she was drunk.  They further stated that Ms. Bonnano was concerned with getting in trouble because she was drinking underage.  Both detectives testified that the petitioner's attorney, Mr. Schroeder, was present during the lineup procedures never more than 8 to 10 feet away.

The first step in deciding whether a *Brady* violation has taken place is to determine the validity of Ms. Bonnano's statements.  If Ms. Bonnano's statements are

credible then they would impeach the police reports and would be evidence that should have been turned over to the defense in discovery. The petitioner argues that Ms. Bonnano is credible because she had a clear view of the shooter. Her accounts of the incident, places her between 3 to 10 feet away from the shooter. Next the petitioner argues that Ms. Bonnano does not have a motive to lie. Lastly, the petitioner states that Jasper Johnson, the in custody informant, is neither credible nor relevant. The State points to inconsistencies in Ms. Bonnano's accounts of the events and her need to continue in her role of Mr. Boyd's savior. The State further asserts that each detective involved in the lineup procedures rebut Ms. Bonnano's claim that she told the police that Boyd was not the shooter. The state further argues that Tashyra Ward is a witness with no motive to fabricate and testified more credibly than Ms. Bonnano.

The court is asked to disregard Jasper Johnson's entire testimony. Although the court is concerned with how some of the information he testified to was obtained, which if true would be relevant, his history as a jailhouse informant and his filings of frivolous lawsuits makes him an incredible witness. The court is also disregarding the testimony of William Saylor as being irrelevant and not worthy of trust. The court also finds that, after viewing the outtakes of the WGN broadcasts, the information put forth in the broadcast is suspicious at best.

Although Ms. Bonnano testified that she had 4 drinks at the max, the court takes this statement with skepticism. According to the testimony, drinking occurred at Ms. Bonnano's home before the excursion to Exodus began. Ms. Ward does not know how many drinks she or Ms. Bonnano had, however she states that she was intoxicated. She described Ms. Bonnano as being boisterous. It is hard to believe someone who boldly goes to a club underage for 5 to 6 hours, stays until closing, only had 4 drinks all night.

The petitioner has stated that it is undisputed that Ms. Bonnano was a short distance to the shooter. Ms. Ward testifies that they were together about 40 feet away. The petitioner believes that this is impossible when compared to the information Ms. Ward gave to the police at the scene. On a well lit street, as was testified to, one can describe a gun as dark and see the object being placed in the waist band. Ms. Ward testified that she was out of the club before Ms. Bonnano and pushed her to the ground when the shooting began. Ms. Bonnano testified that it perhaps was Ms. Ward who pushed her to the ground. Ms. Bonnano testifies the during her observations of the events she was behind a Sun-Times box. The crime scene photos reveal a snowy night and bloodstains on the sidewalk but there is not a Sun Times box present. The petitioner has argued that the testimony of detectives Zuley and Schorsch was untrustworthy because of the hundreds of investigations and lineups they conducted during their careers. This case was unique, an armed assassin spraying victims with an uzi 1 block from Wrigley Field. In order to find that Ms. Bonnano is more credible, one would have to find that the police set up this fame of the petitioner in front of his defense attorney. The lineup report, that was attached to the petition, states that the petitioner told the police he is often mistaken for his cousin, so they brought him to the station and placed him in the lineup. The report further states that the police stopped talking with the petitioner when his attorney arrived at the station and that the attorney was present for the lineups. Based on the totality of the evidence presented, the court finds that the detectives account of the lineup procedure to be most credible.

The petitioner's next argument is that with the combination of Boyd's original trial and Ms. Bonnano's testimony there is at the very least a reasonable probability that the finding would have been different. Petitioner further contends that the verdict relied almost exclusively on the questionable testimony of a single witness, Ricky Warner and that Warner had a motive to falsely accuse Boyd. This court was not the original trier of fact in this case. Judge Shelvin Singer was the trier of fact in this case prior to his retirement.

The court reviewed the trial record and the various rulings made by Judge Singer and the Appellate Court in this case. Judge Singer specifically ruled on the strength of the prosecution's case in his Findings, Conclusions and Order dated 4/30/98. (This order is attached to ruling as appendix 2). In the first full paragraph on page two of his Order, Judge Singer relates how substantial the guilt of the petitioner to be. He went into the identification of the petitioner and the corroboration. He concludes this paragraph by stating, "There was no reason for the witness to falsely implicate petitioner." Later in this Order, Judge Singer states that "the Appellate Court also concluded that the evidence of Petitioner's guilt was substantial. The eyewitness identification was convincing and corroborated by independent evidence. Petitioner's motive to perpetrate the crimes was clearly established." On page 5 of Appellate Opinion No. 1-91-0098, the Court, while commenting on the sufficiency of the evidence, observes that the identification was reliable buttressed by the fact that the defendant had threatened the victim's family and the victim owed the defendant money. In Appellate Opinion No. 1-94-3734, on page 3, the Court once again comments on the reliability of the identification of the defendant being corroborated by the threats and the victim and defendant's prior relationship. Therefore, the court finds that even with Ms. Bonnano's testimony, there was not a reasonable probability of a different finding.

## CONCLUSION

Based upon the foregoing discussion, the court finds that the contentions raised in the petition and at the hearing fail to establish any substantial denial of petitioner's constitutional rights. Therefore, the petition for post-conviction relief shall be hereby denied.

ENTERED:

ENTERED
TIME_____ AM
SEP 15 2004
Judge James Egan
Dorothy Brown
Chief Deputy Clerk
Circuit Court Division

James D. Egan
Circuit Court of Cook County
Criminal Division

DATED: 9-15

EXH. 13

APPELLANT BRIEF

No. 1-04-3088

## IN THE APPELLATE COURT OF ILLINOIS
### FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | On Appeal from the Circuit |
| *Appellee,* | ) | Court of Cook County, |
| | ) | Criminal Division |
| v. | ) | |
| | ) | No. 90 CR 08602 |
| LATHIERIAL BOYD, | ) | |
| | ) | Hon. Judge James D. Egan, |
| *Appellant.* | ) | Judge Presiding |

## BRIEF OF APPELLANT LATHIERIAL BOYD

Patricia A. Bronte (6197090)
Damien P. DeLaney (6281272)
Brian S. Scarbrough (6283939)
JENNER & BLOCK LLP
330 N. Wabash Avenue
Chicago, IL 60611
(312) 222-9350
(312) 527-0484 (fax)

Michael A. Pollard (6186000)
John C. Filosa (6187981)
Lisa Parker Gates (6269788)
BAKER & MCKENZIE LLP
130 E. Randolph St.
Chicago, IL 60601
(312) 861-8000
(312) 698-2168 (fax)

*Counsel for Appellant*

## ORAL ARGUMENT REQUESTED

## TABLE OF CONTENTS

NATURE OF THE CASE ...........................................................................................1

ISSUES PRESENTED FOR APPEAL.....................................................................1

JURISDICTION ........................................................................................................2

STANDARD OF REVIEW .......................................................................................2

STATEMENT OF FACTS ........................................................................................4

    A.    Introduction...............................................................................................4

    B.    The Shooting..............................................................................................5

    C.    The Investigation ......................................................................................5

    D.    The Lineup..................................................................................................7

    E.    The Trial.....................................................................................................8

    F.    Current Petition For Post-Conviction Relief...............................................9

    G.    The Evidentiary Hearing...........................................................................10

        1.    Jennifer Bonanno's Testimony .......................................................10

        2.    The State's Witnesses ....................................................................11

            a.    Tashyra Ward.....................................................................11

            b.    The Lineup Officers...........................................................13

    II.    Trial Court's Denial Of Post-Conviction Relief.........................................14

ARGUMENT.............................................................................................................17

    I.    THE TRIAL COURT APPLIED THE WRONG MATERIALITY
        STANDARD IN EVALUATING BOYD'S *BRADY* CLAIM, AND
        THEREFORE ERRED AS A MATTER OF LAW...................................18

        A.    Boyd's Conviction Rested Almost Entirely On Identification By A
            Single Witness. ..................................................................................20

B.    Bonanno's Statements To Police Are Material Because They Call Into Question Warner's Identification Of Boyd. ...........................23

II.    THE TRIAL COURT IGNORED KEY EVIDENCE AND MADE CREDIBILITY DETERMINATIONS, INFERENCES, AND FACTUAL FINDINGS THAT WERE MANIFESTLY ERRONEOUS......................27

    A.    The Trial Court Failed To Consider Key Evidence. .......................28

    B.    The Trial Court Failed To Support Its Adverse Credibility Determinations Regarding Bonanno. ..............................................32

    C.    The Trial Court Made Unreasonable Inferences And Factual Findings. .......................................................................................35

CONCLUSION ..................................................................................................37

## POINTS AND AUTHORITIES

**STANDARD OF REVIEW** .......................................................................................2

*People v. Coleman*, 183 Ill. 2d 366 (1998) ......................................................2

*People v. Sorenson*, 196 Ill. 2d 425 (2001)......................................................2

*People v. Mitchell*, 152 Ill. 2d 274 (1992) .......................................................3

*People v. Nelson*, 244 Ill. App. 3d 356 (1st Dist. 1993) ................................3

*People v. Roos*, 181 Ill. App. 3d 682 (5th Dist. 1989)...................................4

*People v. Gunsaullus*, 72 Ill. App. 3d 440 (2d Dist. 1979)............................4

*Sarchet v. Zeigler*, 278 Ill. App. 3d 460 (3d Dist. 1996) ................................3

*People v. Bowie*, 36 Ill. App. 3d 177 (1st Dist. 1976) .....................................3

*Midwest Software Ltd. v. Willie Washer Mfg. Co.*, 258 Ill. App. 3d 1029 (1st Dist. 1994) ..........................................................................................................2

*Joel R. v. Board of Educ. of Mannheim Sch. Dist.*, 292 Ill. App. 3d 607 (1st Dist. 1997) ..........................................................................................................2

*Diallo v. Ashcroft*, 381 F.3d 687 (7th Cir. 2004)............................................3

*Binion v. Chater*, 108 F.3d 780 (7th Cir. 1997)..............................................3

**ARGUMENT**...........................................................................................................17

*Brady v. Maryland*, 373 U.S. 83 (1963) .......................................................17

**I.    THE TRIAL COURT APPLIED THE WRONG MATERIALITY STANDARD IN EVALUATING BOYD'S *BRADY* CLAIM, AND THEREFORE ERRED AS A MATTER OF LAW.**..............................18

*Brady v. Maryland*, 373 U.S. 83 (1963) .......................................................18

*Kyles v. Whitley*, 514 U.S. 419 (1995)................................................... 19-20

*Strickler v. Greene*, 527 U.S. 263 (1999) ............................................... 18-19

*People v. Smith*, 352 Ill. App. 3d 1095 (1st Dist. 2004) .............................................19

*People v. Hobley*, 182 Ill. 2d 404 (1998) ................................................. 18-19

*Banks v. Dretke*, 540, U.S. 668 (2004) ...........................................................................19

        **A.**    **Boyd's Conviction Rested Almost Entirely on Identification by a Single Witness**...............................................................................20

*People v. Vasquez*, 313 Ill. App. 3d 82 (2d Dist. 2000)..................................................21

        **B.**    **Bonanno's Statements to Police Are Material Because They Call into Question Warner's Identification of Boyd**.................23

*People v. Molstad*, 101 Ill. 2d 128 (1984) ............................................................. 24-25

*Boyette v. Lefevre*, 246 F.3d 76 (2d Cir. 2001)...................................................... 25-27

*Floyd v. Florida*, No. SC03-865, 2005 WL 673689 (Fla. Mar. 24, 2005) ............ 25-26

*Giglio v. United States*, 405 U.S. 150 (1971) ...................................................................23

*People v. Sharrod*, 271 Ill. App. 3d 684 (1st Dist. 1995) ...............................................24

*People v. Mitts*, 327, Ill. App. 3d 1 (1st Dist. 2001)......................................................24

*People v. Gennardo*, 184 Ill. App. 3d 287 (1st Dist. 1989).........................................24

  **II.**    **THE TRIAL COURT IGNORED KEY EVIDENCE AND MADE CREDIBILITY DETERMINATIONS, INFERENCES, AND FACTUAL FINDINGS THAT WERE MANIFESTLY ERRONEOUS.** .........................................................................................................27

        **A.**    **The Trial Court Failed to Consider Key Evidence.** ...................28

*People v. Mitchell*, 152 Ill. 2d 274 (1992) ............................................................. 28-29

*People v. Roos*, 181 Ill. App. 3d 682 (5th Dist. 1989)..................................................29

*People v. Gunsaullus*, 72 Ill. App. 3d 440 (2d Dist. 1979)...........................................29

*Sarchet v. Zeigler*, 278 Ill. App. 3d 460 (3d Dist. 1996) ...............................................31

*People v. Nelson*, 244 Ill. App. 3d 356 (1st Dist. 1993) ................................................32

*People v. Peterson*, 311 Ill. App. 3d 38 (1st Dist. 1999)..............................................28

*Diallo v. Ashcroft*, 381 F.3d 687 (7th Cir. 2004).........................................................28

  **B.**  **The Trial Court Failed to Support Its Adverse Credibility**
      **Determination Regarding Bonanno.** ..........................................32

*People v. Roos*, 181 Ill. App. 3d 682 (5th Dist. 1989)........................................... 32-34

*People v. Gunsaullus*, 72 Ill. App. 3d 440 (2d Dist. 1979).................................... 32-34

*People v. Burrows*, 172 Ill. 2d 169 (1996)....................................................................34

*People v. Bramlett*, 341 Ill. App. 3d 638 (1st Dist. 2003) .............................................33

*Binion v. Chater*, 108 F.3d 788 (7th Cir. 1997)............................................................32

  **C.**  **The Trial Court Made Unreasonable Inferences and Factual**
      **Findings.**.....................................................................................35

*People v. Davis*, 278 Ill. App. 3d 532 (3d Dist. 1996)..................................................35

*People v. Sweborg*, 293 Ill. App. 3d 298 (3d Dist. 1997) .............................................35

*Bramlet v. Champion*, No. 00-6213, 2001 WL 1521315 (10th Cir. Nov. 30, 2001)...35

## NATURE OF THE CASE

Appellant Lathierial Boyd brought this post-conviction petition because the State did not disclose material exculpatory evidence to him. Specifically, before he was convicted of murder, the State did not tell Boyd or his attorney that an eyewitness to the shooting, Jennifer Bonanno, had both affirmatively excluded Boyd as the shooter and provided the police with a description of the actual shooter that differed significantly from Boyd's appearance. The trial court denied Boyd's petition after an evidentiary hearing. The trial court's judgment was not based on a jury verdict. No questions are raised on the pleadings.

## ISSUES PRESENTED FOR APPEAL

1.     Did the trial court err by applying an incorrect standard of materiality under *Brady* to determine that the State's failure to notify Boyd of Jennifer Bonanno's statements to the police could not undermine confidence in the reliability of Boyd's conviction?

2.     Was the trial court's denial of post-conviction relief contrary to the manifest weight of the evidence where the court ignored key evidence, failed to support its credibility determinations about Boyd's exculpatory witness, Jennifer Bonanno, and relied on unreasonable inferences and unsupported factual findings?

## JURISDICTION

This is an appeal from a denial of post-conviction relief entered on September 15, 2004. A 73-86.[1]  Boyd's notice of appeal was timely filed on October 14, 2004. A 1-5. The Court has jurisdiction of this appeal pursuant to Illinois Supreme Court Rule 651(a).

## STANDARD OF REVIEW

In post-conviction proceedings, this Court reviews *de novo* the trial court's legal standards and legal conclusions. *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001); *People v. Coleman*, 183 Ill. 2d 366, 387-88 (1998).  Credibility determinations and findings of fact will be disregarded only if they are contrary to the manifest weight of the evidence. *Coleman*, 183 Ill. 2d at 384-85; *Midwest Software, Ltd. v. Willie Washer Mfg. Co.*, 258 Ill. App. 3d 1029, 1051 (1st Dist. 1994).  This standard of review was most clearly articulated in *Joel R. v. Board of Educ. of Mannheim Sch. Dist.*, 292 Ill. App. 3d 607, 613 (1st Dist. 1997), where the court explained:

> A finding of fact or verdict is against the manifest weight of the evidence where, upon review of all the evidence in the light most favorable to the prevailing party, an opposite conclusion is clearly apparent or the fact-finder's finding is palpably erroneous and wholly unwarranted, is clearly the result of passion or prejudice, or appears to be arbitrary and unsubstantiated by the evidence.

Appellate review is not perfunctory, however, and deference to the trial court's fact findings does not "preclude overturning the trial court's decision when the evidence so requires." *Midwest Software*, 258 Ill. App. 3d at 1051.  Indeed, no deference should

---

[1] Citations to the Appendix are in the form "A *n*," where *n* refers to the page number(s). Citations to the Common Law Record are in the form "C *n*," where *n* refers to the page number(s).  Citations to the Supplemental Record, of which there are nine volumes, are in the form "S*x y*," where *x* refers to the volume number and *y* refers to the page number(s).

be accorded to findings of fact that are applied to an erroneous legal standard. *People v. Nelson*, 244 Ill. App. 3d 356, 363 (1st Dist. 1993) ("The trial court made no findings which did not refer to defendant's failure to meet his burden, so there are no factual findings to which this court must defer.").

In addition, factual findings are entitled to less deference where the trial court has disregarded a portion of the evidence before it. *Sarchet v. Zeigler*, 278 Ill. App. 3d 460, 462 (3d Dist. 1996) ("[W]e are giving less deference to the trial court's findings than we ordinarily would in such a case because it is clear that the trial judge failed to consider the evidence already in the record."); *People v. Bowie*, 36 Ill. App. 3d 177, 180 (1st Dist. 1976) ("[T]he trial judge must consider all the matters in the record before deciding the case."); *see also Diallo v. Ashcroft*, 381 F.3d 687, 695 (7th Cir. 2004) (rejecting immigration judge's findings of fact under "highly deferential" standard of review where judge ignored key testimony without finding witness not credible). The trier of fact may not "pick and choose among the pieces of evidence" or "select and discuss only that evidence that favors his ultimate conclusion." *Binion v. Chater*, 108 F.3d 780, 788-89 (7th Cir. 1997); *see also Sarchet*, 278 Ill. App. 3d at 462; *Diallo*, 381 F.3d at 695.

Moreover, a reviewing court will not assume that a witness lacks credibility just because the trial court has disregarded or failed to mention his or her testimony. *People v. Mitchell*, 152 Ill. 2d 274, 323 (1992); *Binion*, 108 F.3d at 788 n.4 ("Because [the trier of fact] failed to address the actual credibility of [certain witnesses] at all, we do not give his rejection of their testimony the deference normally awarded to credibility determinations."). "If the circuit court finds a witness to lack credibility, this must

- 3 -

somehow be reflected in the record." *People v. Roos*, 181 Ill. App. 3d 682, 685 (5th Dist.

1989). Without an explicit credibility determination by the trial court, the reviewing

court "will not presume that there were aspects of such a witness's testimony and

demeanor not apparent from the cold type of the record which justified the trial court in

entirely disregarding the testimony." *People v. Gunsaullus*, 72 Ill. App. 3d 440, 443 (2d

Dist. 1979); *Roos*, 181 Ill. App. 3d at 685 (quoting *Gunsaullus*).

## STATEMENT OF FACTS

### A.    Introduction

Based largely on the identification testimony of a single witness, Lathierial Boyd

was convicted in a bench trial of first degree murder, attempted murder, and aggravated

battery in connection with a shooting that occurred in the early morning hours of

February 24, 1990. S8, App. N 439-40; A 96-97. The State's key witness, Ricky

Warner, was a victim of the shooting and an acquaintance of Boyd who, when originally

interviewed by police, could not identify the shooter. A 49; S8, App. N 14-15. Judge

Shelvin Singer sentenced Boyd to 82 years in prison. S8, App. N at 439-40.

In 2001, new evidence from eyewitness Jennifer Bonanno came to light. A 101;

S1 72-74. Prior to trial, the State had disclosed to Boyd that Bonanno and eight other

eyewitnesses had failed to identify Boyd as the shooter in a lineup that occurred on

March 12, 1990. A 53-54. The State did not disclose, however, that Bonanno

affirmatively stated during the lineup that Boyd was *not* the shooter. A 51-63; A 129; S1

65-66. Further, Bonanno's description of the shooter, corroborated by the other

eyewitnesses, did not resemble Boyd. A 39, 45.

Because this exculpatory evidence was not provided to Boyd or his attorney, Boyd filed a Successor Petition for Post-Conviction Relief. A 6. Judge James Egan, presiding instead of Judge Singer, who had retired, conducted an evidentiary hearing and denied Boyd's petition. A 73-86. This appeal follows.

## B.     The Shooting

Shortly after 2 a.m. on February 24, 1990, several people left the Exedus, a reggae dance club on North Clark Street in Chicago. S8, App. N 76, 88, 97. A car then skidded to a halt on Clark Street, and a dark-skinned African-American man got out of the car and began shooting in the direction of the people standing on Clark Street. S8, App. N 77, 98; A 39. The shooting left Michael Fleming dead, Ricky Warner severely wounded, and three of the people who had just left the bar – Richard Kutchek, Dave Lofton and Boris Kaburov – with minor gunshot injuries. S8, App. N 79, 89-91, 100, 110. The first shot hit Warner from behind, and he turned as other shots hit him. *Id.* at 349.

## C.     The Investigation

Within hours after the shooting, police were able to take statements from the other victims – Kutchek, Lofton and Kaburov – and several other witnesses including Jennifer Bonanno and Tashyra Ward. A 42-46. According to the February 24, 1990 police report, several of these witnesses, including Bonanno and Ward, gave descriptions of the shooter. A 44-46. The police report indicates that Bonanno was three feet away from the shooter. A 45.

Bonanno described the shooter as being between 5'8" and 5'10" tall, with a very dark complexion, a moustache, a "fade" haircut (shaved sides with some hair on top),

very high check bones, and a large, angular jaw. S1 46-47. The police report contained only a composite description of the shooter as a black male with a medium to dark complexion, in his mid- to late-20s, between 5'10" and 6 feet tall, between 170 and 190 pounds, "well built," with black hair, a flat nose, and a moustache. A 39, 45. The shooter wore a black leather baseball cap or ski cap, a waist-length dark brown or black leather jacket, blue jeans, and gym shoes. A 45.

Police at the time described Boyd as being 6'2" tall, with a light to medium complexion, weighing 200 pounds, and clean-shaven. A 56; *see also* S4 841, Petitioner's Exhibit 2, lineup photo.

On March 9, 1990, about two weeks after the shooting, the police interviewed Ricky Warner in his hospital room. A 49; S8, App. N 14-15. Warner told police officer Andrew Sobolewski that he did not know who shot him and Michael Fleming. A 49, S8, App. N 15. At Sobolewski's urging, Warner said that he owed money to a man nicknamed "Rat," but Warner did not identify "Rat" or anyone else as the shooter. A 49; S8, App. N 15-27. A nurse, Cynthia Hendricks, was present when Warner told Sobolewski that Warner could not identify the person who shot him. A 49; S8, App. N 22, 28-30. Hendricks described Warner as being "alert and oriented," and she testified that he "could understand what [the police] were asking him." S8, App. N. 31.

To learn the identity of "Rat," police interviewed Ricky Warner's father, Herbert Warner. A 49; S8, App. N 12. Herbert Warner told police that "Rat" had come to Herbert Warner's home seven or eight months earlier and had threatened the Warner family. A 49; S8, App. N 12-13, 36. Herbert Warner told police that "Rat" might be a

relative of the Kelly family, neighbors of the Warners. A 50. Their investigation led them to Boyd, a relative of the Kelly family. A 58.

