IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

M/HN

FILED
8-25-2008
AUG 25 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

LATHIERIAL BOYD #B10106 )
PETITIONER )
)
V. ) CASE # 08 C 4257
)
JOSEPH V. MATHY, WARDEN )
RESPONDENT )
)
)
ATTORNEY GENERAL OF THE ) CASE # OF STATE CONVICTION
STATE OF ILLINOIS ) 90 CR 8602

MOTION TO AMEND PETITION FOR HABEAS CORPUS

NOW COMES PETITIONER, LATHIERIAL BOYD, AND STATES THAT HE IS BEING HELD IN CUSTODY IN VIOLATION OF DUE PROCESS UNDER THE: (STATE/14TH AMENDMENT AND 6TH AMENDMENT), ACTUAL INNOCENCE, INEFFECTIVE ASSISTANCE OF COUNSEL, BRADY VIOLATION, FUNDAMENTAL FAIRNESS, MISCARRIAGE OF JUSTICE, PERJURED TESTIMONY, KEY EVIDENCE, RECORDS AND TESTIMONY IGNORED AND CREDIBILITY DETERMINATIONS CONTRARY TO THE LAW AND RECORDS. RULINGS CONTRARY TO U.S. SUPREME Ct. LAWS.

THE STATE COURTS DENIAL OF HIS CLAIMS THAT WERE CONTRARY TO OR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AS DEFINED BY THE U.S. SUPREME COURT. BASED ON UNREASONABLE

FACTS IN LIGHT OF THE EVIDENCE PRESENTED IN THE STATE COURTS PROCEEDINGS. (SEE) ATTACHED TO HABE BRIEF AND PLA EXHIBITS. AND HIS NEWLY DISCOVERD EXONERATING EVIDENCE/WITHELD EVIDENCE BY THE STATE, THE MERITS MAKE

PETITIONER STATES UNDER THE "UNREASONABLE APPLICATION" TEST, A FEDERAL HABEAS COURT MAY GRANT WRIT OF HABEAS CORPUS WITH RESPECT TO CLAIMS ADJUDICATED ON THE MERITS IN STATE COURT IF THE STATE COURT IDENTIFIES THE CORRECT GOVERNMENT LEGAL PRINCIPLE FROM SUPREME COURTS DECISIONS BUT UNREASONABLY APPLIES THAT PRINCIPLE TO THE FACTS OF THE PRISONER'S CASE 28 USCA § 2254(d)(1). APPLYING AN AMENDED VERSION OF § 2254(d)(1) ENACTED IN THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT OF 1996 (AEDPA). SUBSTANTIVE CLAIMS OF ACTUAL INNOCENCE SHOULD BE COGNIZABLE ON FEDERAL HABEAS. 38 UCHI. REV. AT 159-760, AND n. 87.

THE TRIAL JUDGE WAS TAINTED AND BIAS AGAINST PETITIONER AND WAS THE STATE; COULD NOT BE FAIR BECAUSE THEY ARE THE CRIMINAL JUSTICE SYSTEM. THUS WERE RACIST, NEFARIOUS, ARROGANT, CRUEL, IMPARTIAL - THE EVIDENCE IS IN THE ATTACHED RECORDS. I, LATHIERIAL BOYD, DECLARE UNDER THE PENALTY OF PERJURY THAT THE ABOVE AND INFORMATION IN THE PETITION IS TRUE.

RESPECTFULLY SUBMITTED,
BY: Lathierial Boyd #B10106
8-20-08　BOX 99 PONTIAC, IL 61764

A. <u>Ground One</u>: PETITIONER ALLEGES THAT HE IS BEING HELD IN CUSTODY IN VIOLATION DUE PROCESS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS BECAUSE THE STATE COURT'S DENIAL OF HIS CLAIM THAT HE WAS DENIED A FAIR AND IMPARTIAL JURY WHEN THE TRIAL JUDGE TAINTED THE JURY POOL BY WARNING POTENTIAL JURORS THAT IF THEY ADMITTED BIAS AGAINST THE CRIMINAL JUSTICE SYSTEM OR STATES THAT THEY COULD NOT BE FAIR, HE HAD THE POWER TO SEND THEM TO SERVE ON A JURY IN A MEDICAL MALPRACTICE CASE THAT COULD RUN SIX TO SEVEN WEEKS, WAS CONTRARY TO OR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AS DETERMINED BY THE UNITED STATES SUPREME COURT.