After Warner said that he did not know who shot him, Detective Richard Zuley created photo arrays that included Boyd's picture and showed them to Ricky Warner in the hospital. S8, App. N 233-37. Based on Boyd's picture, Warner named Boyd both as the person he knew as "Rat" and, in contrast to his earlier statement, as the person who shot him. *Id.* at 235, 237.

## D.   The Lineup

When he learned that the police were looking for him, Boyd voluntarily went to the police station on March 12, 1990 and offered to participate in a lineup. A 58-59. Nine eyewitnesses to the shooting, including Bonanno and Ward, viewed the lineup on March 12, 1990. A 53. The police report indicates that "As a result of the line-up, the suspect Lathierias [sic] Boyd was not identified by any of the on the scene at the time of the incident witnesses." A 54.

As Bonanno viewed the lineup, she asked the police officer conducting the lineup "who were you looking for me to pick," and the officer pointed to the man on the left end of the lineup, Boyd. S1 65; A 63, 129. Bonanno told the officer that there was "no way in the world" that the man on the end was the shooter, because that man "looked nothing like the shooter." A 63. She said she never saw that man on the night of the shooting. S1 at 65-66; A 129. The police never disclosed this to Boyd or his attorney.

- 7 -

### E.   **The Trial**

The State's case at trial hinged on the testimony of Ricky Warner, who identified Boyd as the man who shot him. S8, App. N 167. Richard Kutchek and William Clohecy testified only that the shooter was wearing a black jacket or dark coat. *Id.* at 77, 99. David Lofton testified that he never saw the shooter. *Id.* at 91.

For the defense, Angela Boyd, Boyd's sister, testified that Boyd spent the evening of February 23, 1990 at her home eating pizza and watching a Chicago Bulls game on television. S8, App. N 302-06. Angela Boyd lived at 4820 West Ford City Drive in Chicago, more than 20 miles away from where the crime occurred. *Id.* at 301. Angela Boyd's boyfriend, Harold Casey, a Cook County Sheriff's deputy, testified that he and Boyd spent the evening at Angela's apartment. *Id.* at 314-16. Angela testified that Boyd slept at her apartment that night, and did not leave until about 9 a.m. the next morning. *Id.* at 304.

Neither the State nor Boyd's attorney called Bonanno to testify during Boyd's trial.

Based primarily on Warner's identification, Judge Singer convicted Boyd. A 96-97. Judge Singer noted in his ruling that it was "important" that Warner had originally told police that he did not know who shot him. A 94-95. Judge Singer also noted that "in the ordinary kind of situation," Warner's identification of Boyd as the shooter would have been insufficient to convict Boyd. A 94. In Judge Singer's mind, the prior relationship between Warner and Boyd bolstered this otherwise dubious identification. *Id.*

- 8 -

Judge Singer sentenced Boyd to serve 55 years for the murder of Michael Fleming and 27 years for the attempted murder of Ricky Warner. S8, App. N 439. The 27-year sentence for attempted murder was to run consecutively with the murder sentence, and an additional 5-year sentence for aggravated battery was imposed to run concurrently. *Id.* at 439-40. Boyd's conviction and sentence were affirmed on direct appeal. S8, App. P at 5-6. Boyd filed two petitions for post-conviction relief, one of them *pro se*. Both petitions were denied, and the denials were affirmed on appeal. S8, App. Q-X.

## F.   Current Petition For Post-Conviction Relief

In 2001, WGN-TV investigators began looking for and interviewing witnesses to the 1990 shooting, including Bonanno. A 101; S1 15, 72-74. They located Bonanno, now a software programmer in her thirties who had recently relocated to Chicago, and interviewed her about the shooting. A 101-04; S1 72-74. The State stipulated that WGN approached Bonanno, not the other way around. S3 626-27. During an interview with WGN, broadcast in 2002, Bonanno spoke about her recollection of the shooting, investigation, and lineup. S1 72-74; A 105; S8, App. Y. Bonanno said that she had viewed the lineup and told police that Boyd was not the shooter. A 126-30; S1 74.

On March 6, 2002, Boyd filed a Successor Petition for Post-Conviction Relief. A 6-33. The State stipulated that Boyd's Successor Petition was timely. S4 823. Assistant State's Attorneys deposed Bonanno at length on February 3, 2003, during which she testified about witnessing the shooting, viewing the lineup, and telling police that Boyd did not look like the shooter. S5 891-1040, A 100-31 (excerpts).

- 9 -

## G.    The Evidentiary Hearing

### 1.    Jennifer Bonanno's Testimony

A hearing on Boyd's post-conviction petition was held between January and July 2004. S1, S2, S3. Boyd's only witness was Jennifer Bonanno. Bonanno testified that on the evening of the shooting, she and her friend, Tashyra Ward, went to the Exedus on Clark Street around 9 p.m. to celebrate Bonanno's upcoming 19th birthday. S1 38. They were at the bar dancing until the bar closed at 2 a.m. *Id.* at 40. During this five-hour period, Bonanno had three or four drinks, and was not drunk. *Id.* at 40, 83-84. As she explained at her deposition by the State, which was admitted into evidence, she "wasn't there to get drunk" but "to dance and listen to music." A 123.

Bonanno testified that when she and Ward walked out of the bar after it closed, they were approached by two black men who asked whether they wanted to buy marijuana. S1 43. They said no. *Id.* The two men then turned away from Bonanno and she heard a car screech to a halt. *Id.* at 44. She saw a very dark-skinned African-American man, between 5'8" and 5'10" with a "fade" haircut and a moustache, jump out of a greenish-copper car and run toward the sidewalk. *Id.* at 46-47. She saw him pull a gun out of his jacket, shoot toward the men who had tried to sell them marijuana, and run from the scene. *Id.* at 47, 50.

In the hours after witnessing the shooting, Bonanno gave the police a detailed description of the shooter. S1 59. Chicago police officer Daniel Kowalski, the State's witness and the officer who interviewed Bonanno and other eyewitnesses shortly after the shooting, confirmed that Bonanno told him on the night of the shooting that the shooter

was approximately three feet away from her. S2 375. Kowalski testified that he noted nothing unusual about Bonanno's behavior and did not question her ability to give clear answers. S2 380-82. Officer Ralph Sikorski testified that the crime scene was "well lit." S2 359-60.

Bonanno testified that she viewed the lineup that included Boyd. S1 69, 72. None of the witnesses who viewed the lineup, including Bonanno, identified Boyd as the shooter. *Id.* As Bonanno viewed the lineup, a police officer asked her several times if the man she saw was among the men in the lineup. S1 64. Bonanno told the officer that she never saw the man on the left end of the lineup, Boyd, on the night of the shooting, and that the man on the end looked nothing like the shooter. S1 65-66; A 63, 129.

Bonanno has never been in trouble with the law and has no relationship with Boyd or anyone else involved in this matter. S1 75; S5 920-22, 1029-30. This was her only experience of witnessing a shooting and viewing a lineup. A 103.

## 2.   The State's Witnesses

The State called 10 witnesses in an attempt to discredit Bonanno's testimony.

### a.   Tashyra Ward

One of the State's witnesses, Tashyra Ward, corroborated much of Bonanno's testimony, both in her testimony at the evidentiary hearing and in her deposition, which the trial court admitted into evidence. S3 626. For example, Ward testified that Bonanno told her immediately after the shooting that Bonanno had a good look at the shooter and could identify him. S3 432; A 157. Ward testified that she did not remember Bonanno drinking to excess on the night of the shooting. S3 410; A 134-40. Ward also said during

- 11 -

her deposition that she saw the shooter and remembered his haircut, which she, like Bonanno, described as a "fade." A 144.

By the time of the evidentiary hearing, Ward remembered more about Bonanno's activities before the shooting, and less about the actual shooting, than she had recalled at her deposition one year earlier. For example, during her 2003 deposition, Ward testified that, in 2002 and 2003, she had told investigators for the State and for Boyd that she did not remember anything about the night of the shooting. S5 1053-55, 1088, 1098. Ward did not remember where she and Bonanno were before going to the Exedus, whether they were drinking beforehand, or how they got to the Exedus. A 135-36, 139. She had "no idea" what time they arrived there or how long they stayed. A 136, 139. At the 2004 evidentiary hearing, Ward testified that she and Bonanno met and drank alcohol at Bonanno's house before taking the Clark Street bus to the Exedus. S3 408. They arrived between 8 and 9 p.m., and stayed until about 2 a.m. *Id.* at 409-12.

At her deposition, Ward testified that she saw the shooter run southbound on Clark Street and then westbound on Cornelia Street. A 162. At the time of the shooting, she probably could have described the shooter. A 151. Ward testified that she may have told police (as reflected in the police report) that she saw the shooter standing in front of the victims and firing three or four shots, then tucking the gun into his pants. A 162-63. At the hearing one year later, Ward testified that she saw a glimpse of a man running away from her, but she had "no idea" if that man was the shooter, and she denied seeing anyone holding a gun. S3 413-14, 416.

- 12 -

At her deposition, Ward was certain that she viewed a lineup on the night/early morning of the shooting. A 152. During the hearing, Ward recalled, this time correctly, that the lineup occurred more than two weeks after the shooting. S3 418-19.

### b.   The Lineup Officers

Detectives Richard Zuley and Steven Schorsch coordinated and conducted the lineup that Bonanno and eight other eyewitnesses viewed. A 52. At the hearing, Schorsch could not remember what Bonanno looked like. S3 502. Zuley initially testified that he could not describe Bonanno; when pressed, he testified that she had dark hair. *Id.* at 458. In fact, Bonanno had light hair at the time of the lineup, S4 879, and dark hair when she was interviewed by WGN eleven years later. S8, App. Y. Schorsch could not recall whether he or someone else wrote the report of the lineup that he signed, how many witnesses viewed the lineup, or in what order the witnesses viewed the lineup. S3 495-96.

Zuley and Schorsch testified that Bonanno did not affirmatively exclude _ _ _ the shooter. S3 448, 486. The detectives also testified that both Bonanno and Ward told them the same thing on the night of the lineup: that they were drunk on the night of the shooting and hesitant to view the lineup. *Id.* at 444-48, 485-86. Ward testified that she told police that she did not know whether she could identify the shooter because she had been drinking. *Id.* at 419-20. But Ward never heard Bonanno say that to the police and, in fact, Ward did not recall Bonanno being drunk at the time of the shooting. S3 410. Indeed, Kowalski, the officer who interviewed Bonanno shortly after the shooting,

testified that he noted nothing unusual about Bonanno's behavior and did not question her ability to give clear answers. S2 380-82.

Zuley and Schorsch testified that they had participated in hundreds, perhaps thousands, of lineups during their careers, and that they had reviewed the police reports prior to their testimony. S3 458-59, 493-94. The police report dated March 13, 1990, covering events over a period of approximately 12 hours, states that Boyd's lawyer, Robert Schroeder, was present. A 57. Zuley and Schorsch testified that Schroeder was present during the lineup. S3 442-43, 448, 488, 501. According to Schroeder's affidavit, admitted into evidence without objection, Schroeder was not present during any part of the lineup. A 68.

According to the police report, Boyd came to the police station voluntarily at approximately 11:15 a.m. on March 12, 1990. A 58. Zuley testified that Schroeder arrived some time during the day, most likely between 2 and 3 p.m. S3 477. The lineup began seven or eight hours later, at 10 p.m. A 52. Neither Zuley nor Schorsch could recall what Schroeder looked like or what Schroeder did between 2 or 3 p.m. when he arrived at the police station and 10 p.m. when the lineup was conducted. S3 479-80, 502.

## H.    Trial Court's Denial Of Post-Conviction Relief

The trial court denied Boyd's Successor Petition for Post-Conviction Relief, stating that the decision was based "on the totality of the evidence presented." A 75. As a preliminary matter, the trial court found that "the information put forth in the [WGN] broadcast [was] suspicious at best" in light of the unedited WGN interview tape, *id.*,

which the trial court had viewed in camera. C 233. The trial court gave no basis or context for this finding.

Without citing to evidence in the record, the trial court found that "it is hard to believe someone who boldly goes to a club underage for 5 to 6 hours, stays until closing, only had 4 drinks all night." A 75. Bonanno had testified that she was not drunk, S1 40, and Ward likewise testified that she did not remember Bonanno drinking to excess on the night of the shooting, S3 410. Kowalski, called by the State, similarly noted nothing unusual about Bonanno's behavior or her ability to give clear answers. S2 380-82. Nevertheless, the trial court viewed Bonanno's testimony "with skepticism." A 75. The trial court also noted that Bonanno testified that she crouched behind a news box, though no news box can be seen in crime scene photographs. A 75; A 116, 119; S1 53; S7, Respondent's Exhibits 1, 2, 11.

The trial court noted Bonanno's testimony that she was about three feet away from the shooter, and Ward's testimony that she and Bonanno were 40 feet away from the shooter. A 75. The trial court found that Ward's account of the incident was more credible than Bonanno's, because Ward could have seen the shooter tuck the gun in his pants from a distance of 40 feet, as she had told police on the night of the shooting. A 44. The trial court failed to mention (a) the inconsistencies between Ward's deposition and hearing testimony; (b) Ward's testimony at the hearing, in which she denied seeing the shooter or a gun at all, S3 413-14; and (c) her testimony that, shortly after the shooting, Bonanno told Ward that she had gotten a good look at the shooter, *id.* at 435-36. The

- 15 -

trial court gave no further explanation for determining that Ward was more credible than Bonanno.

Although acknowledging that Zuley and Schorsch each had participated in hundreds or thousands of investigations and lineups, the trial court viewed this case as unique in that "an armed assassin spray[ed] victims with an uzi 1 block from Wrigley Field." A 75. Zuley and Schorsch did not witness the shooting and did not visit the crime scene. A 43. Ward testified that the shots were fired individually, not automatically. A 142; S3 413-14. No weapon was ever recovered or tied to this shooting; only one witness, Richard Kutchek, described the shooter's gun as "an Uzi, like a nine millimeter." S8, App. N 78. No evidence at trial indicated that the shooter had used an Uzi or even an automatic weapon.

The trial court rejected Bonanno's testimony, in part, because it assumed that Boyd's "attorney was present for the lineups [sic]." A 75. The trial court believed that "in order to find that Ms. Bonanno is more credible [than the police], one would have to find that the police set up this [frame] of the petitioner in front of his defense attorney." *Id.* Neither Boyd nor his attorneys claimed in this proceeding that the police "framed" Boyd. The trial court's decision does not mention the attorney's affidavit, in which Schroeder testified he did not attend the lineup. A 68. Nor did the trial court explain how or why Schroeder would have waited at the police station for seven or eight hours without doing anything and without attracting notice from the police officers.

## ARGUMENT

The trial court adopted an erroneous legal standard and then applied it to manifestly erroneous factual findings. Both errors warrant reversal of the denial of post-conviction relief.

*First*, the trial court applied the wrong standard for determining materiality under *Brady v. Maryland*, 373 U.S. 83 (1963). Under *Brady*, a defendant must show that the exculpatory evidence suppressed by the State may have led to a different result if it had been presented to the original finder of fact. The trial court, however, determined that the exculpatory evidence at issue in this case was insufficient to reverse Boyd's conviction. *Brady* does not require Boyd to establish that the original finder of fact would have acquitted him had it known of the withheld evidence, but simply that the absence of that evidence undermines confidence in the verdict. Boyd successfully made such a showing in the trial court. The exculpatory evidence discredited the testimony of the State's primary witness and exonerated Boyd. The trial court erred as a matter of law in concluding otherwise.

*Second*, the trial court committed manifest error in ignoring key evidence, making arbitrary credibility determinations, and drawing improper inferences. The trial court improperly disregarded the testimony of key witnesses that support Bonanno's version of what occurred at the lineup. Without any factual basis, the trial court improperly determined that Bonanno's version of events was unworthy of belief. The trial court also based its credibility determinations on unreasonable inferences that have no evidentiary

support in the record. These improper factual conclusions constitute manifest error requiring reversal of the trial court's decision.

## I.   THE TRIAL COURT APPLIED THE WRONG MATERIALITY STANDARD IN EVALUATING BOYD'S *BRADY* CLAIM, AND THEREFORE ERRED AS A MATTER OF LAW.

The trial court erred when it determined that Bonanno's statement could not create a reasonable probability of a different result. On the contrary, Bonanno's exclusion of Boyd as the shooter casts doubt on the State's ability to link Boyd to the crime. The State had only one eyewitness who identified Boyd as the shooter, and that witness did so only after initially telling the police he did not know who shot him. A 49; S8, App. N 14-15. In light of the totality of the evidence presented at the original trial, the fact that the trier of fact never had the opportunity to consider Bonanno's testimony seriously undermines confidence in the reliability of the verdict. The trial court's resolution of this issue in favor of the State represents a fundamental misunderstanding of the *Brady* standard and requires reversal.

The State has an ongoing duty to produce evidence favorable to the accused, irrespective of whether the evidence is wholly exculpatory or impeaching of a State witness and irrespective of whether the accused has requested the material. *Strickler v. Greene*, 527 U.S. 263, 280 (1999); *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Therefore, to establish a *Brady* violation, the "suppressed evidence must both be favorable to the accused and material." *People v. Hobley*, 182 Ill. 2d 404, 432 (1998).

Under the Supreme Court's familiar test for materiality in *Brady* cases, Boyd is entitled to a new trial if he can establish that, had the trier of fact known about the

- 18 -

suppressed evidence, there is a reasonable probability that the result of the trial would have been different. *See, e.g., Banks v. Dretke*, 540 U.S. 668, 703 (2004); *Strickler*, 527 U.S. at 289-90 (1999); *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *accord People v. Smith*, 352 Ill. App. 3d 1095, 1102 (1st Dist. 2004). This question cannot be answered by "determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions." *Strickler*, 527 U.S. at 290; *see also Smith*, 352 Ill. App. at 1102, 1105 (quoting *Kyles* and noting that materiality inquiry is not a "sufficiency of the evidence test"). Instead, the proper question, considering the cumulative effect of the undisclosed evidence, is whether Boyd "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434; *see also Hobley*, 182 Ill. 2d at 433.

It is undisputed that Bonanno's eyewitness account of the crime is favorable to Boyd. The issue in this case is whether the State's suppression of this favorable evidence and the trier of fact's inability to consider that evidence are circumstances that undermine confidence in Boyd's conviction. For the reasons that follow, there can be no question that the verdict is unworthy of confidence and that Boyd's conviction should be vacated and the case remanded for a new trial.

Here, the trial court failed entirely to consider the exculpatory evidence in light of the totality of the evidence presented at the original trial. Instead, the trial court essentially considered whether "after discounting the inculpatory evidence in light of the undisclosed evidence, there [was] enough left to convict" – an analysis expressly rejected by the United States Supreme Court in *Kyles*. *Kyles*, 514 U.S. at 434-35. In *Kyles*, the

state had represented to the defense and to the trial court that no exculpatory evidence existed while withholding, among other things, the prior inconsistent statements of two eyewitnesses who implicated the defendant. The Supreme Court held that the prior statements of the eyewitnesses were material because, if the defense had known of the statements, "the value of . . . those witnesses would have been substantially reduced or destroyed." *Id.* at 441.

Here the trial court dismissed as immaterial Bonanno's version of events, even though it substantially discredits Warner's identification of Boyd as the shooter. The trial court reasoned that Bonanno's testimony simply could not compete with the State's evidence. In so doing, the trial court failed to consider that Bonanno's statement had the effect of casting further doubt on the State's identification evidence. The court's role in the *Brady* inquiry is not to weigh the evidence after adding in the exculpatory material, but rather to ask whether a verdict reached in the absence of the exculpatory material is worthy of confidence. *Kyles*, 514 U.S. at 434-35. Here, the correct answer to that question is, emphatically, no.

## A.   Boyd's Conviction Rested Almost Entirely On Identification By A Single Witness.

The addition of Jennifer Bonanno's statements affirmatively excluding Boyd as the shooter casts the State's evidence against Boyd in a very different light. The only direct evidence against Boyd was the eyewitness testimony of Ricky Warner. Warner testified that he saw Boyd shoot him, S8, App. N 167, but that testimony was inconsistent with his earlier inability to identify his assailant. A 49; S8, App. N 14-15. The State had no other eyewitness testimony to corroborate Warner's identification of Boyd, nor did it

- 20 -

have any physical evidence linking Boyd to the crime. Despite the fact that Boyd presented two witnesses to corroborate his alibi, S8, App. N 301-04, 314-16, the State did not present a witness – other than Warner – who could even place Boyd anywhere near the crime scene when the shootings occurred.

The trial court misconstrued the importance that Bonanno's testimony would have had in a fair trial. The *Brady* rule required the State to produce Bonanno's statements in this case because the State's case turned on Warner's credibility. Where "the reliability of a given witness may well be determinative of guilt or innocence, the nondisclosure of evidence affecting credibility falls within the general Brady rule." *People v. Vasquez*, 313 Ill. App. 3d 82, 97 (2d Dist. 2000). In this case, Warner's testimony was critically necessary to convict Boyd.

Judge Singer, who conducted Boyd's bench trial, considered Warner's testimony, and in particular the statement that he knew Boyd, to be the crucial evidence against Boyd. At the conclusion of Boyd's trial, Judge Singer explained that:

> Now in the ordinary kind of situation, if there had been no prior relationship between the defendant and Ricky Warner, *that identification, in my opinion would not have been sufficient to convict the defendant.* In this case, however, the defendant and Ricky Warner had an ongoing relationship . . . . So that we have Ricky Warner identifying not a stranger, but a person who he has seen on a number of other occasions, whom he's had dealings with.

A 94 (emphasis added).

Nowhere in its post-conviction opinion, however, does the trial court consider the *weaknesses* of the State's case that Judge Singer resolved in the State's favor without ever hearing Bonanno's version of events. For example, the trial court ignored Warner's

inability to identify Boyd as the shooter when police first questioned him. A 49; S8, App. N. 14-15. Having never heard Bonanno's side of the story, Judge Singer had explained away this inconsistency on the basis of the grave condition of Warner's health when he was first asked if he saw the person who shot him. A 95. Also, the trial court ignored that Warner was unable to testify that he saw Boyd holding a gun or shooting. S8, App. N 169. Judge Singer rationalized this inconsistency by melding Warner's testimony with that of the eyewitnesses who saw someone shooting, but could not identify the shooter. A 95. The trial court never evaluated whether Judge Singer's findings might have been influenced by testimony from the only other eyewitness able to put a face on the person who opened fire that night.

Moreover, in its post-conviction opinion, the trial court failed entirely to consider whether Bonanno's testimony bolstered the strength of the evidence exonerating Boyd. There was no physical evidence connecting Boyd to the crime scene. No eyewitness other than Warner identified him as the shooter. A 54. Moreover, Boyd had offered two witnesses who testified that he was miles away from the crime scene at the time of the shootings. S8, App. N 301-04, 314-16. Without hearing Bonanno's testimony, Judge Singer discounted these facts and relied on Warner's weak identification in finding Boyd guilty.

Therefore, it is beyond serious question that the verdict against Boyd is undermined because Judge Singer, the trier of fact, never had a chance to consider Bonanno's version of events. The case against Boyd was closely balanced and Warner's identification was, as Judge Singer noted, indispensable to obtaining a conviction.

Indeed, Judge Singer himself stated that Bonanno's testimony was something he would have wanted to hear and consider in trying the case. S8, App. Y; S6 1219. The trial court's conclusion that the State's evidence at trial was so strong that Boyd's conviction could not be undermined by eyewitness testimony exonerating him was a manifestly erroneous understanding of the facts of the trial and a serious misapplication of *Brady*. Therefore, the trial court erred when it determined that Bonanno's testimony, if credited, would not have led to the reasonable probability of a different result. This determination cannot stand, whether reviewed *de novo* or under the more deferential "manifest weight of the evidence" standard.