FN1: The red line applys and the blue line you apply the right of issue and the claim presented in the state court.

PETITIONER ONLY ASK THAT THIS MISCARRIAGE OF JUSTICE BE CORRECTED AND HE ORDERED SET FREE. FOR 18 ½ YEARS DESPITE THE CLEAR EVIDENCE WHICH A CHILD COULD SEE PROVING HE'S INNOCENT 100%, THE ILLINOIS COURTS HAVE DENIED HIM JUSTICE. PETITIONER'S SIXTH AND FOURTEENTH AMENDMENTS HAVE BEEN DELIBERATELY VIOLATED.

08CV4257

Dear Judge Gottleman:

I received notice to pay the $5.00 Federal Habe filing fee on 8-6-08. I sent a P96 request for Pontiac C.C. trust fund office to mail the clerk a check from my account the same night to not miss the deadline of 30 days.

I wrote them a week ago b/c they had not done so. They take their time — the delay is due to them (see their response). Please do not dismiss my Habe due to them. I will send you my 8-6-08 request receipt once they mail it like the enclosed for my proof.

\* Please read attached letters & stories.

Sincerely,
Lathrerial Boyd
B10106  8-20-08

DCA-15337   IL-426-11498   P-45



**Illinois
Department of
Corrections**

Rod R. Blagojevich
*Governor*

Roger E. Walker Jr.
Director

Pontiac Correctional Center / 700 W. Lincoln Street / P.O. Box 99 / Pontiac, IL 61764 / Telephone: (815) 842-2816 / TDD: (800) 526-0844

# MEMORANDUM

DATE: August 15, 2008

TO: Latherial Boyd, B10106

FROM: Trust Office

SUBJECT: Processing of Offender Authorizations for Payments (P-96)

---

In order for an Offender Authorization for Payment (P-96) to be processed it must have three signatures. The required signatures include the offender's, Asst. Warden/ Major/Designee, and a witness signature from a Lt. or above. **If any one of the signatures is not included on the P-96 then it is returned to the Cell house Major for signatures.** If after the three required signatures are obtained and the P-96 is for any type of publication (Books, Magazines, Literature, Pamphlets) or cassette tapes then the P-96 is sent to the Publication Review Committee/Personal Property for approval. The trust office does not have control of when a P-96 is approved and forwarded for processing. Please be advised the trust office processes P-96's in the order in which they are received. Please be advised a receipt will be sent once the request is received and processed. The trust office is not in receipt of a P-96 request for you.

RECEIVED
AUG 25 2008
JUDGE ROBERT W. GETTLEMAN
UNITED STATES DISTRICT COURT

ILLINOIS DEPARTMENT OF CORRECTIONS

### Offender Authorization for Payment

Posting Document # _____    Date 12-9-07

Offender Name __BOYD__    ID# __B10106__    Housing Unit __SPC 740__

Pay to _____

Address _____

City, State, Zip _____

The sum of _____ dollars and _____ cents charged to my trust fund account, for the purpose of __postage / letter__

[X] I hereby authorize payment of postage for the attached mail.   [ ] I hereby request information on electronic funds transfers to be placed in the attached mail.

Offender Signature __Katthicial Boyd__    ID# __B10106__

Witness Signature _____    525267 DEC. 10. 2007

[ ] Approved  [ ] Not Approved    Chief Administrative Officer Signature _____

Postage applied in the amount of _____ dollars and __41__ cents.

Distribution: Business Office, Offender    *Privileged*

DOC 0296 (Eff. 1/2006)
(Replaces DC 828)

*Printed on Recycled Paper*

ILLINOIS DEPARTMENT OF CORRECTIONS

## Offender Authorization for Payment

Posting Document # _____  Date __8-20-08__

Offender Name __BOYD__  ID# __B10106__  Housing Unit __SPC 750__

Pay to _____

    Address _____

    City, State, Zip _____

The sum of _____ dollars and __50__ cents charged to my trust fund 08CV4257
account, for the purpose of __3 Copies of 3 page Motion + 1 Copy of P96 Memorandum__ (10 Copies total)
for 4 actual

☐ I hereby authorize payment of postage for the attached mail. ☐ I hereby request information on electronic funds transfers to be placed in the attached mail.