## B. Bonanno's Statements To Police Are Material Because They Call Into Question Warner's Identification Of Boyd.

Because Ricky Warner's testimony was the only proof of an element of the State's case against Boyd, Boyd's inability to provide Judge Singer with the testimony of Jennifer Bonanno seriously undermines confidence in the verdict against Boyd. Given the weaknesses and gaps in Warner's testimony, Bonanno's version of the events – coming from a disinterested witness who saw the gunman's face and has definitively and consistently maintained that the gunman was not Boyd – would, if credited, have been sufficient to create reasonable doubt of Boyd's guilt.

Evidence tending to discredit the testimony of one of the State's witnesses is, by definition, material, particularly when that witness's testimony is the key evidence in the State's case. *Giglio v. United States*, 405 U.S. 150, 154 (1971) ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [the *Brady*] rule") (citation omitted). For

- 23 -

example, in *People v. Mitts,* this Court concluded that exculpatory DNA evidence recovered in the investigation of a sexual assault for which the defendant was acquitted was material evidence tending to contradict eyewitness identifications of the defendant in two similar sexual assaults. 327 Ill. App. 3d 1, 11-12 (1st Dist. 2001). This Court has also held that the state violates *Brady* when it fails to turn over a confidential informant's agreement that set forth the terms under which the police paid the state's key witness for supplying information about the defendant. *People v. Gennardo,* 184 Ill. App. 3d 287, 306 (1st Dist. 1989). Even in cases where the state's eyewitness was not the only source of evidence against the defendant, this Court has held that evidence tending to discredit an eyewitness's testimony is material. *People v. Sharrod,* 271 Ill. App. 3d 684, 690 (1st Dist. 1995) (state failed to produce information that crime victim witness was on supervised probation at the time he identified defendant as his attacker).

If this Court found materiality in the cases discussed above, it should likewise find the Bonanno evidence to be material in this case. Here, the evidence is more than merely impeaching – it is wholly exculpatory. Bonanno has consistently maintained that Boyd did not commit these crimes. S1 65-66; A 63, 129. At a minimum, her testimony creates additional doubt as to whether Warner's version of the events is credible. In this respect, this case is analogous to *People v. Molstad,* 101 Ill. 2d 128 (1984). In *Molstad,* the Supreme Court ordered a new trial where the after-acquired affidavits of Molstad's co-defendants contradicted the testimony of the state's key witness and tended to exonerate Molstad. Although the state's witness maintained that Molstad participated in the crime, his fellow defendants maintained that he was not present, but they did not

- 24 -

reveal this fact earlier to avoid incriminating themselves. The Supreme Court remanded for a new trial, because it "appear[ed] that a different result [would be] probable if the trier of fact consider[ed] the testimony of Molstad's co-defendants." *Id.* at 135. As the Supreme Court explained, it is irrelevant whether the newly discovered evidence proves the defendant's innocence; rather, the key issue is whether the evidence undermines confidence in the result of the trial. *Id.* at 135-36.

Under similar circumstances, courts in other jurisdictions have concluded that exculpatory evidence going toward witness credibility is material for *Brady* purposes. For example, in *Boyette v. Lefevre*, 246 F.3d 76 (2d Cir. 2001), the Second Circuit concluded that the defendant was entitled to *habeas corpus* where the state had suppressed evidence that discredited the state's eyewitness, noting that "in the context of this essentially one-witness case, [the] non-disclosure seriously undermines 'confidence in the outcome of the trial.'" *Id.* at 93 (quoting *Kyles*). In *Boyette*, as here, the principal evidence against the defendant was the eyewitness testimony of the crime victim, who claimed to know the defendant and recognize his face. *Id.* at 80-82. The defense in *Boyette*, as here, put forward several witnesses who placed him miles away from the jurisdiction at the time of the crime. *Id.* at 82.

Similarly, *Floyd v. Florida*, No. SC03-865, 2005 WL 673689, at *6-7 (Fla. Mar. 24, 2005) (A 167-78), recognizes that, even if the State's case against Boyd had been stronger, Bonanno's statement is material nonetheless under the *Brady* rule. The state in *Floyd* failed to produce police interviews with a witness who spotted two men, neither of whom were physically similar to the defendant, acting suspiciously near the crime scene

- 25 -

around the time the crime occurred. Unlike this case, the state in *Floyd* had physical evidence against the defendant – the defendant was arrested in possession of the victim's checkbook – and had evidence that the defendant had both forged checks off the victim's checkbook and fabricated an alibi for the murder. *Id.* at *1, 6. Noting that *"irrefutable evidence of innocence is not required* for a conviction to be set aside under *Brady,"* the *Floyd* court concluded that the withheld evidence, including the witness statement implicating individuals other than the defendant, was sufficient to form "a basis for reasonable doubt in the minds of some jurors" and that, as a result, a new trial was necessary. *Id.* at *8-9 (emphasis added).

The reasoning of these cases applies here with equal force. Bonanno's version of events tends to discredit Warner's version of events and is, therefore, material. The *Boyette* court explained that, where the state's case turns essentially on the testimony of one witness, any evidence tending to discredit that witness's version of events is material. 246 F.3d at 92-93. Here, Judge Singer heard from only one witness who positively identified the shooter. The defense was unable to persuade the trial court that Warner's version of events was unbelievable. It is unlikely, however, that Judge Singer would have considered Warner's testimony to be so persuasive if he had heard from Bonanno as well. Therefore, confidence in the reliability of the verdict is undermined. The trial court's error lies in its misconception that *Brady* required Boyd to establish that he would not have been convicted if the trial court had heard the exculpatory evidence. As *Boyette* makes clear, in an "essentially one-witness case," the non-disclosure of evidence that

CASE NO. _08 cv 4257_

ATTACHMENT NO. _1_

EXHIBIT _____

TAB (DESCRIPTION) _____

might have persuaded the court to acquit Boyd is sufficient to find prejudice. 246 F.3d at 93.

Moreover, as *Floyd* makes clear, the relative strength of the State's case against Boyd does not automatically render the *Brady* evidence immaterial. In *Floyd*, the state's case against the defendant was convincing, but the Florida court nevertheless found that the state's suppression of critical exculpatory evidence cast doubt on the reliability of the verdict. Notably, the State's proof against Boyd was considerably less compelling than the inculpatory evidence in *Floyd*. The State has no physical evidence inculpating Boyd, and two witnesses gave Boyd an alibi for the time of the shooting.

The State's case turned in large part on the testimony of one witness. Evidence discrediting that testimony or offering an alternate view of the events satisfies the *Brady* materiality standard. Therefore, the trial court erred when it concluded that Bonanno's exculpatory statements were unlikely to have produced a different result.

## II.    THE TRIAL COURT IGNORED KEY EVIDENCE AND MADE CREDIBILITY DETERMINATIONS, INFERENCES, AND FACTUAL FINDINGS THAT WERE MANIFESTLY ERRONEOUS.

The trial court's denial of post-conviction relief should be reversed, and a new trial should be ordered, because the trial court ignored key evidence, made unsupported credibility determinations, and reached unreasonable and unsupported inferences and factual findings, all against the manifest weight of the evidence. First, it was manifestly erroneous for the trial court to ignore key testimony from Officer Kowalski concerning his impressions of Bonanno shortly after the shooting, S2 at 380-82, and to ignore the testimony of Boyd's attorney, Robert Schroeder, that he was not present at the lineup. A

- 27 -

68. Second, the trial court made manifestly erroneous credibility determinations about the key witness, Bonanno, without any factual basis. Third, the trial court drew unreasonable inferences with no evidentiary support about the ability of Zuley and Schorsch to remember certain details about the lineup.

## A.     The Trial Court Failed To Consider Key Evidence.

The trial court failed to consider the key testimony of Detective Kowalski concerning his observations of Bonanno shortly after the shooting, S2 380-82, and the testimony of Boyd's attorney, Schroeder, stating he was not present at the lineup. A 68.[2] The trial court's failure to consider this evidence demonstrates that its denial of post-conviction relief was manifestly erroneous.

It is manifestly erroneous for a trial court to ignore key pieces of relevant evidence. *People v. Mitchell*, 152 Ill. 2d 274, 326 (1992) (error for trial court to ignore crucial evidence pertaining to defendant); *People v. Peterson*, 311 Ill. App. 3d 38, 46 (1st Dist. 1999) ("the trial court properly exercises its discretion when it examines the relevant facts, applies legal standards, and reaches a reasonable conclusion"); *Diallo v. Ashcroft*, 381 F.3d 687, 695 (7th Cir. 2004) (rejecting immigration judge's findings of fact under "highly deferential" standard of review where judge ignored key testimony without finding witness not credible). Here, it was manifestly erroneous for the trial court to fail to consider the testimony of the State's witness, Detective Kowalski. Kowalski actually interviewed Bonanno on the night of the shooting, not two weeks later during the lineup. S2 373-74; A 43. Kowalski testified that nothing about Bonanno's

---

[2] The State never objected to the admission of Schroeder's affidavit, nor did it request the opportunity to cross-examine him.

appearance or behavior on the night of the shooting struck him as being at all unusual, and he did not question her ability to give clear answers. S2 380-82. The trial court entirely disregarded this testimony when it viewed with skepticism Bonanno's testimony that she had no more than four drinks the night of the shooting, and when it relied on the testimony of Zuley and Schorsch that Bonanno later told them she was drunk the night of the shooting. A 75.

Nowhere in its opinion does the trial court explain why it ignored Kowalski's testimony. Nor did the court find that Kowalski lacked credibility. Because the trial court failed to make a credibility determination as to Kowalski, this Court cannot presume that there were aspects of his testimony and demeanor not apparent from the record which justified the trial court's complete disregard of his testimony. *See Mitchell*, 152 Ill. 2d at 323 (reviewing court will not assume that a witness lacks credibility just because the trial court failed to mention his testimony); *People v. Roos*, 181 Ill. App. 3d 682, 685 (5th Dist. 1989) (if a trial court fails to make adverse credibility findings, an appellate court will not assume there was a justification for disregarding such testimony); *People v. Gunsaullus*, 72 Ill. App. 3d 440, 443 (2d Dist. 1979) (same). Thus, it was manifestly erroneous for the trial court to fail to consider Kowalski's testimony.

Detective Kowalski's testimony supports Bonanno's testimony that she had no more than four drinks that night and undermines Zuley's and Schorsch's version of events – that Bonanno was drunk on the night of the shooting and hesitant to view the Boyd lineup because of this. Also, Zuley and Schorsch testified that Ward and Bonanno each said exactly the same thing during the lineup: that she was drunk on the night of the

- 29 -

shooting, had been drinking underage, and was hesitant to view the lineup. S3 446-50, 485-87. Bonanno testified that she did not say these things to either detective. Ward admitted that she told the detectives she was drunk on the night of the shooting, S3 420, but Ward did not hear Bonanno say that to the detectives. Nor did Ward recall Bonanno being drunk at the time of the shooting. S3 410. Neither Zuley nor Schorsch could remember what Bonanno looked liked. Zuley incorrectly described Bonanno as having dark hair at the time of the shooting, when in fact she was blond at the time. S3 458; S4 879. Schorsch also could not remember what Ward looked like. S3 502.[3] Both men have participated in hundreds or thousands of investigations and lineups during their careers. S3 458-59, 493-94. Their testimony was based on reviews of their reports and meetings with Assistant State's Attorneys, not on their independent recollection. *Id.* 458, 494.

These facts show that Ward, and not Bonanno, told Zuley and Schorsch that she (Ward) was drunk during the shooting and hesitant to view the lineup, and that the officers mistakenly conflated their recollection of the two women. Because the trial court ignored Detective Kowalski's testimony, its determinations about Bonanno's credibility were against the manifest weight of the evidence.

It was also manifestly erroneous for the trial court to ignore the affidavit of Schroeder, Boyd's attorney, and the timing of the lineup. The trial court assumed that Schroeder was present during the lineup. A 75. Although Zuley and Schorsch testified to Schroeder's presence during the lineup, S3 442-43, 448, 488, 501, Schroeder testified

---

[3] Zuley was not asked if he could remember what Ward looked like.

that "I was not present at any lineup involving Boyd." A 68. The trial court made no mention of this affidavit in its opinion and completely failed to consider this evidence. A 73-76.

Further, the trial court declined to discuss the circumstances of Schroeder's arrival at the police station at 2 or 3 p.m. on March 12, 1990, and the lineup's being conducted at 10 p.m.[4] It is inherently implausible that Schroeder would have remained at the police station for over seven hours waiting for a lineup to be conducted, and that no police officer could account for Schroeder's activities during those seven or eight hours. Rather, the only reasonable conclusion is that Schroeder was present early in the afternoon of March 12, 1990, but had left by the time the lineup took place at 10 p.m. The reporting officers, Schorsch and Zuley (A 52), and Zuley and John Murray (A 56), apparently noted the time of Schroeder's arrival but not his departure and, therefore, the reports drafted the following day mistakenly indicated Schroeder's continued presence for the rest of the report period. A 53, 59. Not only did the trial court fail to address Schroeder's affidavit, but it also made a factual finding directly contrary to it, and it relied on that factual finding as a cornerstone of its decision.

The trial court's findings are due less deference because the trial court ignored the Kowalski and Schroeder evidence. *See Sarchet v. Zeigler*, 278 Ill. App. 3d 460, 462 (3d Dist. 1996) (less deference owed to trial court findings based on failure to consider evidence in the record). Because the trial court failed to consider this evidence, much less make credibility determinations or factual findings about it, there are no findings to

---

[4] Although the judge referred to "lineups," A 75, only one lineup was conducted in relation to this shooting. A 52-54.

- 31 -

which this Court should defer. *See People v. Nelson*, 244 Ill. App. 3d 356, 363 (1st Dist. 1993).

## B.   The Trial Court Failed To Support Its Adverse Credibility Determinations Regarding Bonanno.

The trial court's credibility determinations concerning Bonanno were manifestly erroneous. Although a reviewing court cannot substitute its own judgment about witness credibility for that of the trial court, "findings of fact are not insulated . . . from appellate review merely because the trial court observed the demeanor of the witness." *Roos*, 181 Ill. App. 3d at 685; *Gunsaullus*, 72 Ill. App. 3d at 442 (same). Rather, "[i]f the circuit court finds a witness to lack credibility, this must somehow be reflected in the record." *Roos*, 181 Ill. App. 3d at 685. Thus, in making adverse credibility determinations, the trial court must state a factual basis for its findings. *Id.* If it fails to do so, a "court of review will not presume that there were aspects of such witness's testimony and demeanor not apparent from the cold type of the record which justified the trial court in entirely disregarding the testimony." *Id.* (quoting *Gunsaullus*); *see also Binion v. Chater*, 108 F.3d 780, 788 n.4 (7th Cir. 1997) (when lower court fails to address the actual credibility of a witness, reviewing court does not give rejection of such testimony the deference normally awarded to credibility determinations).

Here, the trial court made an adverse credibility determination about Bonanno without stating a factual basis for its determination. Accordingly, this determination should not be granted deference. The trial court never stated why it disbelieved Bonanno. All the trial court stated was that it found the "detectives['] account of the lineup procedure to be most credible." A 75. Inexplicably, the trial court also found Ward's

account of the shooting to be more credible than Bonanno's, even though Ward's testimony – unlike Bonanno's – was riddled with inconsistencies. *See People v. Bramlett,* 341 Ill. App. 3d 638, 649 (1st Dist. 2003) (factual finding as to when a police officer knew of witness's statement implicating the defendant was against the manifest weight of the evidence where it was unsubstantiated by any evidence in the record). As in *Bramlett,* these findings are unsubstantiated by any evidence in the record and thus require reversal.

The trial court expressly believed Ward's testimony, apparently agreeing with the State's argument that Ward had no reason to lie. A 75. But Bonanno similarly had no reason to lie, and the trial court failed to state a reason for finding otherwise or for disregarding her testimony. The only hint of a finding that Bonanno had a motive to lie appears in the trial court's recitation of one of the State's arguments. During the evidentiary hearing, the State argued, without a shred of evidentiary support, that Bonanno must have seen herself as Boyd's "savior," and thus she had a motive to lie about the lineup.

Bonanno has no connection to Boyd or his family. S1 75; S5 920-22, 1029-30. She never sought this role for herself, S1 72; A 101, and the State stipulated that WGN approached Bonanno, Bonanno did not approach WGN. S3 626-27. Bonanno has no reason to lie about the Boyd lineup. To the extent the trial court relied on the "savior" argument to reject Bonanno's testimony, the trial court embraced an argument completely unsupported by the record. *Roos* and *Gunsaullus* require that the trial court provide a factual basis for disregarding witness testimony. *See* 181 Ill. App. 3d at 685-86; 72 Ill.

App. 3d at 443. The trial court's failure to do so with Bonanno was manifestly erroneous.

It was also manifestly erroneous for the trial court to state that "in order to find that Ms. Bonanno is more credible [than the police], one would have to find that the police set up this [frame] of the petitioner in front of his defense attorney." A 75. Nowhere in the record has Boyd or his attorneys claimed that the police "framed" Boyd, or that the court must find that a frame took place in order to grant Boyd's petition. There is simply no factual basis in the record for such a statement by the trial court.

Courts have granted post-conviction relief in similar situations where the state's case was weak and the defendant came forward with newly discovered evidence. In *People v. Burrows*, 172 Ill. 2d 169 (1996), the Illinois Supreme Court upheld the grant of post-conviction relief in the form of a new trial. The Supreme Court found it "noteworthy that no physical evidence was ever discovered to link defendant to the crimes." *Id.* at 181. The court also upheld the lower court's finding that the exculpatory testimony of a newly discovered witness was credible, albeit inconsistent with that of other witnesses, noting that the new witness "had no association with the defendant or with someone in defendant's family" and no reason to lie. *Id.* at 184-85.

Here, as in *Burrows*, there was no physical evidence linking Boyd to the crime. Bonanno similarly had no association with Boyd or his family and had no reason to lie. S1 75; S5 920-22, 1029-30. As in *Burrows*, her testimony is credible even though it is inconsistent with the testimony of other witnesses.

The trial court gave no reason for rejecting Bonanno's testimony, and there is no basis in the record for doing so. Thus the trial court's denial of the post-conviction petition should be reversed and a new trial should be ordered.

## C.    The Trial Court Made Unreasonable Inferences And Factual Findings.

The trial court drew unreasonable inferences, entirely unsupported by the record, about the ability of Detectives Zuley and Schorsch to remember certain details about a lineup that took place 14 years earlier. A 75. "A reasonable inference within the purview of the law must have a chain of factual evidentiary antecedents. If an alleged inference does not have a chain of factual evidentiary antecedents, then within the purview of the law it is not a reasonable inference but is instead mere speculation." *People v. Davis*, 278 Ill. App. 3d 532, 540 (3d Dist. 1996). Courts readily reject unreasonable inferences as manifestly erroneous. *See, e.g., People v. Sweborg*, 293 Ill. App. 3d 298, 302 (3d Dist. 1997) (unreasonable and manifestly erroneous for trial court to infer consent to search a car trunk from the defendant's removal of keys from the ignition); *Bramlett v. Champion*, No. 00-6213, 2001 WL 1521315, at *8 (10th Cir. Nov. 30, 2001) (unpub.) (A 179-90) (rejecting trial court's inferential finding that a witness had not been coerced by detectives or a prosecutor, based on defense counsel's failure to uncover this fact during subsequent interview with the witness).

The trial court found that Zuley and Schorsch were credible in remembering certain details from the Boyd lineup – but not others – even though they had conducted hundreds or thousands of investigations and lineups in their careers. This finding was based on the trial court's inference that this case "was unique, an armed assassin spraying

victims with an uzi 1 block from Wrigley Field." A 75. But there is no chain of factual evidentiary antecedents upon which to base this inference.

No evidence was entered and no testimony heard as to the uniqueness of this case and why it would stand out in the minds of Zuley and Schorsch. S3 458-59, 493-95. In fact, Zuley and Schorsch were not present when the shooting took place. A 43. They did not see "an armed assassin spraying victims with an uzi," nor did they visit the crime scene. S4 829; S8, App. A. No weapon, let alone an automatic weapon, was ever recovered or tied to this shooting. Ward testified that the shots were fired individually, not from an automatic weapon. S5 1068; A 142.

In contrast to the lineup officers, Bonanno was present for the shooting and got a good look at the shooter from a short distance. A 45. Bonanno has participated in only one police lineup in her entire life – the Boyd lineup – as opposed to the hundreds or thousands of lineups Zuley and Schorsch have conducted. A 103; S3 458-59, 493-94. The trial court's decision was based on speculation rather than evidence and should be reversed.

*    *    *

The trial court compounded its error when it applied these manifestly erroneous inferences and findings to an incorrect standard of materiality under *Brady*. Instead of asking in light of the undisclosed evidence whether Boyd received a fair trial resulting in a verdict worthy of confidence, the trial court asked whether the remaining evidence was sufficient to support the conviction. Both individually and collectively, these errors require reversal and a new trial.

- 36 -

## CONCLUSION

At trial, Lathierial Boyd did not know that eyewitness Jennifer Bonanno could exonerate him, and Boyd was unable to convince Judge Singer of his innocence. Now that Bonanno's evidence has come to light, Boyd should be given a fair chance to prove that he did not shoot Michael Fleming or Ricky Warner. For all of the foregoing reasons, and in the interests of justice, Boyd respectfully requests that this Court reverse the denial of his post-conviction petition and grant him a new trial.

LATHIERIAL BOYD

By: _Patricia A. Bronte_

One of his attorneys

Patricia A. Bronte (6197090)
Damien P. DeLaney (6281272)
Brian S. Scarbrough (6283939)
JENNER & BLOCK LLP
330 N. Wabash Avenue
Chicago, IL 60611
(312) 222-9350
(312) 527-0484 (fax)

Michael A. Pollard (6186000)
John C. Filosa (6187981)
Lisa Parker Gates (6269788)
BAKER & MCKENZIE LLP
130 E. Randolph St.
Chicago, IL 60601
(312) 861-8000
(312) 698-2168 (fax)

- 37 -

EXH. 14

PLA

No. _____ **1 0 2 9 1 2**

## IN THE SUPREME COURT OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS,

*Respondent-Plaintiff,*

v.

LATHIERIAL BOYD,

*Petitioner-Defendant.*

On Petition for Leave to Appeal from the Illinois Appellate Court,
First Judicial District, Sixth Division, No. 1-04-3088.
There Heard on Appeal from the Circuit Court of Cook County, Illinois,
Criminal Division, No. 90 CR 08602.
The Honorable James D. Egan, Judge Presiding.

## PETITION FOR LEAVE TO APPEAL

Patricia A. Bronte (6197090)
Damien P. DeLaney (6281272)
Brian S. Scarbrough (6283939)
JENNER & BLOCK LLP
330 N. Wabash Avenue
Chicago, IL 60611
(312) 222-9350
(312) 527-0484 (fax)

Michael A. Pollard (6186000)
John C. Filosa (6187981)
Lisa Parker Gates (6269788)
BAKER & MCKENZIE LLP
130 E. Randolph St.
Chicago, IL 60601
(312) 861-8000
(312) 698-2168 (fax)

*Counsel for Appellant Lathierial Boyd*

FILED

Dated: June 16, 2006

## PRAYER FOR LEAVE TO APPEAL

Pursuant to Illinois Supreme Court Rule 315, Petitioner Lathierial Boyd respectfully petitions this Court for leave to appeal from the opinion and judgment of the Illinois Appellate Court, First District, Sixth Division, entered on May 12, 2006.