Offender Signature __Nathunial Boyd__  ID# __B10106__

Witness Signature _____

☐ Approved ☐ Not Approved  Chief Administrative Officer Signature _____

Postage applied in the amount of _____ dollars and _____ cents.

Distribution: Business Office, Offender

DOC 0296 (Eff. 1/2006)
(Replaces DC 628)

Printed on Recycled Paper



TELEVISION CHICAGO

February 4, 2008

To Whom It May Concern:

We are writing in support of Lathierial Boyd's petition for executive clemency. In 2002, we researched and reported a series of special television news reports on what we believe is his wrongful conviction for murder. The introduction to our first story explains it best:

> Lathierial Boyd has spent every day of the last twelve years behind bars proclaiming his innocence. He's written thousands of letters, trying to get somebody to help him prove he's not a killer.
>
> We did an exhaustive review of police reports and court files. The more digging we did, the more questions we had, about the evidence -- or lack of evidence -- that landed Boyd behind bars.
>
> During the course of our investigation, we turned up an eyewitness who never testified in court. An eyewitness who says she told detectives -- twelve years ago -- they had the wrong man.

When we first contacted eyewitness Jennifer Bonnano and explained that we were looking into this murder, she immediately exclaimed "Don't tell me they convicted the preppy guy!" That moment is etched in our memories, and solidified our faith in Ms. Bonnano's testimony: that she told detectives, during a lineup, that they were after the wrong man. Ms. Bonnano has no reason to lie. In fact, she only invited scrutiny by speaking with us and later confirming her televised statements in a sworn affidavit.

We interviewed dozens of people connected to this case, from Florida to Hawaii. We even tracked down seven of the original nine eyewitnesses who viewed the police lineup. We found nothing to suggest that Lathierial was involved with this crime. Like prosecutors, we found no eyewitnesses placing him at the crime scene, no murder weapon, and no physical evidence. Our interviews confirmed Lathierial's story: that he was asleep at his sister's apartment, 22 miles away, at the time of this shooting.

We are not detectives, prosecutors or judges. But we are citizens of the State of Illinois, which prosecuted Mr. Boyd for crimes he allegedly committed against the community. After an exhaustive examination of the record and our own firsthand reporting, we firmly believe that this case represents a miscarriage of justice and appeal to you to set this man free.

Sincerely,

Muriel Clair
WGN-TV Reporter

Jason Jedlinski
Former WGN-TV Producer

*R. Eugene Pincham*
*Attorney at Law*
*Former Judge Circuit Court Cook County*
*Retired Justice Illinois Appellate Court*
*9316 South Michigan Avenue*
*Chicago, IL 60619*
*(773) 568-7927*
*(773) 568-7938 (fax)*

January 9, 2008

Dear Governor Blagojevich:

I have been familiar with Lathierial Boyd's case for some years now, which included a careful review of Judge Egan's Opinion denying post-conviction relief in early 2005. At that time, I felt it was blatantly obvious that Lathierial had a most viable and just ground for reversal of the original trial court's order. Recently, I reviewed Lathierial's petition for leave to appeal to the Illinois Supreme Court which was also denied. As a former Judge in Cook County and Justice of the Illinois Appellate Court, I truly believe that these were mistakes, and I am writing in the hope that Lathierial may finally be able to obtain the justice he deserves through the clemency process.

In the past few years, there have been a growing number of cases where Defendants have been released from long imprisonment terms, and even death row, based on innocence. In many cases, DNA technology has enabled Defendants to re-examine physical evidence and prove their innocence. In Lathierial's case, unfortunately, there never was any physical evidence. But that does not mean his conviction was just. I encourage you examine the evidence carefully in this case, because I truly believe that Lathierial was wrongfully convicted. You are the only one who can end his unjust imprisonment.