### JURISDICTIONAL STATEMENT AND JUDGMENT BELOW

On October 24, 1990, after a bench trial that hinged on the identification testimony of a single witness, Lathierial Boyd was convicted of murder, attempted murder, and aggravated battery. *See* P 84-96.[1] He was sentenced to consecutive terms of 55 years for murder and 27 years for attempted murder, as well as a concurrent 5-year sentence for aggravated battery. P 2. Boyd filed a post-conviction petition based on *Brady v. Maryland* because the State had not disclosed that an eyewitness to the crime, Jennifer Bonanno, had affirmatively excluded Boyd during a March 1990 lineup. P 28-55. The trial court conducted an evidentiary hearing and denied post-conviction relief on September 15, 2004. P 70-73. Boyd filed a timely notice of appeal on October 14, 2004. P 23-27. On May 12, 2006, the Appellate Court, without hearing oral argument, issued an opinion affirming the lower court's judgment. P 1-19. Boyd did not file a petition seeking rehearing in the Appellate Court. On May 30, 2006, Boyd filed a timely Affidavit of Intent to File a Petition for Leave to Appeal to the Illinois Supreme Court pursuant to Illinois Supreme Court Rule 315(b). P 20-22.

---

[1] Citations to the Appendix to Boyd's Petition for Leave to Appeal are in the form "P *n*," where *n* refers to the page number(s). Citations to the Supplemental Record of which there are nine numbered volumes, are in the form "S*x y*," where *x* refers to the volume number and *y* refers to the page number(s).

## POINTS RELIED UPON FOR REVIEW

1.     The Court should grant Boyd's petition and reverse the judgment of the
Appellate Court because it applied a standard of deference to lower court factual findings
that conflicts with the admonitions of this Court, *see People v. Ortiz*, 196 Ill. 2d 236, 259,
267 (2001) (holding that reviewing courts must "examine carefully the evidence"), and
conflicts with decisions of other appellate courts, *see People v. Roos,* 181 Ill. App. 3d
682, 685 (5th Dist. 1989) (rejecting findings contradicted by police officer testimony
where trial court did not explain why officer was not credible).  Even though Jennifer
Bonanno was a disinterested eyewitness whose testimony and statements excluding Boyd
as the shooter remained consistent over the years, the trial court disregarded Jennifer's
testimony in favor of (a) another witness whose testimony was riddled with
contradictions and who admitted being drunk on the night of the shooting, and (b) two
detectives with an obvious interest in defending their conduct and who, understandably,
had difficulty recalling the details of their investigation of 14 years earlier.  P 71-72; S3
495-96, 502; S4 879.  Moreover, the trial court simply ignored the testimony of the police
officer who interviewed Jennifer shortly after the shooting (S2 380-82) and the affidavit
of Boyd's attorney (P 64-65) -- which supported Jennifer's version of events and cast
doubt on the credibility of the detectives who conducted the lineup.  P 71-72.

       The Appellate Court applied a novel standard of deference that would insulate
virtually all lower court factual findings from review.  Rather than carefully examining
the evidence, the Appellate Court accepted without question the trial court's arbitrary
rejection of Jennifer's testimony and its wholesale acceptance of the testimony of other

2

biased and impeached witnesses. *But see Ortiz*, 196 Ill. 2d at 267.  The Appellate Court also assumed, without any basis, that the trial court had considered and rejected independent evidence supporting Jennifer's version of events. *But see Roos*, 181 Ill. App. 3d at 685.  In doing so, the Appellate Court abdicated its duty to ensure, after a careful review of the evidence, that the manifest weight of the evidence supported the trial court's findings.  This directly conflicts with the teachings of this Court and other appellate courts in the Second, Third, and Fifth Districts.

2.     Because of the Appellate Court's uncritical deference to the trial court's unreasonable and arbitrary factual findings (and lack thereof), the Appellate Court also failed to consider whether Jennifer's exculpatory statements were material under the *Brady v. Maryland* standard.  *Brady v. Maryland*, 373 U.S. 83 (1963); *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *People v. Hobley*, 182 Ill. 2d 404, 433 (1998).  Boyd has consistently said he is innocent, and his murder conviction rested entirely on the identification testimony of a single witness who had previously told the police that he did not know who the shooter was.  P 90-93.  Only after Jennifer appeared in WGN's Reasonable Doubt series – eleven years after Boyd's conviction – did Boyd learn that an eyewitness had told police that Boyd was not the shooter.  P 61, 98.  Because this important evidence was not made available to the defense and to the trier of fact at Boyd's trial, his conviction is unworthy of confidence.

## STATEMENT OF FACTS

Based on identification by a single witness, Lathierial Boyd was convicted in a bench trial and sentenced to 82 years in prison for first degree murder, attempted murder,

3

and aggravated battery in connection with a shooting that occurred in the early morning hours of February 24, 1990. S8 App. N 439-40; P 93-95. Nine eyewitnesses viewed a lineup including Boyd, and not one of them identified Boyd as the shooter. P 5. No physical evidence linked Boyd to the crime. P 90. Two alibi witnesses, including a deputy sheriff, placed him more than 20 miles from the crime scene at the time of the shooting. P 6-7. The trial judge's ruling was based entirely on the identification testimony of Ricky Warner, who initially said he could not identify the shooter. P 7, 87, 90-93; S8 App. N 349.

Eleven years after the conviction, Boyd learned that an eyewitness to the shooting, Jennifer Bonanno, had viewed the Boyd lineup and told police that Boyd was not the shooter. P 8, 61, 98; S1 65-66, 72-74. Jennifer, who did not know Boyd and had no personal interest in his case, was not called by either party at Boyd's trial because a police report of the lineup omitted the fact that Jennifer had affirmatively excluded Boyd as the shooter. P 5-6. Further, Boyd's attorney attested that he was not present at the lineup and was unaware that a witness had excluded his client. P 11-12, 65. Therefore, the court that convicted Boyd never heard Jennifer's testimony.

The two police detectives present at the lineup denied that Jennifer excluded Boyd as the shooter. S3 448, 486; P 11. The detectives, who could not remember Jennifer's appearance or the number of witnesses who viewed the lineup, claimed to remember other details of the lineup: that Jennifer never excluded Boyd as the shooter, though Jennifer says she did; and that Boyd's attorney was present at the lineup, though the attorney testified he was not. S3 442-43, 448, 458, 486, 488, 495-96, 501-02.

4

### Jennifer's Account

Jennifer Bonanno's account begins on the evening of the shooting when she and her friend, Tashyra Ward, went to the Exedus on Clark Street around 9 p.m. to celebrate Jennifer's upcoming 19th birthday. S1 37-38. The pair danced at Exedus until it closed at 2 a.m., and Jennifer consumed about three or four drinks, but was not drunk. S1 40, 83-84; S4 409-12. According to Jennifer, she "wasn't there to get drunk;" she went to Exedus that night "to dance and listen to music." P 120.

As they left the bar that evening, Jennifer and Tashyra were approached by two African-American men who asked them if they wanted to buy marijuana. S1 43. After the women declined, the two men turned to walk away when a car on Clark Street screeched to a halt nearby. S1 43-44. Jennifer saw a very dark-skinned African-American man jump out of a greenish-copper car and run toward the sidewalk. S1 45-47. The man pulled a gun from his jacket, opened fire toward the two men selling marijuana, and then ran from the scene. S1 47, 49-50.

Sixteen days later, Jennifer and eight other eyewitnesses viewed a lineup in which Boyd voluntarily participated. S1 69, 72; S8 App. C, App. D; P 5. None of the eyewitnesses identified Boyd as the shooter. S1 69, 72; S8 App. C; P 5. As Jennifer viewed the lineup, a police officer asked her several times if she saw the shooter among the men in the lineup, and she stated that she did not. S1 64; P 124-25. At that point, Jennifer asked the police officer "who were you looking for me to pick?" S1 65-66; P 6, 126. The police officer indicated the man at the far left end of the lineup, Boyd. *Id.* Jennifer then told the officer there was "no way in the world" that Boyd was the shooter,

5

because Boyd "looked nothing like the shooter." P 6, 61, 126. The police report indicated only that "[a]s a result of the line-up, the suspect Lathierias [sic] Boyd was not identified by any of the on the scene at the time of the incident witnesses." S8 App. C; P 5.

Eleven years later, a WGN reporter located and interviewed Jennifer, and she recounted the events surrounding the shooting and the lineup. S1 72-75; S8 App. Y; P 102. Jennifer repeated her statements to the police that Boyd was not the shooter, and she explained that Boyd looked nothing like the shooter. S1 72-74; S8 App. Y; P 61. The reporter encouraged Jennifer to identify another man as the shooter, but Jennifer would not do so. S5 1001-02, 1006-07.

**The Investigation And Trial**

Immediately after the shooting, police interviewed several witnesses, including Jennifer and Tashyra. S8 App. A. Jennifer told police she was roughly three feet from the shooter, and she described the shooter as being between 5'8" and 5'10" tall with a very dark complexion, a moustache, a "fade" haircut (shaved sides with some hair on top), very high cheek bones, and a large, angular jaw. S1 46-47. The police report contained only a composite description of the shooter as a black male with a medium to dark complexion, in his mid- to late-20s, between 5'10" and 6 feet tall, between 170 and 190 pounds, "well built," with black hair, a flat nose, and a moustache. S8 App. A. Police at the time described Boyd as taller (6'2"), fairer ("medium complexion"), and heavier ("200 pounds") than the composite description. S8 App. D. Boyd was also

6

clean-shaven even though Jennifer and the composite described the shooter with a moustache. S8 App. A; S4 841, Petitioner's Exhibit 2, lineup photo.

On March 9, 1990, a police officer interviewed Warner at the hospital. S8 App. B, App. N 14-15. At the interview, Warner stated that he did not know who shot him. S8 App. B, App. N 15. Warner told police that he owed money to a man nicknamed "Rat," but Warner did not identify "Rat" or anyone else as the shooter. S8 App. B, App. N 15-27. Warner did state that "Rat" had been to his parents' home. S8 App. B. A nurse present at the interview described Warner as "alert and oriented," and testified that he "could understand what [the police] were asking him." S8 App. N 31. After interviewing Warner's father, police returned to Warner's hospital room with a photo array that included Boyd. S8 App. B, App. N 12, 233-37. Warner identified Boyd both as the person he knew as "Rat" and, contrary to his earlier statement, as the person who shot him. S8 App. N 233-37.

No physical evidence linked Boyd to the shooting, and the State's case at trial was based on the identification testimony of Warner. P 6-7. A deputy sheriff and Boyd's sister Angela testified that Boyd spent the night of the shooting at Angela's home at 4820 West Ford City Drive in Chicago, more than 20 miles from the crime scene, and Boyd did not leave until 9 a.m. the following morning. S8 App. N 301-06, 314-16. Neither the State nor Boyd's attorney called Jennifer to testify.

Despite concerns about the sufficiency of the evidence, the trial judge convicted Boyd. P 84-96. The judge noted that Warner initially denied seeing the shooter, and that Warner's later identification of Boyd ordinarily would have been insufficient to convict

7

him. P 91-92. Ultimately, however, the judge concluded that Warner and Boyd knew each other and had an "ongoing relationship" that gave credence to Warner's delayed identification of Boyd. P 91.

The trial judge sentenced Boyd to 55 years' imprisonment for the murder of Michael Fleming and 27 years for the attempted murder of Ricky Warner, to be served consecutively. S8 App. N 439-40. Boyd's conviction and sentences were affirmed on direct appeal. S8 App. P. Boyd filed two petitions for post-conviction relief, one of them *pro se*. Both petitions were denied, and the denials were affirmed on appeal. S8 App. Q-X.

### The Successor Petition For Post Conviction Relief

Although Boyd knew nine eyewitnesses saw the shooting, he first learned that Jennifer had excluded him as the shooter after she was interviewed by WGN in 2001. P 38-39; S8 App. M. After learning of Jennifer, Boyd filed a Successor Petition for Post-Conviction Relief on March 6, 2002. P 28-55. Jennifer appeared for a deposition on February 3, 2003. P 97. The trial court held an evidentiary hearing for portions of six days between January and July 2004. P 8, 70. Jennifer testified consistently with her WGN interview and deposition. *Compare* S1 40-47, 63-66 *with* P 102-18, 123-27 *and* S6 1214-15.

Chicago police officer Daniel Kowalski testified that he interviewed Jennifer on the night of the shooting, and she stated that the shooter was approximately three feet away from her. S2 375. Kowalski testified that he noted nothing unusual about Jennifer's behavior and did not question her ability to give clear answers. S2 380-82.

8

Tashyra Ward confirmed that she had been with Jennifer the night of the shooting. S3 407. Tashyra testified that she was "extremely drunk" that night, and her memory of the shooting was hazy. P 134-36; S3 410, 420; S5 1054. She could not recall whether Jennifer was drunk. S3 410. Tashyra's memory of events *before* the shooting improved during the one-year interval between her deposition and the hearing, and her recollection of the shooting itself deteriorated. In 2003, Tashyra had no memory of any details before the shooting, but at the evidentiary hearing a year later, she testified that she and Jennifer met at Jennifer's house for drinks before taking the Clark Street bus to the Exedus. *Compare* P 131-33 *with* S3 407-09. Tashyra specifically testified that the pair arrived between 8 and 9 p.m., and stayed until about 2 a.m. S3 409-12. At her 2003 deposition, Tashyra testified that she probably could have described the shooter at the time, and that she may have told police she saw the shooter tucking a gun into his pants. P 148, 159-60. At the 2004 hearing, however, Tashyra testified that she only saw a glimpse of a man running away from her, but she had "no idea" if that man was the shooter, and she denied seeing anyone holding a gun. S3 413-14, 416.

Detectives Richard Zuley and Steven Schorsch had conducted the lineup that Jennifer and eight other eyewitnesses viewed about two weeks after the shooting. P 71; S8 App. C. Although Zuley could not remember what Jennifer looked like and Schorsch could not remember how many witnesses viewed the lineup, both detectives testified that, 14 years earlier, Jennifer and Tashyra had each told them exactly the same thing: that they were drunk on the night of the shooting and reluctant to view the lineup. S3 444-48,

9

458, 485-86, 495-96, 502; S4 879. The detectives also testified that Jennifer never affirmatively excluded Boyd as the shooter. S3 448, 486.

## The Trial Court's Ruling

On September 15, 2004, the trial court issued a ruling denying post-conviction relief because it did not believe Jennifer made any exculpatory statements to police. P 70-73. The trial court explained that "[i]n order to find that Ms. Bonanno is more credible, one would have to find that the police set up this fame [sic] of the petitioner in front of his defense attorney." P 72. The ruling did not mention the affidavit of Boyd's attorney attesting that he had not witnessed the lineup. P 70-73. The court did not explain why it found that Jennifer was not credible, but concluded that Jennifer was intoxicated at the time of the shooting, despite the contrary testimony of Daniel Kowalski, the police officer who interviewed Jennifer shortly after the shooting. P 72. Further, although it did not explain why it found "the detectives['] account of the lineup procedure to be most credible," the court bolstered the detectives' credibility with the assertion that the crime was "unique" because it involved "an armed assassin spraying victims with an uzi." *Id.*

## The Opinion of the Appellate Court

The Appellate Court affirmed the judgment of the trial court in all respects. P 1. First, the Appellate Court noted with approval the three "problems" with Jennifer's credibility identified by the trial court: Jennifer's sobriety on the night of the shooting, her opportunity to observe the shooter, and the conflict between the testimony of Jennifer and the detectives. P 15-16. Although the trial court ruling stressed the conclusion that

10

Jennifer had been drunk on the night of the shooting, the Appellate Court found this discussion to be merely peripheral to her credibility on the lineup procedure.  P 16-17.

Second, the Appellate Court deferred to each factual determination made in the trial court.  P 17-19.  The court disregarded the comparative reliability of Jennifer's testimony, concluding only that "[Boyd] petitions this court to reweigh the evidence and substitute our judgment for that of the trial court."  P 18.

Finally, the court downplayed the trial court's conclusion, unsupported by any evidence, that Jennifer was motivated by a "need to continue in her role as [Defendant's] savior," reasoning that "it appears that this was merely a recitation of an argument presented by the State."  P 18.

## ARGUMENT

An appellate court must "examine carefully the evidence adduced at trial." *People v. Ortiz*, 196 Ill. 2d 236, 267 (2001).  "[A]lthough determinations by the trier of fact are entitled to great deference, they are not conclusive." *Id.* at 259; *see also People v. Smith*, 185 Ill. 2d 532, 542 (1999) (factfinder's credibility determination not conclusive).  Rather, findings of fact and credibility determinations of the trial court must be vacated if they are contrary to the manifest weight of the evidence.  *People v. Gunsaullus*, 72 Ill. App. 3d 440, 442-43 (2d Dist. 1979).  By that standard, an appellate court must vacate factual findings that are "unreasonable, improbable" or not based on the evidence.  *Ortiz*, 196 Ill. 2d at 259; *Smith*, 185 Ill. 2d at 542.

The Appellate Court's opinion in this case conflicts directly with this well-settled principle because it follows a standard of blanket deference to the trial court's factual

11

findings even where those findings are unreasonable, arbitrary, and not based on the evidence. Here, Jennifer has been unwavering in her testimony that she saw the killer the night of the shooting, that Boyd was not the man she saw that night, and that she told police that Boyd was not the killer. Yet the trial court found that Jennifer was not credible for reasons that are unreasonable, arbitrary, and unsupported by the evidence.

First, the trial court's principal reason for discounting Jennifer's testimony was its arbitrary determination that she must have been intoxicated the night of the shooting. Instead of considering the credible testimony of Jennifer and Officer Kowalski, the judge relied on his personal belief that "someone who boldly goes to a club underage for 5 to 6 hours" is unlikely to remain sober. P 72.

Second, the trial court found the detectives more credible than Jennifer, despite their selective memory, because a police report stated that Boyd's attorney was present for the lineup – a fact rebutted by the attorney's affidavit attesting he did not witness the lineup. The court simply ignored the affidavit and credited the police report instead. P 72.

Rather than analyzing these unreasonable and arbitrary factual conclusions, the Appellate Court simply deferred to them on the asserted basis that it could not substitute its own judgment for that of the lower court. *See* P 18. In deferring to these unreasonable and arbitrary factual determinations, the Appellate Court's decision adopts a standard of review that is in clear conflict with well-settled principles announced by this Court and other appellate courts.

12

I.      **The Appellate Court's Decision Conflicts With Established Precedent By
        Deferring To Factual Findings That Are Unreasonable, Arbitrary And
        Contrary To The Evidence.**

A.      **The Appellate Court Improperly Deferred To The Trial Court's
        Arbitrary Rejection Of Jennifer's Testimony.**

Jennifer is a disinterested witness. She had no reason to lie and has no connection

to Boyd or his family. S1 75; S5 920-22, 1029-30. She never sought a role for herself in

these proceedings (S1 72; P 98), and the State itself stipulated that she came forward after

being first approached by WGN for an interview (S3 626-27). There is no evidence that

Jennifer's testimony was motivated by anything but the truth – a fact that the trial court

recognized and tried to discount by adopting the State's speculation that Jennifer wanted

to be Boyd's "savior." P 72.

This Court affirmed post-conviction relief in a capital murder case in which no

physical evidence connected the defendant to the crime and a credible witness exonerated

him. *People v. Burrows*, 172 Ill. 2d 169, 181 (1996). One of Burrows' grounds for relief

was a newly discovered witness who corroborated an alibi previously offered by the

girlfriend of Burrows' brother. *Id.* at 178-79. Noting that the new witness "had no

association with the defendant or with someone in defendant's family," the Court found

that the new testimony "lent considerable credence" to the abili. *Id.* at 184-86.

Similarly, Jennifer's testimony should have been given considerable credence in

this case. The record contains no evidence to support the trial court's finding that

Jennifer viewed herself as Boyd's "savior," but the Appellate Court brushed aside this

finding by presuming it did not affect the trial court's decision. Moreover, the Appellate

Court simply abdicated its duty to examine the evidence carefully when it uncritically deferred to each of the trial court's other credibility determinations.

The trial court's finding that Jennifer was intoxicated on the night of the shooting was arbitrary and unsupported by the evidence. The direct evidence regarding Jennifer's condition as she left the bar was: (1) Jennifer's uncontroverted testimony that she had only three or four drinks (S1 40, 83-84); (2) Tashyra's statement that she could not recall whether or not Jennifer was intoxicated (S3 410); and (3) Officer Kowalski's statement that Jennifer did not appear intoxicated (S2 380-82). Although the trial court may be entitled to deference when "weighing conflicting testimony," the court never explained why it disregarded testimony by the only witnesses who personally observed Jennifer's demeanor at the time, in favor of a police report and the detectives' testimony of what Jennifer and Tashyra allegedly said two weeks later. S8 App. D; S3 444-48, 485-86. Indeed, the trial court never even considered Kowalski's testimony that Jennifer did not appear intoxicated. Instead, the trial court simply substituted its own intuition that Jennifer must have been drunk.

Kowalski, the only police officer to interview Jennifer at the time of the shooting, cast doubt on the police report and the detectives by testifying that she did not appear to be drunk. S2 380-82. Rather than articulating any reason for rejecting Kowalski's testimony, the trial court simply ignored it. P 72. Faced with a trial court that has ignored key pieces of relevant evidence, the reviewing court cannot defer to unarticulated credibility determinations. *Sarchet v. Zeigler*, 278 Ill. App. 3d 460, 462 (3d Dist. 1996) (less deference owed to trial court findings based on failure to consider evidence in the

record); *Diallo v. Ashcroft*, 381 F.3d 687, 695 (7th Cir. 2004) (rejecting immigration judge's findings of fact under "highly deferential" standard of review where judge ignored key testimony without finding witness not credible). The reviewing court "must decide cases on proof in the record and not theater of the mind." *People v. Davis*, 278 Ill. App. 3d 532, 544 (1st Dist. 1996).

The Appellate Court reasoned that the question of whether Jennifer was intoxicated that evening "was only tenuously related to whether Bonanno's account of the lineup procedure was accurate" (P 16-17), but the trial court's ruling makes clear that its assessment of Jennifer's overall credibility was heavily influenced by the judge's view that she was drunk during the shooting. This view was based not on the evidence but rather on the judge's opinion that anyone "who boldly goes to a club underage for 5 to 6 hours" must have gotten drunk. P 72. The Appellate Court improperly deferred to the judge's unsupported assessment, instead of holding the trial court to its duty to state a *factual* basis for its findings. *People v. Roos*, 181 Ill. App. 3d 682, 685 (5th Dist. 1989); *Gunsaullus*, 72 Ill. App. 3d at 443.

The Appellate Court also deferred to the trial court's arbitrary conclusion that Jennifer was not credible because she claimed to have been a short distance from the shooter and next to a newspaper box. P 15. The lower courts inexplicably credited Tashyra's testimony about the position of the shooter over Jennifer's testimony, even though Tashyra admitted that she was "extremely drunk" at the time and her testimony about the shooting was inconsistent. S3 420. At her deposition, Tashyra testified that she may have told police that she saw the shooter put a gun in his pants. P 159-60. At the

15

hearing, she testified that she only glimpsed a man, had no idea if he was the shooter, and never saw a gun. S3 413-14, 416. The Appellate Court, therefore, had no basis to defer to the trial court's conclusion that Tashyra was more credible than Jennifer. *See People v. Sledge*, 25 Ill. 2d 403, 407 (1962) (reversing conviction resting on victim's testimony that differed from his pretrial statements).

The lower courts ignored that Jennifer told Officer Kowalski immediately after the shooting that she was only three feet from the shooter and she gave Kowalski a detailed description. P 60; S1 59; S2 375, 379. Moreover, whether Jennifer was next to a newspaper box or some other object as the shooting began is a collateral matter which, as this Court held in *Burrows*, cannot render Jennifer's account "inherently unreliable." 172 Ill. 2d at 185.