Most Sincerely,

*R. Eugene Pincham*

R. Eugene Pincham

1614289.1

# The Wrongful Conviction of Lathierial Boyd

By John Albert

Several shots were fired, perhaps four, possibly more, it was hard to be certain. They were fired quickly, close together and unexpectedly. The weapon was a nine-millimeter UZI semi-automatic. The police found the shell casings. Nineteen year-old Michael Fleming was shot. He lay stretched out on the sidewalk, dead. The body of his cohort, 22-year-old Ricky Warner lay beside him, unconscious. When Warner woke up later in the hospital he was paralyzed from the neck down. A bullet had struck him in the neck severing his spinal chord. Both boys were shot from behind. They had no warning. Fleming was dead instantly and Warner was unconscious before he hit the ground.

Five other young men were there that Fleming and Warner had been trying to sell drugs to. Three of them sustained minor injuries from bullet grazes and the other two were not injured. They gave statements to the police describing the shooter as a medium height dark-skinned Black man.

The shooting occurred at 2 a.m. on the morning of February 24, 1990 outside the Exodus, a reggae nightclub on Chicago's North Clark Street. It was early Saturday morning and nightclubs in the area had just closed, so there were many people on the well-lit street near the shooting. A number of witnesses who saw the shooter gave their descriptions to police. The police composite drawing of those descriptions is of a 5'10", 180 lbs., mid to late twenties, mustached, flat nosed, dark complexioned Black man.

[Include Graphic of features beyond composite drawing and Boyd.]

### Ricky Warner questioned by police two weeks after shooting

Two weeks after the shooting, police detectives interviewed Warner for the first time at the hospital on March 9. Although completely paralyzed and unable to move, Warner was mentally alert and articulate. Warner told the detectives he did not know who shot him and he did not see the shooter. However, he mentioned that he owed money to a man that he only knew by his nickname of "Rat." The detectives had no suspects and the only lead they had was the unknown "Rat."

When the detectives interviewed Warner's father Herbert, he told them a man had come to his house about a year or so earlier and tried to collect a $600 drug debt he claimed Ricky Warner owed. Ricky wasn't at home so two weeks later the man came back, trying again to collect. Herbert told the detectives he did not know who the man was, but he saw him leave in a car with a vanity plate with the name "Rat" on it. He never saw the man again.

The detectives checked around and learned that "Rat" was a nickname used by 24-year-old Lathierial Boyd.

When the detectives showed a photo array that included Boyd to Warner, he identified Boyd as "Rat." But, he changed his previous statement by claiming to recognize Boyd as the shooter. That should have raised a red flag because unlike the shooter's description from the eyewitnesses, Boyd was light complexioned (not dark); 230 pounds (not 180); 6'-2" (not 5'-10"); he did not have any facial hair (no moustache); and his nose was not flat.

### Witnesses don't identify Lathierial Boyd in line-up

After Boyd learned the police were looking for him, he voluntarily went to a police station. He agreed to participate in a live line-up. Nine eyewitnesses to the shooting viewed the line-up and none identified Boyd. A police report about the line-up even described Boyd as not matching the composite drawing of the shooter. Warner's father also viewed the line-up, and he selected Boyd as the person who came to his house to collect money owed by Warner.

Boyd did use the nickname, "Rat," but he never had a vanity plate on his car.

1

**Boyd's alibi was being asleep 20 miles from crime scene**

The eyewitnesses' exclusion of Boyd as the shooter is consistent with his alibi that at the time of the shooting he was 20 miles away asleep in his sister's south Chicago apartment. His sister Angela, her boyfriend Harold Casey, and Boyd were together in Angela's apartment from 8 p.m. Friday evening until 9 a.m. Saturday morning. As it happened Casey, a Cook County Deputy Sheriff for eleven years, awakened at 1:30 a.m. that morning. When he got up to use the bathroom he saw Boyd asleep in the other room.

For the car less Boyd to have committed the 2 a.m. shooting after being asleep at 1:30 a.m., he would have had 30 minutes to get dressed, leave the apartment unnoticed by the awake Casey, get outside and find some form of transportation to speedily travel 20 miles through Chicago to the exact location of the victims, find the victims in the large crowd, and get close enough to shoot them from behind. According to Yahoo.com Maps, it takes 43 minutes driving the speed limit to travel from the location of Angela's apartment to the crime scene. [1] So the idea that in 30-minutes he could have done everything necessary to have committed the crime stretches credulity. And of course, Boyd would then have had to return to the apartment without his sister and Casey knowing he had left – which would have been all but impossible because Angela's highly secure apartment building required a pass key to enter, and Boyd did not have a key to either enter the building or open her apartment door. So he could not have returned without his sister and Casey knowing it.