## B. The Appellate Court Improperly Deferred To The Trial Court's Unreasonable Inferences To Bolster The Credibility Of The Detectives.

The Appellate Court deferred to the trial court's unreasonable inferences, entirely unsupported by the record, about the ability of Detectives Zuley and Schorsch to remember selected details about a lineup that took place 14 years earlier. P 15-19, 72. The veteran detectives had conducted hundreds, perhaps thousands, of lineups in their careers, yet claimed to remember specific details of this lineup while completely forgetting others. S3 442-43, 448, 458-59, 486, 488, 495-96, 501-02. For example, neither Zuley nor Schorsch could remember what Jennifer looked like. Zuley incorrectly described Jennifer as having dark hair at the time of the shooting, when in fact she was blond then and dark-haired during the later WGN interview. S3 458; S4 879. Schorsch

16

also could not remember what Tashyra looked like. S3 502.[2] Their testimony was based on reviews of their reports and meetings with Assistant State's Attorneys, not on their independent recollection. *Id.* 458, 494. The Appellate Court, therefore, had no basis to defer to the trial court's conclusion that the detectives were more credible than a disinterested eyewitness.

Recognizing this flaw, the trial court apparently believed that the detectives' credibility was bolstered by another unsupported inference: that this case was unique because it involved "an armed assassin spraying victims with an uzi[.]" P 72. The detectives never saw the crime or the crime scene, and the lineup they conducted was two weeks after the shooting. P 5, 17; S2 373; S4 829; S8 App. A, App. D. The court's finding that this lineup would have been more memorable to the detectives than to an eyewitness to the shooting is unreasonable.

The trial court also inferred that the detectives must have been truthful because they would not have "framed" Boyd in front of his attorney. P 72. This inference rested on the false premise that Schroeder was present for the lineup. But Schroeder attested that he was not there. P 65. The trial court simply ignored this direct and reliable evidence (P 72), and the Appellate Court tried to correct the oversight by claiming, incorrectly, that the trial court had considered and rejected it (P 17). "If the circuit court finds a witness to lack credibility, this must somehow be reflected in the record." *Roos,* 181 Ill. App. 3d at 685. A reviewing court may not fill in the gaps left by the trial court. Moreover, it is inherently implausible that Schroeder would have remained at the police

---

[2] Zuley was not asked if he could remember what Tashyra looked like.

station for six hours or more waiting for a lineup to be conducted, and that no police
officer could account for Schroeder's activities during all that time. Schroeder arrived at
the police station around 2 or 3 p.m., and the lineup took place around 9 or 10 p.m. S3
477. The only reasonable conclusion is that Schroeder arrived early in the afternoon but
had left by the time of the lineup. Yet the trial court and the Appellate Court ignored
Schroeder's testimony and credited the implausible police report.

This Court has admonished reviewing courts to reject unreasonable inferences as
manifestly erroneous. *Smith*, 185 Ill. 2d at 543-44 (rejecting State's unreasonable
inference that defendant waited in a vestibule between two doors before shooting the
victim where no evidence supported such an inference); *see also People v. Sweborg*, 293
Ill. App. 3d 298, 302 (3d Dist. 1997) (unreasonable and manifestly erroneous for trial
court to infer consent to search a car trunk from defendant's removal of keys from
ignition). The Appellate Court in this case, however, departed from the decisions of this
Court and those of the Second, Third, and Fifth District Appellate Courts in embracing
the trial court's unreasonable inferences and conclusions.

## II.    Jennifer Bonanno's Exculpatory Testimony Meets The *Brady* Materiality Test.

Although the Appellate Court did not reach the issue, Jennifer's testimony plainly
meets the materiality standard under *Brady v. Maryland*, 373 U.S. 83 (1963). *See Kyles
v. Whitley*, 514 U.S. 419, 434 (1995); *People v. Hobley*, 182 Ill. 2d 404, 433 (1998).
Under *Brady* and its progeny, the relevant question is whether, in the absence of the
evidence, the verdict is worthy of confidence. *Kyles*, 514 U.S. at 434. In order to show
that the suppression of evidence "undermines confidence in the outcome of the trial," a

18

defendant need only show that, had the original trier of fact seen the concealed evidence, there would be a reasonable probability of a different result. *Id., citing United States v. Bagley*, 473 U.S. 667, 678 (1985); *see also Hobley*, 182 Ill. 2d at 433 (1998). Here, the trial court misconstrued the *Brady* standard, reasoning that the evidence was material only if "after discounting the inculpatory evidence in light of the undisclosed evidence, there [was] enough left to convict." *Kyles*, 514 U.S. at 434-35. *Kyles* expressly rejected this analysis. *Id.*

Had the trial court applied the appropriate standard, it would have found Jennifer's testimony to be material. *See Kyles*, 514 U.S. at 434. The original trial was close. No physical evidence connected Boyd to the shooting, and not one of the nine eyewitness identified Boyd as the shooter when they viewed the lineup. The State's case hinged entirely on Warner's later identification of Boyd after first stating that he could not identify the shooter. The judge stated this would have been insufficient to convict Boyd "in the ordinary kind of situation," but believed Warner because of his ongoing relationship with Boyd. P 90-92. Given the hesitation of the trier of fact to convict based on the evidence before him, Jennifer's disinterested testimony, which contradicts Warner's identification, would have undermined confidence in the outcome of the trial and created a reasonable probability of a different result. *See Kyles*, 514 U.S. at 434. Therefore, the trial court erred as a matter of law when it determined that Jennifer's testimony was not material.

## CONCLUSION

For the foregoing reasons, this Court should grant appellant Lathierial Boyd leave

to appeal to this Court.

Dated: June 16, 2006

Respectfully submitted,

LATHIERIAL BOYD

By: _Patricia A. Bronte_

One of his Attorneys

Patricia A. Bronte (6197090)
Damien P. DeLaney (6281272)
Brian S. Scarbrough (6283939)
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL 60611
(312) 222-9350
(312) 527-0484 (fax)

Michael A. Pollard (6186000)
John C. Filosa (6187981)
Lisa Parker Gates (6269788)
BAKER & MCKENZIE LLP
130 E. Randolph St.
Chicago, IL 60601
(312) 861-8000
(312) 698-2168 (fax)

## CERTIFICATE OF SERVICE

I, Patricia A. Bronte, certify that I caused three copies of the foregoing **PETITION FOR**

**LEAVE TO APPEAL**, as well as three copies of the **SEPARATE APPENDIX TO THE**

**PETITION FOR LEAVE TO APPEAL**, to be served upon:

James E. Fitzgerald
Georgia A. Buglass
Assistant State's Attorneys
300 Richard J. Daley Center
Room 309
Chicago, IL 60602

by First Class mail, postage prepaid, on June 16, 2006.

Patricia A. Bronte

EXH. 15

EXECUTIVE CLEMENCY
BASED ON ACTUAL INNOCENCE
AND A FUNDAMENTAL MISCARRIAGE
OF JUSTICE

PARDON DOCKET NO. _____

BEFORE THE ILLINOIS PRISONER REVIEW BOARD
SPRING TERM, 2008
ADVISING THE HONORABLE ROD R. BLAGOJEVICH, GOVERNOR
IN THE MATTER OF LATHIERIAL BOYD

# PETITION FOR EXECUTIVE CLEMENCY

Patricia A. Bronte
Brian S. Scarbrough
Nicholas A. Kurk
Jenner & Block, LLP
330 N. Wabash
Chicago, IL  60611
312-222-9350

Attorneys for Petitioner

Dated: February 4, 2008

1521230

PARDON DOCKET NO. _____

BEFORE THE ILLINOIS PRISONER REVIEW BOARD
SPRING TERM, 2008
ADVISING THE HONORABLE ROD R. BLAGOJEVICH, GOVERNOR
IN THE MATTER OF LATHIERIAL BOYD

---

## PETITION FOR EXECUTIVE CLEMENCY

---

## AFFIDAVIT OF MAILING

The undersigned, an attorney, certifies that he served true and correct copies of the

Petition for Executive Clemency of Lathierial Boyd on February 6, 2008 upon:

> Illinois Prisoner Review Board
> 319 East Madison Street
> Suite A
> Springfield, Illinois 62701
>
> Cook County State's Attorney
> Room 11D38
> 2650 South California Avenue
> Chicago, Illinois 60608
>
> Hon. Paul P. Biebel, Jr.
> Chief Judge, Criminal Division
> Circuit Court of Cook County
> 2600 South California Avenue
> Chicago, IL 60608

Nicholas A. Kurk

i

# TABLE OF CONTENTS

AFFIDAVIT OF MAILING ................................................................................................. i

I.  INTRODUCTION ........................................................................................................... 1

II.  REQUIRED INFORMATION ...................................................................................... 2

III.  BIOGRAPHICAL INFORMATION ......................................................................... 3

IV.  CONVICTION PROCEDURE ................................................................................... 4

V.  STATEMENT OF FACTS............................................................................................ 6

    A.  Background ............................................................................................................ 6

    B.  Evidence at Trial.................................................................................................. 8

    C.  Trial Judge's Ruling ......................................................................................... 10

    D.  Evidence Not at Trial....................................................................................... 11

        1.  *New Evidence - Testimony of Eyewitness Jennifer Bonanno*.................. 11

        2.  *Further Evidence of Innocence*................................................................. 12

VI.  REASONS FOR SEEKING CLEMENCY ............................................................. 14

    A.  The Evidence In Its Totality Shows Lathierial Boyd Is Innocent .............. 14

    B.  Community Support............................................................................................ 17

    C.  Prayer for Relief................................................................................................ 19

VII.  DECLARATION........................................................................................................ 21

VIII.  REQUEST FOR PUBLIC HEARING .................................................................. 22

## I. INTRODUCTION

Petitioner Lathierial Boyd is a 41-year-old man who has been confined for over seventeen years for a crime he did not commit. Throughout these years Lathierial has maintained his innocence. As this Petition will demonstrate, the evidence used to obtain Lathierial's conviction is highly unreliable; key mitigating evidence, including recently discovered evidence, was never presented at trial; and there are extremely compelling reasons for believing that he is actually innocent.

Absolutely no physical, scientific, or forensic evidence tied Lathierial Boyd to the crime. Lathierial's murder conviction hinged on the questionable identification by one of the shooting victims, Ricky Warner, who initially told the police that he did not see who shot him. Two alibi witnesses, one of whom was a Cook County Sheriff of eleven years, placed Lathierial over twenty miles away from the crime scene on the night of the incident. Lathierial voluntarily participated in a lineup but was not identified by any of nine individuals that witnessed the shooting. The eyewitnesses and the police composite described the shooter in a manner inconsistent with Lathierial's physical characteristics at the time. And finally, a disinterested eyewitness to the shooting affirmatively and positively excluded Lathierial as the shooter during the lineup and consistently has maintained that Lathierial was not the shooter.

Lathierial is seeking clemency because this is the rare case where the justice system has not served its purpose and has failed him. The appellate and post-conviction court system is riddled with procedural hurdles, standards of review, deference to lower court findings and credibility determinations, time limits, and numerous other factors that, when coupled with new evidence that has gradually been surfacing since the crime occurred, has prevented any one court from hearing all of the evidence. The Prisoner Review Board and Governor Blagojevich are in the unique position to look at all the evidence, which clearly shows that the justice system did

1

not work the way that it is supposed to work. Looking at everything that is known today, Lathierial would not have been found guilty at trial. This is the last chance to fix that mistake.

Pursuant to 730 ILCS § 5/3-3-13 and the guidelines set forth by the Illinois Prisoner Review Board, Lathierial respectfully requests a pardon for his conviction based on his innocence of the crime for which he was convicted in 1990. Lathierial further requests that this conviction be expunged from his record. In the alternative, Lathierial requests that his sentence be commuted to the over seventeen years that he has already served. Lathierial respectfully requests that he be permitted to supplement this petition at a public hearing. He thanks the Prisoner Review Board and Governor Blagojevich for taking the time to consider his petition.

## II. REQUIRED INFORMATION

The following information is provided in compliance with the Illinois Prisoner Review Board's Guidelines for Executive Clemency:

1. Lathierial Boyd's current mailing address is Pontiac Correctional Center, 700 W. Lincoln Street, P.O. Box 99, Lincoln, Illinois, 61764.

2. Lathierial was convicted of the offense for which clemency is being sought under the name Lathierial Boyd, which is his true name. Lathierial has never used an alias.

3. Lathierial's social security number is 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. His state prisoner number is B-10106.

4. Lathierial has once previously asked for executive clemency for this conviction in November 2002.

5. Lathierial was convicted of several minor offenses other than the one for which he currently is seeking executive clemency. He was convicted in 1986 of misdemeanor battery and violation of an order of protection after a verbal dispute and physical contact with Ginnie Rugis, the woman with whom he was living at the time. He was sentenced to one (1) year of court supervision. (S1.)[1]

6. Lathierial was convicted of misdemeanor theft on June 3, 1987, when he failed to return a $1,900 deposit he had obtained from a woman interested in purchasing property Lathierial

---

[1] Citations to the Supplemental Appendix are in the Form "S*n*" where *n* represents the numbered tab. Exhibit A through Exhibit P is attached to this petition.

owned and who subsequently changed her mind. Lathierial was sentenced to one (1) year of probation. He also returned the entire deposit. (S2.)

7. On January 16, 1990, Lathierial was convicted of possessing a controlled substance. On February 8, 1990, he was sentenced to 14 months of nonreporting probation and a $100 fine. (S3.)

8. Lathierial has not served in the military.

Lathierial's biographical information is provided in Section III below. The required information regarding the conviction for which Lathierial is requesting executive clemency is provided in Section IV below. The required statement of the facts of the offense is set forth in Section V below. The reasons for seeking executive clemency and the type desired are described in Sections I and VI of this Petition.

## III. BIOGRAPHICAL INFORMATION

Lathierial Boyd was born on January 30, 1966, in Chicago. He grew up on the Southwest Side with his three brothers and three sisters. He attended Chicago public schools – Hurst Elementary School, Nathaniel Green Elementary School and Curie Metropolitan High School – before graduating in 1983 from the private Cosmopolitan Preparatory High School in downtown Chicago.

For several years after high school, Lathierial worked as a construction assistant for the firm of Gustafson-Lindberg in Buffalo Grove, during which time he was a member of the carpenters' union. He also worked as a trail guide at Camelot Farms on Chicago's South Side. Then Lathierial worked as a fashion model for Elite Modeling Agency. Lathierial took and passed a real estate course at Citywide College, and began buying, renovating and selling old buildings on the South Side. In addition, Lathierial owned a clothing business from 1988 to 1990.

Lathierial was married to Jan Murray from June 25, 1988, through December 28, 1990. His wife served him with divorce papers while he was being held in Cook County Jail awaiting

3

the outcome of his trial concerning the shooting for which he is currently in prison. Lathierial has two daughters: Olivia, 22, and Camillia, 16. Lathierial was Olivia's primary caretaker for the first three years of her life while her mother worked as a film director's assistant. He barely knows Camillia, who was born shortly after Lathierial's arrest.

Even though Lathierial has had his freedom taken away for more than seventeen years due to his wrongful conviction that is the subject of this petition, he has remained positive and has attempted to have a positive effect on the lives of others. He plans to have gainful, honest employment upon his release from prison. His family has remained very supportive throughout the years and will no doubt help Lathierial transition back into society. If necessary, he will be able to borrow money from family and friends. He hopes to spend as much time as he can becoming involved again in the lives of his daughters. Lathierial intends to live with his fiancée, Debbie Martinez, in Las Vegas, NV upon release. Ms. Martinez is currently employed as a real estate investor and interior designer and plans to support Lathierial until he is able to gain meaningful employment.

## IV. CONVICTION PROCEDURE

On October 24, 1990, in a bench trial in Cook County, Lathierial was convicted of murder, attempted murder, and aggravated battery in connection with a shooting that took place in Chicago on February 24, 1990. People v. Boyd, No. 90 CR 8602. (S4; *See also* S25, Transcript of Proceedings, October 24, 1990, pp. 10-12.) No forensic or physical evidence linked Lathierial to the shooting. At least nine people witnessed the shooting, and none of them identified Lathierial in a police lineup as the shooter. Instead, the conviction was based on a dubious identification by one of the victims, while in the hospital, that contradicted his earlier statements to police. On December 10, 1990, the trial court sentenced Lathierial to consecutive

4

terms of 55 and 27 years and a concurrent term of 5 years, totaling 82 years. (S4.) The Illinois Appellate Court affirmed Lathierial's conviction on direct appeal on March 24, 1993. (S5.)

On May 27, 1992, Lathierial filed a *pro se* petition for post-conviction relief, which he withdrew on December 14, 1992. (S4.) Thereafter, on August 3, 1993, Lathierial re-filed his first post-conviction petition, which trial judge Shelvin Singer (now retired) denied on October 12, 1994. (S6.) That decision was upheld by the Illinois Appellate Court on January 31, 1996. (S7.) Lathierial's petition to appeal the decision to the Illinois Supreme Court was denied on June 5, 1996. (S8.)

The trial judge dismissed Lathierial's second *pro se* post-conviction petition, which was filed on March 19, 1998, on procedural grounds, without discussing the merits, on April 10, 1998. (S9.) After Lathierial supplemented this petition, the trial judge again dismissed the petition on April 30, 1998. (S13, App. 2.) After Lathierial submitted affidavits, the petition was once again denied by an order dated May 7, 1998. The dismissal was affirmed by the Illinois Appellate Court on August 30, 2000. (S10.) Lathierial's petition to appeal the decision to the Illinois Supreme Court was denied on November 29, 2000. (S11.)

Upon discovering new evidence, Lathierial filed a successor petition for post-conviction relief on March 6, 2002, based on *Brady v. Maryland*, 373 U.S. 83 (1960), because the State had not disclosed that a disinterested eyewitness to the crime, Jennifer Bonanno, had affirmatively excluded Lathierial during a lineup conducted two weeks after the shooting. (S12.) The trial court conducted an evidentiary hearing and, after making credibility determinations that were inconsistent with the record, denied post-conviction relief on September 15, 2004. (S13.) On May 12, 2006, the Appellate Court, without hearing oral argument, issued an opinion affirming the lower court's judgment. (S14.) Lathierial's petition to appeal the decision to the Illinois

Supreme Court was denied on September 27, 2006. (S15.) There are no court actions or appeals pending.

## V. STATEMENT OF FACTS

### A. Background

At about 2:00 a.m. on February 24, 1990, two people were shot and three were grazed by bullets outside Exedus, a reggae nightclub located on the 3300 block of North Clark Street in Chicago. One of the victims, Michael Fleming, died at the scene. His cousin, Ricky Warner, was paralyzed as a result of being shot from behind and died several years later. The three others, who were grazed by bullets – Richard Kutchek, David Lofton and Boris Kaburov – survived without severe injury. Ricky Warner and Michael Fleming had been trying to sell fake marijuana to people leaving the bars in the area.

On March 9, 1990, approximately two weeks after the shooting, the police interviewed Ricky Warner in his hospital room. Several witnesses were present when Warner told Chicago Police Detective Andrew Sobolewski that he did not know who shot him:

Q.     Did you ask Ricky Warner who shot him?
A.     Yes, I did.

Q.     Did he answer?
A.     Originally he answered he didn't know.

(S16, Examination of Andrew Sobolewski, August 2, 1990, p. 15; *See also* S17, Supplementary Police Report dated March 9, 1990, p. 2.) According to Detective Sobolewski's report from March 9, 1990, when he asked Ricky Warner "who might have done this," Ricky Warner told him that he owed money to a man nicknamed "Rat," and that "Rat" was known to carry an automatic weapon. (S17, Supplementary Police Report dated March 9, 1990, p. 2.) At no time during this interview did Ricky Warner ever suggest that he was able to identify "Rat" or anyone else as the shooter.

In light of Ricky Warner's suggestion that "Rat" may have had a motive to shoot him, the police sought to learn the identity of "Rat." Through an interview with Ricky Warner's father, Herbert Warner, the police learned that "Rat" had come to Herbert Warner's home some seven or eight months earlier and had allegedly threatened the Warner family over a drug debt. (*Id.* at pp. 2-3.) The police also learned that petitioner, Lathierial Boyd, went by the nickname "Rat."

Detective Richard Zuley created a photo assortment that included Lathierial's picture and showed this to Ricky Warner in the hospital. According to Detective Zuley, Ricky Warner identified Lathierial's picture as the person he knew as "Rat," *and* as the person who shot him. (S18, Examination of Richard Zuley, October 23, 1990, p. 237.) This was contrary to what Ricky Warner had told the police earlier on March 9, 1990.

On March 12, 1990, after Lathierial learned that the police were looking for him, he went to the police station voluntarily and asked to participate in a live lineup. The police report indicates that ten individuals viewed the lineup. Nine of these individuals were eyewitnesses or victims who were standing outside the bar at the time of the shooting. Not one of these nine eyewitnesses was able to identify Lathierial as the shooter. A police report states that "as a result of the line-up, the suspect Lathierias [sic] Boyd was not identified by any of the on the scene at the time of the incident witnesses." (S19, Supplementary Police Report dated March 13, 1990, p. 3.)

The tenth person who viewed the lineup was Herbert Warner, the father of Ricky Warner, who was not at the scene of the crime. After viewing the lineup, Herbert Warner identified Lathierial as the man whom he knew as "Rat," who had supposedly threatened the Warner family several months before the shooting. (*Id.*)

## B.   Evidence at Trial

In a bench trial before Judge Singer, the key evidence against Lathierial was the

testimony of Ricky Warner. Ricky Warner stated that he was selling fake marijuana the night of

the shooting. He testified that he saw Lathierial shoot him and that he knew who Lathierial was

because he had known him for a couple of years and he owed him money:

> Q.   Do you know what Rat's real name is?
> A.   Boyd.
>
> Q.   Do you know what his first name is?
> A.   Lathierial. Lethoadus (sic).
>
> Q.   How much do you owe Mr. Boyd?
> A.   A Thousand. A Thousand Dollars.
>
> Q.   What did you owe him a Thousand Dollars for?
> A.   For cocaine.
>
> Q.   How long had you owed him that Thousand Dollars for cocaine?
> A.   Some months. About seven months to a year.
>
> Q.   What happened about 2:00 o'clock in the morning on that day?
> A.   I was walking. We was walking on the same side. We was walking and I heard a
>       gunshot and I turned around and he shot me.
>
> Q.   Who shot you?
> A.   Rat shot me. I know Rat.
>
> Q.   How long have you known Rat?
> A.   About a couple of years. I know him through Kelly.

(S20, Examination of Ricky Warner, October 16, 1990, p. 167.) Ricky Warner testified that after

he was shot and lying on the ground, he saw Lathierial run across the street and jump into a car,

which he believed was white. (*Id.* at pp. 171, 215.) Ricky Warner also described a slip of paper

as having Lathierial's beeper number on it, which Lathierial had given him at least seven months

earlier indicating that Lathierial wanted Ricky Warner to sell cocaine for him. (*Id.* at pp. 177-

83.) Ricky Warner disclaimed ever having told Detective Sobolewski or others that he did not

know who shot him. (*Id.* at pp. 187-88.)

8

Several other eyewitnesses testified that they either did not see the shooter or they saw the shooter but could not describe him in detail. Herbert Warner, who was not an eyewitness, testified that he knew Lathierial as the man who had come to his home to collect a $600 debt that Ricky Warner supposedly owed Lathierial in connection with dugs. According to Herbert Warner, Lathierial said that unless Ricky Warner paid what he owed, something would happen to his family. (S21, Examination of Herbert Warner, October 2, 1990, pp. 130-32.) Herbert Warner also testified that Lathierial was driving a car with a vanity license plate containing the letters "RAT." (*Id.* at pp. 133-34.)