**Boyd charged and tried for shooting**

Relying on Warner's new statement identifying Boyd as the shooter, prosecutors charged him with Fleming's murder and Warner's attempted murder. For reasons unknown, Boyd's lawyer advised him to waive his right to a jury trial. His bench trial began in October 1990.

There was no physical or forensic evidence tying Boyd to the crime scene, and none of the more than a dozen witnesses to the shooting identified Boyd. So the prosecution's case rested solely on Warner's testimony:

Q. (By prosecutor) Do you know what Rat's real name is?
A. (by Warner) Boyd.
Q. Do you know what his first name is?
A. Lathierial, Lethoadus (sic).

Q. What happened about 2:00 o'clock in the morning on that day?
A. I was walking. We was walking on the same side. We was walking and I heard a gunshot and I turned around and he shot me.
Q. Who shot you?
A. Rat shot me. I know Rat. (S20, Examination of Ricky Warner, October 16, 1990, p. 167.)

Warner also testified that after Boyd shot him he saw him run across the street and jump into a car. He denied ever telling the police he did not see who shot him, however, the detective testified:
Q. Did you ask Ricky Warner who shot him?
A. Yes, I did.
Q. Did he answer?
A. Originally he answered he didn't know.

A nurse also testified (for the defense) that she was present when Warner told the detective he didn't see the shooter or know who shot him. She also testified he was "alert and oriented and understood what the police were asking him."

After the prosecution rested its case, Angela Boyd and Casey testified about Boyd's alibi of being at her apartment from the evening before, until the morning after the crime. However, Boyd's lawyer did not elicit Casey's testimony about waking up and seeing Lathierial at 1:30 a.m., even though he knew about it. Casey's testimony about that would have exposed the prosecution's theory of Boyd committing the crime as being implausible.

The prosecution had a weak case, and Boyd's attorney only needed to make four points clear to win Boyd's acquittal: He needed to show that Warner's identification of Boyd was not medically credible because Warner was shot from behind and rendered immediately unconscious; that Warner's identification contradicted the many unimpaired witnesses who did not identify Boyd in the line-up; that Boyd

2

did not fit the description of the shooter by witnesses at the scene; and that Boyd's alibi was reliable and compelling. Boyd's attorney had the evidence available to accomplish those proofs, but he failed to accomplish it. None of the nine eyewitnesses that excluded Boyd after viewing the line-up was brought forward to testify by Boyd's lawyer, and he did not introduce the evidence of the composite drawing of the shooter not matching Boyd.

### Boyd convicted and appeals denied

In spite of the poor defense showing, the judge said his decision could have gone either way. The tipping point for the judge in finding Boyd guilty was Warner's identification of Boyd that the judge considered reliable because Warner said he knew Boyd on sight. Boyd was sentenced to 82 years in prison – 55 years for Fleming's murder and 27 for Warner's attempted murder, with his earliest parole date in 2031 after completing 50% of his sentence, when he would be 65.

His trial lawyer handled Boyd's direct appeal. After his conviction and sentence were affirmed by the Illinois Court of Appeal in March 1993, Boyd filed a post-conviction petition *pro se* that was denied by the trial court. In June 1996 the Illinois Supreme Court denied review of the dismissal. Boyd filed a successive post-conviction petition *pro se* that was denied by the trial court, and in November 2000 the Illinois Supreme Court denied review of that dismissal.

### Chicago's WGN-TV investigates Boyd's case

In 2001 Chicago television station WGN-TV believed there were enough doubts about Boyd's case to warrant investigating it. Their reporters interviewed dozens of people, and they were able to find seven of the nine eyewitnesses who viewed the police line-up. Jennifer Bonanno was one of those witnesses. She was not subpoenaed to testify at Boyd's trial and she had lived away from Chicago for years and knew nothing about the trial. When the reporters told her they were investigating Boyd's case she exclaimed, "Don't tell me they convicted the preppy guy!" Bonanno had stood only three feet from the shooter, and in a February 28, 2002 affidavit she swore that fter she was finished viewing the line-up she asked a detective which one was the suspect. When told it was the man to the far-left, she told the detective there is "no way in the world" he was the man they were looking for because he looked "nothing like the shooter." When WGN broadcast its report on Boyd's case, his now retired trial judge said in an interview that he would want to hear Bonanno's testimony if he was still a judge and had the case.