The only eyewitness who testified that he saw the face of the shooter was Ricky Warner. The other eyewitnesses who testified all disclaimed any ability to either identify or exclude Lathierial.

The defense presented several witnesses, including Angela Boyd, Lathierial's sister. Angela Boyd testified that Lathierial was at her home with her and her boyfriend, Harold Casey, eating pizza and watching a Chicago Bulls game on television during the evening of the shooting. (S22, Examination of Angela Boyd, October 23, 1990, pp. 303-04.) At the time, Angela Boyd lived at 4820 West Ford City Drive, 22 miles from where the crime occurred. Harold Casey, a Cook County Deputy Sheriff for 11 years, testified that he was with Lathierial at Angela's home during the night, and that he and Lathierial left Angela's home at around 9:00 the following morning. (S23, Examination of Harold Casey, October 23, 1990, pp. 314-16; *See also* S24, Affidavit of Harold Casey, July 26, 1993, ¶¶4-7.)

The defense also presented Cynthia Hendricks, the nurse who was attending to Ricky Warner in the hospital and was present when Ricky Warner told Detective Sobolewski that he did not know who shot him. Ms. Hendricks testified that Ricky Warner was "alert and oriented

9

and understood what the police were asking him." (S35, Examination of Cynthia Hendricks, August 2, 1990, p. 31.)

### C.    Trial Judge's Ruling

During trial, the prosecution failed to produce any physical, scientific, or forensic evidence tying Lathierial to the crime, and there was no evidence that Lathierial ever made any statements admitting involvement in the matter. Rather, the trial judge based his ruling upon the testimony of one witness, Ricky Warner, a victim of the shooting who was seriously injured and whose identification was always plagued by questions.

After first telling the police during the investigation that he did not know who shot him, Ricky Warner changed his story. He later told the police, and testified at trial, that he owed money to Lathierial and that he saw Lathierial shoot him even though Warner was first shot from behind. He testified that he had known Lathierial for a couple of years prior to the shooting. The trial judge noted the inconsistency with Warner's identification in his ruling, but blamed this discrepancy on Warner's medical condition at the time. (S25, Transcript of Proceedings, October 24, 1990, pp. 7-10; *see also* S14, p. 7.) Moreover, the trial judge determined that since Lathierial and Ricky Warner had previously known each other, he found the identification sufficient:

> Now in the ordinary kind of situation, if there had been no prior relationship between the defendant and Ricky Warner, that identification, in my opinion, would not have been sufficient to convict the defendant. In this case however, the defendant and Ricky Warner had an ongoing relationship...

(S25, Transcript of Proceedings October 24, 1990, p. 8.) Further, the trial judge found that this "ongoing relationship" was corroborated by the identification of Lathierial as "Rat" by a non-eyewitness, Herbert Warner (Ricky Warner's father) and Herbert Warner's testimony at trial

regarding supposed threats made by Rat regarding money owed by Ricky Warner. (*Id*. at p. 10.) Lathierial was found guilty and sentenced to 82 years in prison. (*Id*. at pp. 10-12; S4.)

## D.   **Evidence Not at Trial**

Although the trial judge felt there was enough evidence presented at trial to find Lathierial guilty "beyond a reasonable doubt," the trial judge heard only part of the story. There was crucial mitigating evidence that Lathierial's trial counsel never introduced and, more importantly, there has been new evidence that has surfaced since Lathierial's conviction that casts serious doubt on the verdict.

### 1.   *New Evidence - Testimony of Eyewitness Jennifer Bonanno*

New evidence has surfaced since trial that the trial judge never had the benefit of considering, and that evidence seriously undermines the reliability of the verdict. Throughout the years since he was convicted, Lathierial has worked passionately to prove his innocence. As part of that process, his lawyers and investigators tried to uncover new evidence, which included locating and interviewing many of the eyewitnesses to the shooting.

In 2001, reporters from WGN-TV began investigating the evidence surrounding Lathierial's conviction. By chance, they were able to find Jennifer Bonanno, an eyewitness to the shooting who had recently returned to Chicago after spending many years moving from city to city. After interviewing Bonanno, the reporters informed Lathierial and his counsel of Bonanno's account of the shooting and the lineup. They also aired several accounts of their investigation of Lathierial's case, including an interview with Bonanno, on WGN-TV news. A DVD containing the WGN broadcasts is included at S26. Written transcripts of the broadcasts are included at S27.

Bonanno, like other eyewitnesses, viewed a live lineup in which Lathierial voluntarily participated on March 12, 1990, a little over two weeks after the shooting. (S19, Supplementary

11

Police Report dated March 13, 1990, p. 2.) She was unable to identify Lathierial as the shooter. Bonanno also asked the police who their suspect was. A detective told her that it was the man to the far-left of the lineup, which was Lathierial Boyd. Bonanno told the detective there was "no way in the world" that the man on the left was the man she saw that night, and that Lathierial looked "nothing like the shooter." (S28, Affidavit of Jennifer Bonanno, February 28, 2002, ¶11; *See also* S29, Deposition of Jennifer Bonanno, February 3, 2003, pp. 81-86; S30, Examination of Jennifer Bonanno, January 12, 2004, pp. 42-50.) Bonanno has no reason to lie and consistently has maintained to this day that Lathierial was not the shooter. During the WGN broadcast, Lathierial's trial judge, who had since retired, admitted that if he were a judge now, and had that case, he certainly would want to hear Jennifer Bonanno's testimony. (S26 and S27, WGN Broadcast, February 13, 2002.)

### 2.  *Further Evidence of Innocence*

In addition to the testimony of Jennifer Bonanno, there is other evidence that was never before the trier of fact. First, Lathierial's trial counsel never introduced evidence that the composite description in the police reports did not match Lathierial's physical description at the time. The police composite described the shooter as a black male with a medium to dark complexion, in his mid- to late-20s, between 5'10" and 6 feet tall, between 170 and 190 pounds, "well built," with black hair, a flat nose, and a moustache. [2]  (S31, Supplementary Police Report dated February 24, 1990, p. 2.) During the lineup that Lathierial participated in on March 12, 1990, the police described Lathierial as taller (6'1") and heavier ("215 pounds") than the composite description. (S19, Supplementary Police Report dated March 13, 1990, p.2.) When

---

[2] Jennifer Bonanno has stated that she was roughly three feet from the shooter, and described the shooter as being between 5'8" and 5'10" tall, 180-190 pounds, with a very dark (jet or midnight black) complexion, a moustache, a "fade" haircut (shaved sides with some hair on top), very high cheek bones, and a large, angular jaw. (S14, p. 3; S28, Affidavit of Jennifer Bonanno, February 28, 2002, ¶5; S29, Deposition of Jennifer Bonanno, February 3, 2003, pp. 45-46; S30, Examination of Jennifer Bonanno, January 12, 2004, pp. 24-25.)

12

taken into custody after the lineup, the police also described Lathierial as taller (6'2"), heavier ("200 pounds") and fairer ("medium complexion") than the composite description. (S32, Supplementary Police Report dated March 13, 1990, p. 1.) Lathierial was also clean-shaven even though Jennifer and the police composite described the shooter with a moustache. Lathierial was actually 6'3", light skin, and 230 pounds at the time of the shooting.

Second, the trial judge's guilty finding, which was based on Ricky Warner's "on-going relationship" with Lathierial, was supported at trial by two pieces of evidence. The first piece of evidence was the testimony of Herbert Warner, who identified Lathierial as "RAT" and described Lathierial driving a car with "RAT" vanity plates. Second, there was an exhibit, which was a slip of paper that Lathierial purportedly gave to Ricky Warner, that proved that Ricky Warner had Lathierial's pager number and that Lathierial wanted Ricky Warner to sell drugs for him. Both of these pieces of evidence were later proved false after trial. The post-conviction trial court, on ruling on Lathierial's first post-conviction petition, accepted it "as fact" that both pieces of evidence were false. (S6, pp. F3-F4.)

Third, during Lathierial's investigation and trial, other motives and other suspects were never explored. For instance, the police investigative report shows that Michael Fleming, one of the shooting victims, told Charisse Parker, his girlfriend at the time of the incident, that "he had a problem with three (3) black guys to whom he had sold some fake cocaine, and that he had some altercation with some white guys for the same reason." (S33, Supplementary Police Report dated February 24, 1990, at LB 00528.) The WGN broadcast explores another suspect, Yuri "Cheesy" Smith, a member of a violent Jamaican street gang, whom the police never questioned.[3] This unexplored theory is consistent with the police investigative report, which

---

[3] When shown a photograph of Yuri Smith, Jennifer Bonanno testified that although she could not say with 100% certainty that Smith was the shooter, he looked a whole lot like the shooter. (S29, Deposition of Jennifer Bonanno, February 3, 2003, p. 112.) This is important because Yuri

states that at the time of the shooting, Luther Thomas, owner of the Booga Lou Tavern on Clark Street, "was chased by a group of Jamaicans at the time of the incident." (*Id*. at LB00486.)

Lastly, James Fleming, the brother of Ricky Warner, who was never questioned by Lathierial's trial counsel, executed an affidavit which states that Ricky Warner told him about five months after the shooting that he never saw who shot him and pinned it on Lathierial because Lathierial had previously threatened him over a drug debt. (S34, Affidavit of James Fleming, April 16, 2001, ¶¶3-4.) This affidavit also corroborates the theory above that the shooting was the result of the victims' selling fake drugs.

## VI. REASONS FOR SEEKING CLEMENCY

### A.    The Evidence In Its Totality Shows Lathierial Boyd Is Innocent

Lathierial Boyd is innocent of the crimes for which he was convicted in 1990. It may be easy, as the Prisoner Review Board or the Governor, to assume that if an appeals court rejected one or another of Lathierial's claims, there is no conceivable rationale to revisit this case. This assumption ignores one of the most basic reasons for clemency: the fact that the justice system makes mistakes. For the first time in over seventeen years, the Prison Review Board and Governor Blagojevich are in the unique position to take a step back and look at *all* the evidence. This involves looking at what occurred prior to trial, what was presented at trial, what wasn't presented at trial that should have been, the trial judge's ruling, and the crucial new evidence that has surfaced since then. Lathierial's conviction was plagued by issues of ineffective counsel, a dubious identification by a single witness, and unheard key mitigating evidence that

---

Smith and Lathierial Boyd look absolutely nothing alike; Smith was much shorter and had a much darker complexion, which is consistent with the police reports, composite description, and Jennifer's description of the shooter. (*See* S19, Supplementary Police Report dated March 13, 1990, p.2.; S28, Affidavit of Jennifer Bonanno, February 28, 2002, ¶5; S29, Deposition of Jennifer Bonanno, February 3, 2003, pp. 45-46; S30, Examination of Jennifer Bonanno, January 12, 2004, pp. 24-25.)

demonstrates Lathierial's innocence. Lathierial's conviction was based on a disconcerting tangle of speculation and uncertainty.

The simple fact is that the evidence that was adduced at trial and discovered since demonstrates only that Lathierial and Ricky Warner were involved in drugs together about seven months to a year before the shooting. This could be a motive for Ricky Warner to pin the shooting on Lathierial even though Lathierial took no part in the shooting. (*See* S34, Affidavit of James Fleming, April 16, 2001, ¶4.) Lathierial has admitted that he is not perfect and has made his share of mistakes in his life, but his connection to Ricky Warner does not make him guilty of the crimes for which he has now spent over seventeen years behind bars. In the face of this there is much evidence proving Lathierial was not involved with the shooting, including the unequivocal evidence of eyewitness Jennifer Bonanno affirmatively stating that Lathierial was not the shooter.

Taking a common sense approach, the facts and resulting conviction do not add up. First, Detective Sobolewski testified that Ricky Warner initially stated that he did not know who shot him, but did say that "Rat" owed him money. Ricky Warner later recanted and said he owed "Rat" money *and* he identified "Rat" as Lathierial and as the shooter. The trial judge blamed this discrepancy on Warner's medical condition at the time (S14, p. 7; S25, Transcript of Proceedings, October 24, 1990, pp. 7-10.), but in fact, the opposite was true: Nurse Hendricks, who was attending to Warner and present in the hospital room testified that Ricky was alert and oriented and understood what the police were asking him when he stated he did not know who shot him. (S35, Examination of Cynthia Hendricks, August 2, 1990, p. 31.) If Ricky Warner knew Lathierial for a couple years prior to the shooting, why did he not identify Lathierial immediately when asked who shot him? Why did Warner first tell the police that he did not know who shot him? Wouldn't the fact that Lathierial supposedly threatened Ricky over a drug

15

debt some seven months to a year earlier be a motive to pin the shooting on Lathierial, particularly when Ricky had sold fake drugs to numerous persons in an area subject to violent gang activity (theories not explored at trial)?

Second, two alibi witnesses, one of which was a Cook County Deputy Sheriff of eleven years, testified that Lathierial was with them on the night in question over twenty miles away.

Third, other key evidence was not presented at trial. The description of the shooter given by the eyewitnesses and contained in the police composite do not match Lathierial's physical description at the time of the shooting. Nine eyewitnesses viewed a line up in which Lathierial voluntarily participated. Not one of them identified Lathierial as the shooter.

More importantly, you now have the testimony of Jennifer Bonanno, one of those nine witnesses that was close to the shooter on the night in question. She testified under oath (and had absolutely no reason to lie) that Lathierial was absolutely and positively not the shooter, and she told the police that during the lineup. During the WGN broadcast the trial judge, then retired, admitted that he would have liked to have heard her testimony when deciding the case. Further, Bonanno's affidavit, deposition, and court testimony, in which she describes witnessing the shooting, seeing the shooter, and telling police that Lathierial did not commit the crime, are powerful endorsements of Lathierial's innocence and wrongful conviction. (S28; S29; S30.)

Lastly, not presented at trial were the police investigative reports. (S17; S19; S31; S32; S33.) These reports reference the statement of Charisse Parker, the girlfriend of victim Michael Fleming, which showed that the victims were selling fake drugs on the night in question and had previous altercations not involving Lathierial in the same area in which they were shot. (S33, Supplementary Police Report dated February 24, 1990, at LB 00528.) Further, the reports state that a group of Jamaicans chased Luther Thomas, the owner of the Booga Lou Tavern, at the time of the shooting. (*Id.* at LB 00486.)

16

In sum, there is no credible evidence that Lathierial committed the crimes for which he has spent over seventeen years behind bars. This is one of the rare cases in which the justice system failed, and this is the last chance to fix this mistake. Lathierial respectfully requests a pardon because of this mistake.

## B.    Community Support

A pardon will in some measure begin to redress the enormous and unjustified suffering that Lathierial and his family have endured as a result of his wrongful conviction. The hardship inflicted on Lathierial is staggering. Lathierial was twenty-four years old at the time of his wrongful conviction. More than seventeen vital, central years of Lathierial's life have been spent in prison for a crime he did not commit. His health has suffered, his relationships with his children have deteriorated, and many of his other personal relationships have suffered. He has lost forever the opportunity to experience life as a free man in his late twenties and thirties and to see his daughters grow up. (*See* Exhibit A, Letter from Lathierial's daughter Camellia.)

Lathierial's family and friends have remained convinced of his innocence and continue to support him throughout his over seventeen year ordeal. Lathierial's sister Angela Boyd knows he is innocent because he spent the night of the crime in her apartment. A letter she has written on her brother's behalf asserts that her brother would never take another person's life. (Exhibit B, Letter from Angela Boyd.)

Katherine Boyd, Lathierial's mother, raised her son to be a kind and caring person and prays each night that someone will reverse the injustice that has been done to her son. (Exhibit C, Letter from Katherine Boyd.) Lathierial's sister Arnita Burnett is convinced of her brother's innocence, and writes that he has been and remains a good person, intelligent, and full of promise and ideas. (Exhibit D, Letter from Arnita Burnett.)

Lathierial's cousin Dora Dixie remembers Lathierial as a gifted young man who was kind to her children. (Exhibit E, Letter from Dora D. Dixie, M.D.) Even from behind bars, Lathierial has remained an inspiration to his younger cousin Lateasa Boyd. (Exhibit F, Letter from Lateasa Boyd.) LaVette McKenzie, a friend of Lathierial's, describes him as an "outstanding person who desires to achieve many dreams in his life despite his current situation." (Exhibit G, Letter from LaVette McKenzie.) Nalicia Cotton has known Lathierial for over 30 years and knows that he was not a violent person. (Exhibit H, Letter from Nalicia Cotton.)

In addition to Lathierial's family and friends, he has the support of people who were complete strangers before the incident and who strongly believe that Lathierial is innocent and that the criminal justice system failed him. R. Eugene Pincham, former Judge in Cook County and Justice of the Illinois Appellate Court, believes that mistakes were made in this case and encourages you to carefully examine the evidence. He firmly believes that Lathierial was wrongfully convicted and urges you to end his unjust imprisonment. (Exhibit I, Letter from R. Eugene Pincham.) Allan Ackerman, an attorney with over 45 years of experience in the Illinois criminal justice system, acknowledges the difficulties a criminal defendant faces from a reviewing court. (Exhibit J, Letter from Allan Ackerman.)

Muriel Clair and Jason Jedlinski, who investigated Lathierial's case for WGN, wrote a letter describing their exhaustive search for the truth. This letter describes their first contact with eyewitness Jennifer Bonanno, their interviews with dozens of people connected to the case from Florida to Hawaii, and their interviews with seven of the original nine eyewitnesses. The more digging that they did, the more questions they had, but they were never able to find anything that suggested Lathierial was involved in the crime. (Exhibit K, Letter from Muriel Clair and Jason Jedlinski.)

18

Virginia Lukas became acquainted with Lathierial's case over ten years ago and has gotten to know Lathierial since then. She describes him as a "kind, gentle, and compassionate man who is trying to help other wrongfully convicted victims obtain freedom." (Exhibit L, Letter from Virginia Lukas.) John Pizer, Prison Legal Aid Association, has known Lathierial since 1999 and describes him as an "exceptionally fine man, very intelligent, well motivated, and a decent, honorable man." (Exhibit M, Letter from John Pizer.) Lathierial also has the support of many Illinois clergymen, including Senator James Meeks. (Exhibit N, Letter from Council of Clergymen.) All of them believe Lathierial is innocent, and they support these clemency efforts.

Dr. Margaret Burroughs, Commissioner of the Chicago Park District, taught Lathierial art and creative writing and urges you to consider him for clemency. (Exhibit O, Letter from Dr. Burroughs.) Bill Ryan, publisher of Stateville Speaks, points out that many prisoners who have been convicted have later been found to be innocent. He also believes that the evidence used to convict Lathierial in no measure proved Lathierial was guilty beyond a reasonable doubt. (Exhibit P, Letter from Bill Ryan.)

### C.    **Prayer for Relief**

Clemency will reaffirm that the criminal justice system of the State of Illinois is committed to punishing the guilty and protecting the innocent, and will demonstrate that the people and their representatives demand of the system a high regard for the truth. Clemency will convey the message that the State recognizes Lathierial's wrongful conviction, which will help him piece his life back together once he is released. To the credit of the system and the many good men and women who work in it, failures like this one are rare. However, when an innocent person is convicted and punished, the integrity of the system is questioned and the people's confidence in their public servants falters. Pardon Lathierial, and the people's faith may be restored.

As defined by the Illinois courts, "clemency is the historic remedy employed to prevent a miscarriage of justice where the judicial process has been exhausted." The evidence discussed above shows the miscarriage of justice regarding Lathierial, a miscarriage that has continued to this point as Lathierial has exhausted the judicial process. Executive clemency has provided the fail safe in our criminal justice system. It is an unalterable fact that our justice system, like the human beings who administer it, is fallible. Although the State can never give back to Lathierial the years that have been taken from him, this is the last opportunity to fix a mistake and prevent a miscarriage of justice.

For the foregoing reasons, Lathierial respectfully requests a pardon for the crimes for which he was convicted on December 3, 1990. In the alternative to a pardon, Lathierial respectfully requests a commutation of his sentence to the over seventeen years that he has already served.

Respectfully submitted,

LATHIERIAL BOYD

By: _Patricia A. Bronte_

One of His Attorneys

Patricia A. Bronte
Brian S. Scarbrough
Nicholas A. Kurk
JENNER & BLOCK LLP
330 N. Wabash Avenue
Chicago, IL 60611
Telephone: (312) 222-9350
Facsimile: (312) 527-0484

## VII. DECLARATION

I declare under penalty of perjury that all of the assertions made in this petition are complete, truthful and accurate.

*Lathierial Boyd*

Lathierial Boyd

Subscribed and sworn to before me
this ⁴ᵗʰ day of ___Feb___, 2008.

_____
Notary Public

"OFFICIAL SEAL"
Mark G. Spencer
Notary Public, State of Illinois
My Commission Exp. 06/08/2008

EXH. 17

LETTERS FROM STATE AND GOVERNMENT OFFICIALS. DOCTORS, ATTORNEYS, JUDGES, TV NEW REPORTERS AND PRODUCERS. FAMILY. PUBLISHERS AND A COUNCIL OF CLERGYMEN, SENATOR, COMMISSIONER SCIENTIST ETC., PLEADING THAT THIS MISCARRIAGE OF JUSTICE BE CORRECTED AND PETITIONER BE SET FREE.



**TELEVISION CHICAGO**

February 4, 2008

To Whom It May Concern:

We are writing in support of Lathicrial Boyd's petition for executive clemency. In 2002, we researched and reported a series of special television news reports on what we believe is his wrongful conviction for murder. The introduction to our first story explains it best:

> Lathicrial Boyd has spent every day of the last twelve years behind bars proclaiming his innocence. He's written thousands of letters, trying to get somebody to help him prove he's not a killer.

> We did an exhaustive review of police reports and court files. The more digging we did, the more questions we had, about the evidence -- or lack of evidence -- that landed Boyd behind bars.

> During the course of our investigation, we turned up an eyewitness who never testified in court. An eyewitness who says she told detectives -- twelve years ago -- they had the wrong man.

When we first contacted eyewitness Jennifer Bonnano and explained that we were looking into this murder, she immediately exclaimed "Don't tell me they convicted the preppy guy!" That moment is etched in our memories, and solidified our faith in Ms. Bonnano's testimony: that she told detectives, during a lineup, that they were after the wrong man. Ms. Bonnano has no reason to lie. In fact, she only invited scrutiny by speaking with us and later confirming her televised statements in a sworn affidavit.

We interviewed dozens of people connected to this case, from Florida to Hawaii. We even tracked down seven of the original nine eyewitnesses who viewed the police lineup. We found nothing to suggest that Lathierial was involved with this crime. Like prosecutors, we found no eyewitnesses placing him at the crime scene, no murder weapon, and no physical evidence. Our interviews confirmed Lathierial's story: that he was asleep at his sister's apartment, 22 miles away, at the time of this shooting.

We are not detectives, prosecutors or judges. But we are citizens of the State of Illinois, which prosecuted Mr. Boyd for crimes he allegedly committed against the community. After an exhaustive examination of the record and our own firsthand reporting, we firmly believe that this case represents a miscarriage of justice and appeal to you to set this man free.

Sincerely,

Muriel Clair
WGN-TV Reporter

Jason Jedlinski
Former WGN-TV Producer

### R. Eugene Pincham
**Attorney at Law**
Former Judge Circuit Court Cook County
Retired Justice Illinois Appellate Court
9316 South Michigan Avenue
Chicago, IL 60619
(773) 568-7927
(773) 568-7938 (fax)

January 9, 2008

Dear Governor Blagojevich:

I have been familiar with Lathierial Boyd's case for some years now, which included a careful review of Judge Egan's Opinion denying post-conviction relief in early 2005. At that time, I felt it was blatantly obvious that Lathierial had a most viable and just ground for reversal of the original trial court's order. Recently, I reviewed Lathierial's petition for leave to appeal to the Illinois Supreme Court which was also denied. As a former Judge in Cook County and Justice of the Illinois Appellate Court, I truly believe that these were mistakes, and I am writing in the hope that Lathierial may finally be able to obtain the justice he deserves through the clemency process.