Boyd's trial lawyer never questioned the murdered Fleming's brother James. WGN's reporters talked with him, and in April 2001 he executed an affidavit in which he states that about five months after the shooting Warner told him that he never saw who shot him. (Affidavit of James Fleming, April 16, 2001, ¶¶3-4.)

### Post-conviction petition filed based on new evidence

Boyd filed another post-conviction petition in 2002. It was based on the new evidence that the prosecution failed to disclose to Boyd's trial lawyer that, two weeks after the shooting eyewitness Bonanno had categorically excluded Boyd as the shooter. The police detective was aware of Bonano's statement exonerating Boyd, but the prosecution suppressed that information. After an evidentiary hearing Boyd's petition was denied in September 2004. In May 2006 the Illinois Court of Appeals affirmed the dismissal of Boyd's petition, and four months later the Illinois Supreme Court denied review of his case.

### Prime suspects not investigated by police

Once Boyd was arrested all investigation of the case stopped. So other suspects and motives for the crime were not investigated by the police or raised during Boyd's trial. On the day of Fleming's murder his girlfriend told the police that "he had a problem with three ⁽⁾ black guys to whom he had sold some fake cocaine, and that he had some altercation with some white guys for the same reason." pplementary Police Report dated February 24, 1990.) It is believed that Fleming and Warner were trying to sell fake drugs outside the Exodus Club when they were shot.

3

Yet the police did not pursue this solid lead. WGN's investigation team focused on a prime suspect who was never questioned by the police – Yuri "Cheesy" Smith. Smith was a well-known drug dealer and a leader in the "Solid Gold Posse," a violent Jamaican street gang that controlled the territory around the site of the shooting. Smith had warned Fleming and Warner to stay away, not just because they were violating his turf, but they were hurting his business by selling fake drugs. Smith bragged on the street about shooting Warner and Fleming, and it is known that his gang was in the area on the morning of the shooting because the owner of the Booga Lou Tavern on Clark Street told police that he "was chased by a group of Jamaicans at the time of the incident."

When Bonanno was shown a photograph of Smith she said that she could not say with 100% certainty that he was the shooter, but he definitely looked a lot like the shooter. This is significant because Smith and Boyd look nothing alike, and Smith's appearance fits the descriptions of the witnesses and the composite drawing.

However, Smith is now dead so he can never be questioned.

### Boyd files clemency petition

Boyd has been imprisoned for more than 18 years based on what can at best be described as Warner's unreliable identification. With his legal challenges to his conviction exhausted, on February 6, 2008 Boyd filed a petition for executive clemency with the Illinois Prisoner Review Board. The petition is based on the argument that the evidence supports the pardoning of Boyd based on his actual innocence of the Exodus shootings.

The clemency petition included many letters written by various people on Latherial Boyd's behalf. One of those letters was one by WGN-TV reporter Muriel Clair and former producer Jason Jedlinski. They wrote in their letter dated Feb. 4, 2008: "We are not detectives, prosecutors or judges. But we are citizens of the State of Illinois, which prosecuted Mr. Boyd for crimes he allegedly committed against the community. After an exhaustive examination of the record and our own firsthand reporting, we firmly believe that this case represents miscarriage of justice and appeal to you to set this man free."

As of mid-July 2008 the clemency petition is pending.

You can write to Lathierial Boyd at:
Lathierial Boyd #B-10106
Pontiac Correctional Center
P.O. Box 99
Pontiac, Il  61764


His outside contact is his attorney:
Nicholas A. Kurk
Jenner & Block LLP
His email is: NKurk@jenner.com


Endnote:
1 The shortest route is 19.41 miles between Angela Boyd's apartment at 4820 West Ford City Drive in Chicago, and the shooting scene at 3500 North Clark Street in Chicago, and it can be expected to take 43 minutes to travel between them driving the speed limit according to Yahoo.com Maps. (Last visited July 20, 2008.)


Include MAP of route from:
Angela Boyd's apartment – 4820 West Ford City Drive
Shooting at – 3500 North Clark Street.