In the past few years, there have been a growing number of cases where Defendants have been released from long imprisonment terms, and even death row, based on innocence. In many cases, DNA technology has enabled Defendants to re-examine physical evidence and prove their innocence. In Lathierial's case, unfortunately, there never was any physical evidence. But that does not mean his conviction was just. I encourage you examine the evidence carefully in this case, because I truly believe that Lathierial was wrongfully convicted. You are the only one who can end his unjust imprisonment.

Most Sincerely,

R. Eugene Pincham

R. Eugene Pincham



LAW OFFICES OF
## Allan A. Ackerman, P.C.

ALLAN A. ACKERMAN

2000 North Clifton Avenue
Chicago, Illinois 60614

Telephone: (312) 332-2891
FAX: (773) 871-3304

May 28, 2007

Rod R. Blagojevich
Governor, State of Illinois
Office of the Governor
100 W. Randolph Street
Chicago, Illinois 60601

RE:   Lathierial Boyd
      IDOC No. B 10106

Dear Governor Blagojevich:

Over the last five or six years I was privileged to communicate with Mr. Boyd regarding his circumstances within the Cook County/Illinois criminal justice system. Regrettably, as a young black man, the circumstances leading to his arrest and conviction were mired in confusion, potential police misconduct and, generally speaking, the [then] shortcomings of the criminal justice system.

My reading of the material involving Mr. Boyd's case has persuaded me that he is one of the many Illinois inmates who are "actually innocent" of the crimes charged.

Mr. Boyd's Clemency Petition recounts the background of his case and, thus, I will not replicate that which is set forth in his Clemency Petition. Be assured, that after practicing within the Illinois criminal justice system for over 45-years, I am intimately familiar with the difficulty that a defendant encounters while attempting to persuade a judge, jury or reviewing court that he is [was] "actually innocent."

I, along with many others, sincerely endorse your granting Mr. Boyd's Clemency Petition. Moreover, there is nothing in Mr. Boyd's background which would serve to indicate that he will be anything but a valuable, hard-working and law abiding citizen upon release.

Sincerely,

Allan A. Ackerman

AAA/jl

## CLERGY OFFICE OF
# Reverend Ahmad R. Boyd, B.A.

4402 S. Lavergne Ave        773. 469. 6524 Cell
Chicago, IL 60638           773. 767. 8110 Office
                            rev_arboyd@hotmail.com

August 13, 2007

The Honorable Rod R. Blagojevich
Governor, State of Illinois
Office of the Governor
100 W. Randolph Street
Chicago, Illinois 60601

Dear Governor Blagojevich:

As an Ordained Clergyman of the State of Illinois and a Seminary graduate of Midwest Theological Seminary, I write to you in full support of the Clemency request for Mr. Lathierial Boyd, IDOC No. B 10106. After a Council of Clergymen, including myself reviewed this entire case ( WGN News documentations) Official letters from Lawyers, police reports, we find Mr. Lathierial Boyd innocent of the crime he was convicted for.

Proof of Innocence: Mr. Boyd was not present at the scene of the crime. There was respectable evidence from a Cook County Deputy Sheriff who testified that he was with Boyd at his sister's apartment at the time of the shooting. The prosecutor was fully aware of that verification of the alibi, nevertheless he persuaded the court with false claims to convict Boyd. The further evidence of Boyd's actual innocence comes from an eyewitness at the scene of the crime who after viewing a line-up including Boyd, told police investigator that Boyd was not the man she saw fire the gun at the victims.

Our complete investigation of all material concerning Mr. Boyd's case has persuaded the Council of Clergymen that he is " completely innocent" of crimes charged. We pray that you would put an end to this suffering, and correct this injustice, grant him clemency by ordering his release.

Council of Clergymen:

Rev. James Meeks, State Senator
Rev. Ahmad R. Boyd, B. A.
Dr. James F. Stevenson, Pastor
Dr. Ann Brickel, Ed. D. , Public Relations
Rev. Benjamin Johnson, Pastor
Rev. Dr. Michael Jones D.D.
Elder Tyrone Handy, Pastor
Bishop Larry Trotter, Pastor

Humbly Submitted, Rev. A. R. Boyd, B. A.

*Reverend, Ahmad R. Boyd*

PRISON LEGAL AID ASSOCIATION
P. O. BOX 30280, PMB 111, PHOENIX, AZ 85046-0280
John A. Pizer, Pres 602-996-4846 johnpizer1@yahoo.com

April 5, 2007

The Honorable Rod R. Blagojevich
Governor of Illinois

Dear Governor Blagojevich,

I write to you in support of the Clemency request for Lathierial Boyd. I have known Lathierial since October of 1999, nearly eight years, and we have become close friends. I have come to hold a high regard for him. He is an exceptionally fine man, very intelligent, well motivated, and a decent, honorable man. I know for a fact that he is not a criminal.

I have also been closely involved with the investigation of his case. I performed my own investigation to satisfy myself of his actual innocence. Then I worked closely with Professor Lawrence Marshall at the Northwestern University Innocence Project and was instrumental in exposing the critical information which led to his post-conviction appeal in the courts. That appeal was denied and is on appeal, but the denial was an error on the part of the court, and the appellate court has been unwilling to rule on the matter in spite of the overwhelming evidence of actual innocence.

Lathierial Boyd was not at the scene of the crime. There was the incontrovertible evidence from a Cook County Deputy Sheriff who testified that he was with Boyd at his sister's apartment at the time of the shooting. The prosecutor was fully aware of that verification of the alibi, but he nevertheless persuaded the court with false claims to convict Boyd.

The further evidence of Lathierial Boyd's actual innocence comes from an eyewitness at the scene of the crime who, after viewing a line-up including Boyd, told the police investigator that Boyd was not the man she saw fire the gun at the victims. That information was suppressed from the defense by the state. Had that been presented to the court, the result of the trial would have been different. It only came to light years later when the witness was found.

That witness stated that she had been moving around constantly without any permanent address and would have been impossible to find. Nevertheless the prosecution claimed that she should have been located sooner and that the police believed she lied about her failure to identify the shooter and therefore her testimony should not be considered by the court. The court accepted and used that false claim as grounds for denial.

My background and involvement in this case is as the president of Prison legal Aid Association, a non-profit, public charity, approved by the IRS as a 501(c)(3) organization. We are dedicated to assisting the wrongfully convicted. We provide investigation resources and writ writing capability or whatever aid appears to be needed to overturn wrongful convictions.

In this case, Boyd had the legal representation of Lawrence Marshall, as well as Jenner and Block, so my only contribution was as an investigator. However, I have read the legal briefs in this case and I am familiar with the litigation. I am qualified to judge the merits of the evidence. The only possible conclusion for a reasonable juror is that Lathierial Boyd is innocent. The evidence of his innocence is undeniable.

The result of this miscarriage of justice has been to deprive a young, honest citizen of 17 years of what would otherwise have been a normal maturation of his life in free society. He is not a criminal, yet he has suffered mistreatment and abuse from the Illinois D.O.C. for 17 years.

This case of wrongful conviction demonstrates the incompetence of the Cook County Police Department for failing to perform a thorough investigation and charging an innocent man, the corruption in state prosecutor's office for suppressing evidence and prosecuting a wrongful conviction, and the corruption of the Illinois Courts by denying relief in spite of compelling evidence. It is a stain upon the justice system in the state of Illinois. At this stage of the litigation only you, the governor, can correct this injustice by exercising your authority to grant clemency.

I beg you to put an end to this suffering, correct this miscarriage of justice, grant him clemency, and order his release.

Thank you for your consideration,

Sincerely,

John A. Pizer, Pres.

March 10, 2007

Dear Governor Blagojevich,

I became aquainted with Lathierial Boyd's case (IDoc# B10106) ten years ago when my daughter wrote a paper for one of her college courses on the infamous Cook County Scandal, "Niggers by the Pound," which occurred in the late '80's and early '90's. I then met Lathierial through another family member. Lathierial, who weighed 280 pounds at the time of his arrest, is very likely one of the victims of this scandal. After corresponding with Lathierial for the past 10 years and reading his trial proceedings, there is no doubt in my mind that this man was framed for a murder he did not commit.

Lathierial has already spent 17 years of the prime time of his life behind bars, yet he is completely innocent. He has spent all of his time and most of his resources, while in prison, appealing his case in the State of Illinois with

no success. I am neither an attorney nor a rocket scientist, but anyone with average reading skills and reasoning ability would conclude Lathierial is innocent after reading the transcripts of his trial. I suspect the State of Illinois is doing everything possible, legal or not, to keep him in prison in order to avoid having to pay him millions of dollars in a wrongful conviction suit if he is exonerated.

Lathierial has spent his prime years deprived of the chance to watch his daughters grow up and see his grandson arrive. No amount of money can compensate for such losses. I implore you to look over his case and consider him for full **exoneration**, or at least clemency so that he will be free to pursue exoneration of his own accord.

This man is not a murderer. On the contrary, he is a kind, gentle, compassionate man who is trying to help other wrongfully convicted victims obtain freedom. Please

contact me for more information about Lathierial's case. I have reams of documents as well as a video of his case aired on WGN TV.

Thank you for your time and consideration of Lathierial's case.

Sincerely,

Virginia Lukas

Senior Genetic Engr. Research Spec.
Dept. Biotechnology, DNA Services Unit
Room 329 ERML
1201 W. Gregory
University of Illinois at Urbana-
Champaign
Urbana, IL 61801
(217) 244-1007

Virginia.lukas@gmail.com
Vlukas@uiuc.edu

MS. LATEASM BOYD
7937 SOUTH MAY
CHICAGO, IL. 60620

JULY 15th, 2007

HONORABLE. ROD R. BLAGOJEVICH:
GOVERNOR OF THE STATE OF ILLINOIS
1301 CONCORDIA COURT
P.O. Box 19277
SPRINGFIELD, IL. 62794

Dear Mr. Governor,

I am corresponding with you via this letter in reference to my cousins clemency petition. LATHERIAL BOYD, is the petitioner and I would like to just supplement my opinion in his regards. Mr. Boyd happens to be one of my most favorable big cousins. I have learned a lot from him over the years and not just upon his stay in the realm of society, but he has been an inspiration to me from his cell in the penitentiary.

Mr. Boyd is deeply missed by myself and the remainder of my family, and we all are hoping that you will consider allowing him clemency and give him a chance to allow his family the missing subsidy that we have been missing for such a very very long time. I truly believe that he will assist his family a lot more upon his release, and he is a pillar of his community, and an asset to our State of Illinois.

What could possibly be better than a walking Blagojevich on our streets? because Mr. Boyd is a leader too, with the initiative of becoming a great leader as yourself. Over the duration of years that he has spent in prison, he has learned a lot and can appreciate life on a different level, and his background while in prison gives this depiction. I respectfully request that you will pardon him and allow him to explicate the things in which he has learned, thank you for reading and have a wonderful day.

SINCERELY, LaTease Boyd

**Dora D. Dixie, MD**
5421 South Cornell Ave
Chicago, Illinois 60615

October 30, 2007

Governor Rod Blagojevich
State of Illinois

Re: Clemency for **Lathierial Boyd**

Dear Governor Blagojevich:

Lathierial Boyd is my cousin. He and his legal team asked me to write a letter in support of clemency for him. This is the second letter I have written to a governor regarding clemency for Lathierial. The first was in 2002. My cousin is still incarcerated for a crime he assures me he did not commit. Reasonable doubt is the term attached to his case by the legal team, Jenner & Block.

I remember when Lathierial was born. I watched him grow up, handsome and talented. It was my privilege to accompany him as a young boy to his many piano recitals. Child musical prodigy is a term that could have been applied to him. I remember the photo spreads in magazines and Sunday news papers as his modeling career flourished. He was emotionally generous to my children as they grew together. I do not remember him living out side the law. To comprehend Lathierial and jail forever are incongruent with the Lathierial I watched grow up.

Lathierial and I have had some correspondence over the last 9 years. He assures me of his innocence. I do not know all the particulars of his case. I have not read the court transcripts. I do know that he is part of a large family and we want to grow old with Lathierial in our mist. His parents are in their 70s, all his siblings are over 40, and his young-adult children have had no father.

Most will never have the God granted power that you have, Mr. Governor. I do not envy your position of power or your level of responsibility to the people of Illinois. You and only you can grant clemency to my cousin. I pray that God will soften your heart where Lathierial Boyd is concerned, and when the question is asked, you will say yes to his freedom.

Sincerely,

Dora D. Dixie, MD

October 1, 2007


The Honorable Rod R. Blagojevich
Governor, State of Illinois
Office of the Governor
100 West Randolph Street
Chicago, Illinois 60601


Dear Governor Blagojevich:


This is a plea for justice. For nearly eighteen years, my brother, Lathierial Boyd, has been incarcerated for a double murder that he is totally innocent of. I say this because I am 100% sure of his location when the murders were committed. He was at my sister's house with her friend.

When my family learned that the authorities were looking for Lathierial, we got together and took him to the police station. We were not really concerned about what was being said because we all knew where he was at the time in question. My sister Angela, my mom and dad and myself, took him to the police station, not knowing that this would be the end of his freedom. We have been fighting to prove his innocence ever since that day.

Lathierial has been taken from us while the guilty party has been left to live a free life. His two beautiful daughters have been deprived of having a father in their lives. My mom and dad have been deprived of their son, and we have been deprived of our brother. This has nearly killed both my parents. I cannot explain the pain that this has caused our entire family.

We are a large family, proud, caring and hard working. We all had high hopes for Lathierial. He was a very intelligent young man, full of promise and great ideas. We loved him dearly. We thought that he would amount to something. Our hopes and dreams were shattered on that day when he was convicted and given an unimaginable amount of years to serve.

I t is a terrible thing to have to give up all of your youth for something that you did not do. Yet Lathierial is not bitter nor hateful. He has his ups and downs, but he continues to be a good person. He respects others and spends his time writing and trying to improve himself. He still believes that someone will see that he is innocent and free him. I also

believe that he will be freed because I have faith and refuse to give up on him and on the system.

Therefore, I am asking that you review my brother's case, and send him home to his family and loved ones.

Respectfully,

Arnita F. Burnett

Arnita F. Burnett

8/9/07

Dear: Govenor Blagojevich

My name Is Nalicia Cotton
And I have Known Lathierial Boyd
for 30 years. we grew up together
During all the years. I've Known
him. he was not a violent person
And I feel he has been falsly
accused of a crime he didn't not
do

Thank you
Nalicia Cotton
(773) 735-4096

October 1, 2007

The Honorable Rod R. Blagojevich
Governor, State of Illinois
Office of the Governor
100 West Randolph Street
Chicago, Illinois 60601

Dear Governor Blagojevich:

I pray each night before I drift off to sleep that someone will do something to reverse the horrible injustice done to my son, Lathierial Boyd. My son has spent the last seventeen years of his life behind bars for a crime that he is innocent of. I had hoped and prayed that his sentence would be reversed by the Courts, but as of this date, that has not happened.

I cannot explain the grief that my heart feels. If my son was a murderer, I could not and would not find it in my heart to ask you to free him, knowing that he had taken the life of another mother's child.

I raised my son to be a kind and caring person. He was the joy of my life when he was a child, always kind and giving. I know that my son was at my daughter's house when the murders that he is accused of occurred.

Sir, if you would take some of your valuable time, and review all of the evidence, I believe that you will find that he is innocent also. If he was a violent person when he was not locked up, I believe that he would most certainly be a violent person while locked up. He has not caused any problems in the seventeen years that he has been locked up. Instead he spends his time on trying to free himself, and writing letters of encouragement to his loved ones.

Please grant my son clemency so that he can be with his family and loved one.

Grieving Mother,

*Katherine Boyd*

Katherine Boyd

May 31, 2007

Dear Governor Rod Blagojevich

I am writing this letter in an effort to make a plea for clemency for my brother Lathierial Boyd who was wrongfully convicted of a crime. The evidence clearly proves that my brother is innocent. Harold Casey and I testified under oath to Lathierial's whereabouts on the night in question. That night, Lathierial, Harold Casey and myself were at my southwest-side apartment eating and watching television. Lathierial did not have a key to my apartment nor did he own a vehicle at that time. He was there the entire night and the following morning until he left with Harold Casey. This information was made clear to both the police detective and to his attorney. Also, there was a lot of other significant information that was not revealed during the trial. Several witnesses were not made available to testify on behalf of my brother's defense.

From early childhood, Lathierial has been very goal-oriented and ambitious. He has always had a desire to achieve the greatest amount of success. If released, he will be given another opportunity to reach the goals that as of now, he can only dream of. Please find it not only in your heart, but also in the evidence that you have been presented to release my brother and to provide him with a new life. He has two beautiful daughters whose lives he has been unable to take part in. He has a mother, father, sisters and brothers who dream of the day that he can join them. The simple dreams that a family holds for there loved one is only a vision away when your loved one is imprisoned under false pretenses.

Unlike most, Lathierial has admitted to being an imperfect man. If there is a punishment for such a crime as imperfection, Lathierial would willingly accept the sentence, Yet, he has been incarcerated for well over a decade for something that is far more serious than imperfection. My brother along with the rest of his siblings, have always been taught to value life. This does not include placing value on only his life, But more importantly, on the lives of others. Lathierial would never accept the role of determining how long an individual should live. Our parents have always taught us that we do not have the right to do so.

We as citizens look to the judicial system for justice; however, in this matter it's not being served. An innocent man has been incarcerated for much too long. Lathierial has been forced to suffer the consequences of someone else's actions. No person deserves to be wrongly accused, especially when the facts are clear. I am convinced that it is your obligation and your duty as the governor to make sure that justice is served. By viewing all of the information that is related to this case, your decision should be simple. It has been long enough for my brother. Now, it is time for him to come home.

Sincerely

Angela D. Boyd

02-09-07

DEAR CATHERAL,                          8:15AM

HAPPY BELATED BIRTHDAY SO YOUR 40 NOW?

MAYBE YOU COULD WRITE ME A LETTER AND LET ME

KNOW ALL THE TRUTH ABOOT YOUR PAST AND GIVE

ME SOME COMMUNICATION DAD I'M 16 NOW

AND I'M CURRENTLY AT A MILITARY SCHOOL

RECIEVING MY G.E.D AND DISCIPLINE SKILLS.

MY MOTHER HAS DONE SUCH AN OUTSTANDING

JOB OF BEING MY MOTHER & MY FATHER, AND I

HAVEN'T DONE MY PART AS I GET INTO SO MUCH

TROUBLE WITH C.P.D AND ON THE STREETS & HAVE

SUCH A BAD ATTITUDE TOWARDS MY MOMMA.

I CHOSE TO COME HERE TO BOOT CAMP AND IT'S

HARD BUT I BELIEVE IN MYSELF & MY MOM +

OLIVIA HAVE BEEN GIVING ME SO MUCH SUPPORT.

IF YOU CHOOSE, WRITE BACK.

LOVE,
YOUR DAUGHTER
CAMELLIA  AKA
BLUEBIRD

P.S - DO YOU HAVE MY
GRANDMA CATHERINE'S ADDRESS
+ MY UNCLE MARTY'S ADDRESS
+ I NEED SOME STAMPS RAT

# *Chicago Park District*

### 541 NORTH FAIRBANKS COURT
### CHICAGO, ILLINOIS 60611



DR. MARGARET T. BURROUGHS
COMMISSIONER

Office: (312) 742-4737
Fax: (312) 742-3374

July 21, 2007

Honorable Governor Rod R. Blagojevich
Governor of Illinois
James R. Thompson Center
100 West Randolph, 16th Flr.
Chicago, IL 60601

Re: Lathierial Boyd, #B10106

Dear Governor Blagojevich:

I have been a volunteer for several years, visiting, counseling, and presenting programs to inmates at Cook County Jail, Stateville, Joliet, Hill Center, Dixon, and other Illinois Correctional Centers. I am a volunteer Chaplain with the Operation P.U.S.H. Prison Ministries also. I have had occasion to counsel and talk with and observe many inmates over a period of time.

I would like to speak on behalf of inmate Lathierial Boyd, Inmate Number B-10106, who is incarcerated at Pontiac Correctional Center. He is a student in my art and creative writing class. Keeping Mr. Boyd incarcerated any further can serve no good purpose. Mr. Boyd was married, had two daughters and just started his own real estate business when he was charged with his crime. I urge you to consider him for clemency.

In short, I trust Lathierial completely and support and recommend his clemency unequivocally.

Sincerely,

Dr. Margaret T. Burroughs
Commissioner

MTB/aam

Governor Rod Blagojevich
James Thompson Center, 19th floor
100 W. Randolph
Chicago, Il, 60606

Dear Governor:

I am writing to recommend clemency for Lathierial Boyd.  I have communicated with Mr. Boyd
several times over the years. We became acquainted as result of his reading an issue of the prison
newspaper, Stateville Speaks, that I publish.

Mr. Boyd sent me extensive material regarding his case, including the transcript of an
investigative report, entitled reasonable doubt, by TV station WGN I urge you very carefully
review this document as the evidence presented surely raises serious question about Mr. Boyd
guilt.    In my view, there is no way there is evidence beyond a reasonable doubt that he
committed the crime for which he was convicted.

As you are well aware, there is documented evidence that many, many prisoners who have been
convicted have later been found to have been innocent. I refer not only to the 19 exonerated
former death row prisoners but  the  number of innocent men reported regularly in the press.

It is a terrible injustice for anyone to spend one day in prison for something the person didnt do
and in Mr. Boyd's case he has spent 18 years. I urge you to correct this miscarriage of justicen

Thanks you for your consideration.

Bill Ryan

EXH. 18

LINES 5-19 PAGE 5 OF JUDGE
SINGERS DECISION, HE SAYS
HIMSELF, RICKY WARNER 3 WEEKS
AFTER HE WAS SHOT, HE SAID HE
DID NOT KNOW WHO SHOT HIM.
DET. SOBOLEWSKI AND R.N. MS. HENDRICKS
TESTIFIED TO THE FACT.

YET SINGER STILL FOUND ME
GUILTY. SEE PETITIONERS ATTACHED
CRIMINAL HISTORY RECORD.

1    if he didn't identify the defendant again in the

2    second photograph array.  So in terms of evidentiary

3    material, I don't see much evidentiary value in that

4    second identification.

5            In the defendant's case, in my opinion, the

6    most compelling evidence is that of Detective

7    Sobolewski, S-o-b-o-l-e-w-s-k-i.  Detective Sobolewski

8    testified to interviewing Mr. Ricky Warner on

9    approximately March 9th, 1990.  At which time he

10   testifies, and this is from the stipulation of his

11   testimony at the motion to suppress identification

12   hearing, as part of, as part of evidence in this case,

13   he said that Ricky Warner when asked by him at that

14   initial interview, by Detective Sobolewski, he said

15   Ricky Warner said he did not know who shot him.  Then

16   at subsequent interviews, he gave the name of quote,

17   Godfather, and quote Rat, as nicknames of the shooter.

18   And did make an identification of the defendant as the

19   shooter.

20           There was a photograph array that Sobolewski

21   presented to the witness Ricky Warner.  The

22   defendant's photograph was not in that photograph

23   array.  No one was identified as the offender in that

24   photograph array, although Ricky Warner did identify a

                        5

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS        Page 001

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 85127390001

LATHIERHAL J BOYD

        CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

     I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County/Local Prosecutor has filed a complaint
with the Clerk of the Circuit Court.