4



At **FINAL JUSTICE, INC.**, it pays to make a difference. A man's true wealth is the good he does in the world.

# FINAL JUSTICE, INC. NFP

C/O Cadence Bank
301 E. Main Street
Starkville, MS 39759
Arnita Burnett, CEO
Phone: (662) 324-8258
arnitaburnett@yahoo.com

**FINAL JUSTICE, INC.** is a non-profit corporation dedicated to the release of wrongfully convicted men and women in U.S. prisons.

## Board of Directors

Arnita Burnett, B.A., CEO, President
Ryan Burnett, Ph.D., Vice President
Angela Boyd, Secretary
Irma Bailey, Treasurer
Virginia Lukas, M.S.



**Lathierial Boyd**
IDOC # B10106
100 % innocent, yet serving 82 years in prison.

*[handwritten margin note: You go to IDOC.com You'll see I'm ½ white/complexion.]*

Dear Judge Gettleman,

FINAL JUSTICE, INC., NFP is a non-profit corporation approved by the Secretary of State of Illinois. The Articles of Incorporation are registered with the Recorder of Deeds in the County of Champaign, Illinois. Our charitable organization is registered with the Attorney General, Division of Charitable Trust Act and Illinois Solicitation Act.

As you may be aware, hundreds of prisoners in the U.S. have spent decades behind bars for crimes they did not commit. DNA testing has played a major role in freeing more than 200 inmates who were sentenced to death (see enclosed materials). More than one hundred other prisoners have been exonerated, after having spent decades in prison for crimes they did not commit, through documented proof that they were elsewhere when the crimes they were accused of were committed, reliable alibis, or simple recantations from State's witnesses who initially lied under oath.

My loved one, Lathierial Boyd, has spent 18 years in prison for a crime he did not commit (see enclosed WGN news broadcasts; CD of these broadcasts available upon request). Cook County police, prosecutors, and judges knowingly and deliberately disregarded the laws they were sworn to uphold by ignoring key evidence, testimony, and court records that clearly prove he is innocent. Accepting perjurers' testimonies as fact is abuse of process, conspiracy, and reckless misconduct in an effort to secure and maintain an illegal conviction. They have breached their duties to safeguard defendant's civil and constitutional rights, an act of malice.

We ask for your financial donation for this charitable cause of freeing innocent men and women from U.S. prisons. There is no greater charitable cause than saving the lives of wrongfully convicted people and reuniting them with their loved ones. Your donation will provide DNA testing, private investigators, attorneys, and medical and forensic experts to work on the cases of innocent inmates. Your donation will also provide basic hygiene items for prisoners whose cases are being reviewed, aid for their families, including food, shelter, clothing, and help with educational expenses for their children, and operational necessities required to maintain a corporation. There are very few organizations that work to free innocent inmates, thus this corporation and funding are desperately needed in this country. Nationally renowned groups like the Innocence Project,

directed by Barry Sheck in New York, only focus on DNA cases. This leaves 99% of other innocent inmates who have no DNA evidence to rot in prison. FINAL JUSTICE, INC. NFP, will offer help to inmates whose cases involve a wide spectrum of evidence: Cases involving evidence has been withheld or hidden, newly discovered evidence, people who defended themselves in court, etc. will all be accepted.

Under current law, Police, Prosecutors, and Judges are immune from prosecution, even when they knowingly disregard the law that results in a wrongful conviction. They are, in fact, usually promoted. Decades later, a few such cases may be reviewed, resulting in the freeing of innocent prisoners, and we, the tax payers, must cover the cost of the millions of dollars that are paid to these victims in wrongful conviction suits. No charges can be filed against the corrupt State, County, and Government officials who were responsible for these deliberate wrongful convictions. No amount of money can restore the lives, hopes, dreams, and separations from loved ones that the innocent suffer.

This corruption will continue as long as we, the voters and taxpayers, allow it to happen. "Absolute Immunity" does not exist however, once these pretentious people break the law and violate the rights of U.S. citizens. The only way to prevent future wrongful convictions is through a landmark Federal Civil Suit forcing them to uphold the law or face fines and prison time. Your financial donations will help in amassing a team of attorneys to file these civil suits. Only then will these criminals finally be held accountable for their actions.

Thank you in advance for your financial support and compassion.

Sincerely,

*Anita Burnett*