Charging the above named defendant with:

   38    12-3A                         M ✓    _ BATTERY

The following disposition(s) was/were rendered before the Honorable Judge(s):

12/04/85 BOND SET BY RULE OF COURT              12/30/85 2829
         WILENS, EUGENE
12/30/85 TRANSFERRED                            01/02/86 8260
         WILENS, EUGENE
01/02/86 PG JW FINDING GUILTY           C001
         BOWE, JOHN E.
01/02/86 SUPERVISION - COURT            C001 12/31/86 8260
         BOWE, JOHN E.
12/31/86 SUPERVISION TERM/DISCHARGED ✓  C001
         WARD, WILLIAM F. JR.

                              I hereby certify that the foregoing has
                              been entered of record on the above
                              captioned case.
                              Date 01/24/02

                              _Dorothy Brown_
                              DOROTHY BROWN
                      CLERK OF THE CIRCUIT COURT OF COOK COUNTY

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS      Page 001

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 86CR1190801

LATHIERIAL   BOYD

          CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
with the Clerk of the Circuit Court.

Charging the above named defendant with:

    38-16-1-A(1)                     F      THEFT
    38-16-1-B(1)                     F      THEFT
    38-16-1 M                        M      THEFT (MISD)

The following disposition(s) was/were rendered before the Honorable Judge(s):

09/18/86 IND/INFO-CLK OFFICE-PRES JUDGE         10/02/86 1701
         FITZGERALD, RICHARD J.
10/02/86 S.O.L. WARRANT                  W001                      $    7500
         FITZGERALD, RICHARD J.
11/24/86 WARR RETURNED, EXECUTED,FILED   W001
         FITZGERALD, RICHARD J.
11/24/86 REINSTATE FROM WARRANT          CALL 11/24/86 1701
         FITZGERALD, RICHARD J.
11/24/86 DEFENDANT ARRAIGNED
         FITZGERALD, RICHARD J.
11/24/86 CASE ASSIGNED                          01/26/87 1714
         FITZGERALD, RICHARD J.
01/26/87 NO BAIL
         BERKOS, CHRISTY S.
01/26/87 BOND FORFEITURE/WARRANT         B001 02/26/87 1714
         BERKOS, CHRISTY S.
02/24/87 CASE ADVANCED                          02/24/87 1714
         BERKOS, CHRISTY S.
02/24/87 BOND FORF-WARR EX/QUASH         W001
         BERKOS, CHRISTY S.
02/24/87 BOND TO STAND
         BERKOS, CHRISTY S.
02/24/87 REINSTATEMENT FROM B.F.W.       CALL 03/20/87 1714
         BERKOS, CHRISTY S.
02/26/87 JUDGMENT ON BOND FORFEITURE     B001
         BERKOS, CHRISTY S.
02/26/87 MOTION STATE - CONTNUANCE - MS         03/26/87
         BERKOS, CHRISTY S.

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS      Page 002

PEOPLE OF THE STATE OF ILLINOIS

VS                    NUMBER 86CR1190801

LATHIERIAL    BOYD

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
with the Clerk of the Circuit Court.

```
03/20/87 CASE ADVANCED                        03/20/87 1714
         BERKOS, CHRISTY S.
03/20/87 PRE-TRIAL INVESTIGATION ORDRD        04/29/87 1714
         BERKOS, CHRISTY S.
04/29/87 MOTION DEFT - CONTINUANCE - MD       05/01/87
         MOTION STATE BOND FORF WARRANT ENTERED AND CONTINUED
         BERKOS, CHRISTY S.
05/01/87 CONTINUANCE BY AGREEMENT             05/07/87
         BERKOS, CHRISTY S.
05/07/87 CONTINUANCE BY AGREEMENT             05/29/87
         BERKOS, CHRISTY S.
05/29/87 CONTINUANCE BY AGREEMENT             06/03/87
         BERKOS, CHRISTY S.
06/03/87 CHARGE AMENDED TO MISDEMEANOR    C001
         BERKOS, CHRISTY S.
06/03/87 PG JW FINDING GUILTY             C003
         BERKOS, CHRISTY S.
06/03/87 NOLLE PROSEQUI                   C002
         BERKOS, CHRISTY S.
06/03/87 DEF SENT PROB, WITH RESTITUTN    C003              $    1900
         NON-REPORTING.
                 12 MTH
         BERKOS, CHRISTY S.
06/03/87 RESTITUTION MADE IN OPEN COURT
         BERKOS, CHRISTY S.
06/03/87 COURT COSTS                                             055
         BERKOS, CHRISTY S.
07/31/87 BOND FORF-WARR EX/QUASH          B001
         BERKOS, CHRISTY S.
07/31/87 BOND JUDGMENT VACATED
         BERKOS, CHRISTY S.
07/31/87 CASH BOND REFUND TO ATTORNEY     B001
         BERKOS, CHRISTY S.
06/02/88 PROB TERMINATED- SATISFACTORY
         BERKOS, CHRISTY S.
```

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 001

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 89CR2251001

LATHIERIAL    BOYD

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

   I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
with the Clerk of the Circuit Court.

Charging the above named defendant with:

   56.5-1401-B(2)                  F      MAN/DEL >10-30G COC
A 56.5-1402-B                      F      POSS CONT SUB

The following disposition(s) was/were rendered before the Honorable Judge(s):

10/23/89 IND/INFO-CLK OFFICE-PRES JUDGE        10/31/89 1701
     FITZGERALD, THOMAS R.
10/31/89 DEFENDANT ARRAIGNED
     BASTONE, ROBERT P.
10/31/89 PLEA OF NOT GUILTY
     BASTONE, ROBERT P.
10/31/89 CASE ASSIGNED                         11/06/89 1737
     BASTONE, ROBERT P.
11/06/89 ADMONISH AS TO TRIAL IN ABSENT
     PORTER, DENNIS J
11/06/89 PRETRIAL DISC ORDER ENTERED
     PORTER, DENNIS J
11/06/89 CONTINUANCE BY AGREEMENT              12/07/89
     PORTER, DENNIS J
12/07/89 CONTINUANCE BY AGREEMENT              01/16/90
     PORTER, DENNIS J
01/16/90 PLEA OF NOT GUILTY
     PORTER, DENNIS J
01/16/90 JURY WAIVED
     PORTER, DENNIS J
01/16/90 MOTION DIRECT VERD OR FINDING                       S
     AS TO PCS W/ INTENT
     PORTER, DENNIS J
01/16/90 CHARGE AMENDED                    C002
     PORTER, DENNIS J
01/16/90 FINDING OF GUILTY                 C002
     PORTER, DENNIS J
01/16/90 NOLLE PROSEQUI                    C001
     PORTER, DENNIS J

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS    Page 002

PEOPLE OF THE STATE OF ILLINOIS

VS                        NUMBER 89CR2251001

LATHIERIAL    BOYD

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
with the Clerk of the Circuit Court.

```
01/16/90 BOND TO STAND
         PORTER, DENNIS J
01/16/90 CHANGE PRIORITY STATUS            M
         PORTER, DENNIS J
01/16/90 PRE-SENT INVEST. ORD, CONTD TO        02/08/90 1737
         PORTER, DENNIS J
02/08/90 MOTION DEFENDANT - NEW TRIAL                  D
         PORTER, DENNIS J
02/08/90 DEF SENT PROB AND FINE         C002                   $      100
         $100 PAYABLE THRU PROBATION BY 3-30-90
                  14 MTH
         PORTER, DENNIS J
02/08/90 DEF ADVISED OF RIGHT TO APPEAL
         PORTER, DENNIS J
03/13/90 SPECIAL ORDER
         3-14-90
         SOUTH, LESLIE E.
04/26/90 PET VIOL OF PROBATION FILED               E
         PORTER, DENNIS J
04/26/90 MOTION FOR BAIL HEARNG                    S       2
         PORTER, DENNIS J
04/26/90 BAIL AMOUNT SET                                      $    30000
         PORTER, DENNIS J
04/26/90 O/C ONLY REL DEF ON C/D BOND                        $    30000
         PORTER, DENNIS J
04/26/90 CONTINUANCE BY ORDER OF COURT        05/17/90
         PORTER, DENNIS J
05/17/90 DEFENDANT IN CUSTODY
         PORTER, DENNIS J
05/17/90 CONTINUANCE BY AGREEMENT             05/30/90
         PORTER, DENNIS J
05/30/90 DEFENDANT IN CUSTODY
         PORTER, DENNIS J
05/30/90 APPEARANCE FILED
         PORTER, DENNIS J
05/30/90 CONTINUANCE BY AGREEMENT             09/10/90
         PORTER, DENNIS J
```

EXH. 19

**Re: Conflict of Interest / Clemency Petition / Habeas Petition**

Dear Lathierial:

We enjoyed speaking with you last week. The purpose of this letter is to summarize our telephone call, specifically what we discussed regarding the potential conflict of interest situation, a federal habeas petition, and the clemency petition.

As you pointed out to us and we have verified, certain facts from the police report were never introduced by your trial counsel at your bench trial in front of Judge Singer. Further, your post-conviction counsel, Brent Stratton, never included those facts in your first post-conviction petition. Among the facts that we feel are important include the fact that nine eyewitnesses to the shooting viewed a lineup in which you were present and none of the nine identified you as the shooter. Secondly, the police reports contained a composite description that did not match your physical description. Although these facts were present in your 1996 *pro se* amendment to the first post-conviction petition, that was denied on procedural grounds, so it was never considered on the merits. Subsequently these facts were also presented in the successive post-conviction petition that we filed in 2004, which was ultimately denied based on the adverse credibility determinations made by the trial judge regarding witness Jennifer Bonanno.

At this point, we are preparing to file a clemency petition based on your innocence. We feel your strongest argument is to show what evidence was presented at trial and what was not; what the trial judge based his ruling on; and then show what has surfaced since then and what should have been introduced at trial. We feel that your strongest argument is to focus on your trial and all the exculpatory evidence that was right there in the police reports or could have been discovered from the police reports. Although perhaps an argument could be made that Brent Stratton was ineffective for not alleging these facts in the first post-conviction petition, we feel a stronger argument for clemency is that trial counsel should have introduced all of this evidence

May 17, 2007
Page 2

during the original trial. It is our position in the clemency petition that if all of this evidence had come to light during your initial trial, the outcome would have been different. Our focus will not be on Brent Stratton's performance as post-conviction counsel, because arguably anything that he should have done should have first been done by your trial counsel at trial.

As we discussed on the phone, if you wanted to proceed (either in the clemency petition or a habeas petition) and allege that Brent Stratton was ineffective, Jenner & Block would not be able to represent you in that matter. If you decide that you would like us to continue representing you and preparing your clemency petition, you will do so knowing that we will not be raising any claims of ineffectiveness by Brent Stratton. This is your decision to make, and we would like you to think about this and make sure you are comfortable with your decision.

During our phone call on Wednesday May 2, 2007 you told us that you wanted us to proceed and you understood that we would not be alleging that Brent Stratton was ineffective. We would like you to confirm this by letter after having time to think about it and weighing your options. In the meantime, we will continue collecting letters of support and drafting your clemency petition.

## Federal Habeas

You asked us whether we think you may have a viable federal habeas claim based on the innocence gateway established in *Schlup v. Delo*, 513 U.S. 298 (1995) and *House v. Bell*, 126 S.Ct. 2064 (U.S. 2006). It is our opinion that you probably do not.

The U.S. Supreme Court cases *Schlup v. Delo* and *House v. Bell* offer an addition way to get a habeas claim heard on its merits when it is otherwise barred procedurally. These cases require a petitioner asserting innocence as a gateway to defaulted claims to "establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House*, 126 S.Ct. at 2077; *Schlup*, 513 U.S. at 327. Under *House* and *Schlup*, a gateway claim requires "new reliable evidence - whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence that was not presented at trial." *House*, 126 S.Ct. at 2077 (citing *Schlup*, 513 U.S. at 324). The habeas court must consider "all of the evidence; old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House*, 126 S.Ct. at 2077 (citing *Schlup*, 513 U.S. at 327-28). A reviewing court is permitted to make credibility determinations. *House* noted that "*Schlup* set a demanding standard and permits review only in the 'extraordinary' case." *Id. House* and *Schlup* still require an underlying constitutional violation. Both *House* and *Schlup* were death penalty cases, so although that may have been an influencing factor, it does not appear that the innocence gateway is limited to death penalty cases; *House* stated the innocence exception in *Schlup* applies to "substantive offenses." *House*, 126 S.Ct. at 2075.

### Evidence in Schlup v. Delo

In *Schlup*, the new evidence was in the form of additional witness affidavits, including some from eyewitnesses stating Schlup was not involved in the crime. *Schlup* permitted this new

May 17, 2007
Page 3

evidence of actual innocence to serve as a gateway for a habeas petition alleging ineffectiveness of counsel for failure to interview alibi witnesses and a *Brady* violation by the State.

## Evidence in House v. Bell

In *House*, the new evidence was DNA testing which showed that it was not the defendant's semen on the victim's clothing. Additionally, the defendant produced expert testimony on the degradation of blood stains which tended to show that the victim's blood may have spilled on the defendant's jeans while the evidence was being transported. Further evidence showed that a blood sample from the victim was unaccounted for. The constitutional claim was ineffective assistance of trial counsel.

In your case, perhaps the composite description and the fact that none of the eyewitnesses at the line-up identified you could be considered new evidence for purposes of actual innocence because it was not presented at trial. The first hurdle, which *House* and *Schlup* are not clear on, is whether evidence may be considered "new" if it was previously before a court or litigated. In both *House* and *Schlup*, the new evidence surfaced after state proceedings were exhausted. In your case, evidence of the composite description and the eyewitnesses was known at the time of trial and was presented during the evidentiary hearing on the successor post-conviction petition, albeit in the context of a *Brady* violation. Even with this evidence, the court found Bonanno to be not credible and denied relief.

The second hurdle is whether this evidence would meet the high standard set by these cases. We would have to argue that it is more likely than not that no reasonable juror would have found you guilty beyond a reasonable doubt if they had known of the composite description and the lineup. If the court agreed with that, then as our constitutional violation for the substantive habeas claim, we would argue ineffective assistance of trial counsel. As these cases point out, this is an extremely demanding standard and review is permitted only in the most extraordinary cases. I am not sure the facts in your case meet this stringent showing, particularly in light of Judge Egan's ruling.

And lastly, if a petitioner does meet the stringent showing required for new reliable evidence, then he is entitled to an evidentiary hearing on the underlying constitutional violation. In your case, both an ineffective assistance of counsel claim and a *Brady* claim have already been litigated in state court, so it is doubtful that a federal court would rule any differently given that all of this evidence was already before the court during the successor post-conviction petition.

In sum, under the innocence gateway the court must first determine that the petitioner has established that, in light of new reliable evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. Only then will the court permit the constitutional claim to be heard. *Schlup* set a demanding standard for the "new reliable evidence" that is not likely met in your case. Further, it is likely that any evidence presented would not constitute "new" evidence because it was before a court during the successor post-conviction petition filed in 2004. Lastly, if the court did find that you presented new reliable evidence, then that only permits a federal court to hear your constitutional claim,

May 17, 2007
Page 4

which would likely fail since both ineffective assistance of counsel and *Brady* claims have already been litigated in state court.

There is no time limit on a *Schlup* gateway petition as long as there is "new evidence," so filing now could harm any chances of success in the future if some truly new evidence were found. Based on the above, it is still our opinion that a clemency petition is the better option at this point.

If you still want us to proceed with the clemency petition, even though we will not and cannot argue that Brent Stratton was ineffective, please sign one copy of this letter and return it to me. Please feel free to contact us if you have any questions or concerns. In the meantime we will continue preparing the clemency petition.

Sincerely,

Patricia Bronte

Patricia Bronte                                   Lathierial Boyd                          Date
                                  _____        _____

**JENNER&BLOCK**

February 23, 2007

Jenner & Block LLP    Chicago
One IBM Plaza      Dallas
Chicago, IL 60611-7603  New York
Tel 312 222-9350    Washington, DC
www.jenner.com

**VIA U.S. MAIL**

**LEGAL MAIL**

**PRIVILEGED AND CONFIDENTIAL
ATTORNEY-CLIENT COMMUNICATION**

Lathierial Boyd
IDOC #B10106
700 West Lincoln Street
P.O. Box 99
Pontiac, IL 61764

Patricia A. Bronte
Tel  312 923-8357
Fax  312 840-7757
pbronte@jenner.com

Re:   **Federal habeas and clemency**

Dear Lathierial:

Brian Scarbrough and I enjoyed speaking with you this morning. As we discussed, this letter addresses our opinion on taking your case to federal court through a petition for habeas corpus, and our recommendation that we prepare a new clemency petition in Illinois.

**Federal Habeas**

After reviewing the caselaw regarding federal habeas, it is our opinion that filing a petition for federal habeas is not warranted. Your only claim that likely was not already time barred back in the 1990s is the *Brady* claim raised in your successor post-conviction petition. A petition for federal habeas by a person in custody pursuant to a State court judgment is governed by a one-year statute of limitations. 28 U.S.C § 2244(d)(1). As relevant in your case, the limitations period runs from the latter of one year after either "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review" or "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C § 2244(d)(1)(A) and (D). This one-year statue of limitations is tolled during the time "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C § 2244(d)(2). In your case, direct review ended on March 24, 1993 (the date the Illinois Appellate Court affirmed the judgment against you ) or shortly thereafter when your time to petition the Illinois Supreme Court for leave to appeal expired. Due to the fact that the one-year statute of limitations was not added to the federal habeas statute until April 24, 1996, and that your first petition for post-conviction relief was properly filed and pending in Illinois court until June 27, 1996, the one-year statute of limitations did not begin running until at the earliest June 28, 1996, the day after the Illinois Supreme Court's mandate issued denying your petition for leave to appeal your first post-conviction petition. At that point you had one year to petition for

Lathierial Boyd
February 23, 2007
Page 2

federal habeas challenging the judgment. You did not do so, and you did not file another post-conviction petition until March 19, 1998, well over one year after June 28, 1996. Thus, for well over one year you had no properly filed application for State post-conviction or other collateral review pending in the Illinois courts, and your time for petitioning for federal habeas on any claim other than your *Brady* claim have likely expired.

Your time for petitioning for federal habeas on your *Brady* claim has not expired. This is because under 28 U.S.C § 2244(d)(1)(D), the one-year limitations period runs from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." In your successor post-conviction petition, Lawrence C. Marshall stated in an affidavit that in November 2001, he learned of Jennifer Bonanno's statements from WGN. Assuming that was "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence" (a court could possibly determine that an earlier date is warranted, such as the date WGN learned of Bonanno's statements), then you had one year from November 2001 to petition for federal habeas based on your *Brady* claim. This one-year period was tolled beginning on March 6, 2002 when you filed your successor post-conviction petition. Thus, approximately four months (depending on the exact date in November 2001) of the one-year federal habeas time period had lapsed. Your successor post-conviction petition ended on November 2, 2006, when the Illinois Supreme Court's mandate issued denying your petition for leave to appeal. At that point, your time to petition for federal habeas based on your *Brady* claim began to run again. You have until approximately the end of June or beginning of July 2007 to petition for federal habeas based on your *Brady* claim.

Despite there being time to petition for federal habeas on your *Brady* claim, it is our opinion that pursuing federal habeas is not warranted. We base this opinion on two factors. First, on federal habeas review, State court findings are preclusive unless they are contrary to or involved unreasonable application of clearly established federal law or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C § 2254(d). Further, State court factual determinations are presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C § 2254(e)(1). This is an extremely unfavorable standard of review. Second, because the Illinois circuit court found Jennifer to lack credibility, your sole challenge on federal habeas would be to State court credibility determinations. As your saw from the appeals process in Illinois, such determinations are virtually impossible to challenge. A recent United States Supreme Court decision confirm this.

In *Rice v. Collins*, 126 S. Ct. 969 (2006), the United States Supreme Court reversed the granting of a federal habeas petition challenging the credibility determinations made in a state trial court. The case dealt with a federal habeas petition regarding a peremptory strike used by the prosecution against a juror. The petitioner claimed that the peremptory strike was race-based. This necessarily involved making credibility determinations regarding the prosecutor's race-neutral explanation for the strike. The Court stated that in order to grant federal habeas, it must find the state trial court's credibility determination was unreasonable in light of the evidence presented. Thus, a habeas petition could only be granted if it was unreasonable to credit the

Lathierial Boyd
February 23, 2007
Page 3

prosecutor's race-neutral explanation for the peremptory strike. Moreover, the Court held that state court factual findings are presumed correct, and the petitioner has the burden of rebutting this presumption by clear and convincing evidence. Although all state courts and the federal district court had found to the contrary, the Ninth Circuit had found that the state trial court had made an unreasonable factual determination in accepting the prosecutor's race-neutral explanation for the peremptory strike. This depended entirely on the state trial court's credibility determinations. The Supreme Court reversed the Ninth Circuit and found that while the state trial court may have had reason to question the prosecutor's credibility, that did not compel the conclusion that the state trial court had no permissible alternative but to reject the prosecutor's race-neutral explanation. "Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supercede the trial court's credibility determination." *Id.* at 976; *see also Montgomery v. Uchtman*, 426 F.3d 905, 912-913 (7th Cir. 2005) (affirmed denial of a habeas challenge attacking credibility determinations made by a state court judge during a post-conviction evidentiary hearing; the state court judge had ruled that based on credibility determinations, certain statements the petitioner said existed simply did not exist.) I have enclosed with this letter a copy of each of these cases.

If you were to challenge the *Brady* claim on federal habeas, it would have to be on credibility grounds. Given the unfavorable standard of review and caselaw, we have reluctantly concluded that your petition would almost certainly be rejected. In addition to researching the applicable law, we consulted with other experienced lawyers at Jenner & Block and at the Center on Wrongful Convictions. Unfortunately, these lawyers all confirmed our conclusion. Thus, it is our opinion and recommendation that you not file a federal habeas petition.

**Clemency**

As you know, we filed a clemency petition on your behalf in November 2002. That petition was not granted, but we understand that the personnel of the Prisoner Review Board has changed since that time. We are not aware of any clemency petition granted by the governor, so we cannot encourage you to believe that the chances of success are high, or even modest. However, we believe that the petition would serve the purpose of making the record. The political and legal climate could change in the future, and having the petition on file could further your cause. In addition, we hope the petition will forcefully present your case, without legal jargon, so that the petition could be used to attract additional media attention to your innocence. When I spoke with Bill Ryan, he agreed that this proposed course of action was the best.

Thank you for providing the names of people who might submit letters supporting your clemency petition. We hope to have a draft of the petition around the middle of June. Because we would prefer the supporting letters to be dated close to the date of the actual petition, we probably will not contact your supporters until we are closer to having the petition ready to file. But in the meantime, if you think of other people who might write letters, please let us know and we will add those names to the list of people that we will contact.

Lathierial Boyd
February 23, 2007
Page 4

Finally, I want to discuss an issue that has arisen in the last few months. From time to time you have sent us packets of materials through legal mail channels, with a request that we forward those materials to others outside your legal team. We are not comfortable doing this, for two reasons. First, this could be seen as an abuse of the legal mail system which, if discovered, could prevent us from preserving the attorney-client privilege that should cover our communications with you. Second, some of the materials you asked us to forward are themselves privileged communications, and sharing them with third parties would destroy their confidential status. We cannot recommend that you waive the privilege in this way. Naturally, formal documents such as the final clemency petition and the briefs we have filed would not be considered privileged, and we would honor (and have honored) your reasonable request to forward these documents to others. I hope you will understand our position in this regard. I am returning to you the materials that we did not forward.

We look forwarding to sending you a draft of the clemency petition for your review and comments. Take care of yourself.

Best regards,

Patricia A. Bronte

Enclosures

cc:    Brian S. Scarbrough
       Hugh D. Brown